UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
MARTIN JOHN STEVENS,

                                                                    Case No.:
                                    Plaintiff,

        -against-                                           **JURY TRIAL DEMANDED**


ALAN J. HANKE, IOLO GLOBAL LLC,
GUARANTEE INVESTMENT TRUST,
SHERRY SIMS, SIDNEY MILLS ROGERS III,
AMY ROY-HAEGER and JOHN DOES 1-100

                                    Defendants.
-------------------------------------------------------x


## COMPLAINT

Plaintiff Martin John Stevens ("Plaintiff"), by and through his undersigned counsel, as

and for his complaint against Alan J. Hanke ("Hanke"), IOLO Global LLC ("IOLO"), Guarantee

Investment Trust ("GIT"), Sherry Sims ("Sims"), Sidney Mills Rogers III ("Rogers"), Amy Roy-

Haeger ("Roy-Haeger") and any and all entities and persons acting with or on behalf of IOLO

and Hanke in connection with the wrongful conduct described herein (collectively,

"Defendants"), alleges as follows:

### NATURE OF THE ACTION

1.      This action concerns a blatant theft of Plaintiff's funds by Hanke, a grifter

masquerading as a legitimate financial advisor and program manager, and his corporate shell,

IOLO, including any entities owned and/or controlled or individuals acting with IOLO/Hanke,

including GIT, Sims, Rogers and Roy-Haeger. Plaintiff seeks to hold Defendants accountable for

1

their breaches of contracts, fraudulent inducement, fraud, breach of fiduciary duties, and violation of the Investment Advisers Act of 1940 (15 U.S.C. §§ 80b-1 et seq.), and conspiracy and aiding and abetting those same breaches, as a result of Defendants' attempt to steal millions of dollars from Plaintiff through a marketed investment program purportedly designed to generate significant returns on the money Plaintiff invested. Plaintiff seeks to restrain Hanke and his affiliates, agents, representatives, and corporate entities from continuing to defalcate Plaintiff's funds, and seeks injunctive relief to prevent any loss of Plaintiff's invested funds or any profits generated by them.

2. After spending months reviewing and relying upon materials and information provided by Hanke concerning his investment model and performance, both orally and in writing, Plaintiff entered into a Management and Deposit Agreement ("MDA") with another of Hanke's shell companies, BALA Trading LLC ("BALA"), dated December 14, 2018 (the "December 2018 MDA"). The December 2018 MDA, among other things, required BALA to invest Plaintiff's funds in a trading program managed and operated by BALA and Hanke. Hanke represented that he would manage the funds invested by Plaintiff for the purpose of generating trading profits. Hanke also expressly represented that he would manage the program through BALA, and that he had direct relationships with the traders who would be operating the trading platform.

3. In January 2019, prior to any funds being transferred, Plaintiff met with Hanke in New York City to discuss Plaintiff's anticipated investment with Hanke. During this meeting, Hanke made numerous false and misleading statements to induce Plaintiff to invest with Hanke, which would presumably allow Hanke to generate illicit profits for himself, and possibly others. After the meeting in New York, on April 18, 2019, presumably on instructions from Hanke, a

2

third-party consultant issued Plaintiff a new MDA which, among other changes to the December 2018 MDA, replaced BALA with another of Hanke's entities, IOLO.

4.      Reasonably relying on Hanke's false statements, many of which were made directly to Plaintiff in New York, on November 28, 2019 Plaintiff executed a new MDA that replaced BALA with IOLO as the contracting party (the "November 2019 MDA"). Based on the false promise that Hanke and IOLO, with the assistance of Defendants, would invest certain funds in trade programs, which would pay returns to Plaintiff on a periodic basis, Plaintiff transferred $1 million to IOLO/Hanke in December 2019. Although Plaintiff advanced funds as required under the November 2019 MDA, the only thing he received in return were empty excuses and lies.

5.      Section 5.1 of the November 2019 MDA requires that Hanke/IOLO, among other things, insure Plaintiff's entire deposit "by private deposit Surety ("Surety" or "Deposit Guarantee Surety"), issued by a syndication of Surety companies or Trust, and paid for by IOLO..." Accordingly, on November 27, 2019 the parties entered into an agreement titled "Financial Guarantee."

6.      The Financial Guarantee is among Defendant GIT, as Guarantor and, IOLO, as Principal, and "memorializes that the Guarantor (GIT) is held and firmly bound unto Martin John Stevens [Plaintiff] the "Obligee," in the amount of $1,000,000 One Million USD Dollars to which [GIT] unconditionally bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents." The Financial Guarantee further provides that upon IOLO's default, GIT shall "jointly and severally indemnify [Plaintiff] against all losses and liabilities including, but, not limited to default or failure of performance on the part of any party to the [MDA]." Defendant Sims executed the Financial Guarantee on behalf of GIT

3

as Trustee.

7.      The November 2019 MDA contemplated that Plaintiff would transfer $1 million to Hanke in an escrow account in exchange for a promise that, (50) international banking days following the release of Escrow, an initial minimum payment equivalent to $5,000,000 would be credited to Plaintiff for use in a subsequent transaction as agreed between the parties. To date, Plaintiff has not received this, or any other, credit and/or payment. Notwithstanding the failure to make the first required payment, Hanke attempted to conceal his scheme through a series of manipulations and artifices.

8.      In direct communication with Plaintiff, Hanke convinced Plaintiff to enter into a document titled "Addendum #1" to the November 2019 MDA, dated April 8, 2020. Plaintiff agreed to enter into Addendum #1 in reliance upon what Plaintiff thought were legitimate excuses for nonpayment, as expressed by Hanke. Addendum #1 changed Appendix A of the November 2019 MDA to (i) provide for Client (Plaintiff) Assets on deposit of $5.2 million rather than the $1 million contained in the November 2019 MDA; and (ii) added a clause titled "Payment Timing," which provides that "forty (40) international banking days following Moved Forward Date [April 6, 2020] a payment equivalent to eighty percent (80%) of Four Million One Hundred Sixty Thousand United States Dollars ($4,160,000.00) shall be credited [to Plaintiff]..." In short, according to Addendum #1, Hanke/IOLO were required to credit Plaintiff's account $4,160,000 million dollars on or about June 5, 2020 (40 international banking days after the Moved Forward Date of April 6, 2020). No credit ever came.

9.      As set forth in the November 2019 MDA, subsequent Addenda were contemplated to provide for additional periodic payments to Plaintiff every forty (40) international business days after the initial payment covered by Addendum #1. Hanke/IOLO

4

have failed to make any of these payments to Plaintiff. Instead, Hanke sought repeatedly to cover up his fraudulent scheme through a series of manipulations, false promises and lies. Hanke falsely promised that payments on the November 2019 MDA were imminent, and that the payment delays were due to circumstances beyond his control, among other excuses. Distributions on the November 2019 MDA never came, yet Hanke continued to claim falsely that Hanke/IOLO would make the required distributions.

10.    Plaintiff reasonably relied on Hanke's bogus excuses and explanations for the delays, which Plaintiff believed to be genuine. Hanke's fabrications, however, have now been exposed. Plaintiff entrusted $1 million to Hanke/IOLO and believed that they were in good faith performing as investment advisers exactly as they were contractually required - *i.e.*, investing Plaintiff's funds in the trading program to generate profits. Hanke/IOLO's representations from the outset were false and their subsequent representations were merely intended to further their fraudulent scheme, in breach of contract, and in breach of their fiduciary duties. Plaintiff seeks to recover $5.2 million, plus interest, the money he invested under the MDAs and the investment returns due to him, and to prevent Hanke/IOLO from absconding with his funds and any profits generated from trading on them.

11.    Each of GIT, Sims, Rogers and Roy-Haeger conspired with and aided and abetted in Hanke/IOLO's improper and fraudulent conduct. For his part, Rogers allowed his attorney IOLTA Trust account to present the appearance of authenticity and was a key player in the fraudulent investment ruse in that he assisted Hanke/IOLO in creating the fabricated appearance that Plaintiff's money was being deposited with and managed by genuine methods. Sims and GIT, for their part, issued fraudulent surety bonds, which were not collateralized by the assets claimed. Finally, Roy-Haeger impersonated bank personnel to deceive investors into

believing that Hanke/IOLO had invested their money, as promised, into the trading program. These Defendants are each equally liable for Hanke/IOLO's fraudulent conduct.

12.     Consistent with the MDA and the Financial Guarantee, Plaintiff long ago provided Defendants notice in writing of Hanke/IOLO's default, and demanded that Defendant GIT make Plaintiff payment of $1,000,000 under the binding, unequivocal provisions of the Financial Guarantee. GIT has acknowledged both its obligations under the Financial Guarantee and receipt of Plaintiff's notice of default but has nevertheless failed to make payment to Plaintiff. Plaintiff therefore seeks through this litigation to recover his investment of $1,000,000, plus interest, from Defendant GIT.

## THE PARTIES

13.     Plaintiff is a citizen of the United Kingdom, who at all relevant times resided in Algarve, Portugal.

14.     Defendant Hanke is an individual who is and at all relevant times, was the Managing Member of IOLO. Upon information and belief, Hanke resides in Crystal Lake, Illinois. Upon information and belief Hanke is the sole member of IOLO, IOLO functions as his alter ego and, to perpetrate his wrongdoings, Hanke created numerous entities with "IOLO" names.

15.     Defendant IOLO is a limited liability company existing under the laws of the state of Wyoming. Upon information and belief, IOLO's registered office is at 1712 Pioneer Avenue, Suite 500, Cheyenne, WY 82001.

16.     IOLO is a mere alter ego of Hanke. IOLO's telephone number, as set forth in the November 2019 MDA, is Hanke's personal cell phone number. The November 2019 MDA also reflects that IOLO does not have a separate company e-mail account, and instead uses Hanke's

6

SBC Global e-mail account for corporate e-mails and contract notices. Due to Hanke/IOLO's failure to make any of the required payments to Plaintiff, it is apparent that IOLO lacks adequate capitalization for its business purposes. Upon information and belief, IOLO has no assets distinct from Hanke's personal assets, and/or commingles whatever assets it has with Hanke's personal assets.

17.   Defendant GIT is a trust existing under the laws of the state of Georgia. Upon information and belief, GIT's registered office is at 2985 Gordy Parkway, Marietta GA 30066. Upon information and belief, Defendant Sims is the grantor and beneficiary of GIT, and the trust is managed by Defendant Sims.

18.   Defendant Sims is an individual who is, and at all relevant times was, the grantor and beneficiary of GIT, and the day-to-day manager of GIT. Sims resides in and is a citizen of Texas.

19.   In a deposition in unrelated cases, Patricia Moore, a non-party and a nominal trustee to another trust affiliated Defendant Sims (and involved in a related and nearly identical scheme perpetrated by Hanke), the SubGallagher Guarantee Investment Trust ("SGIT"), testified that Sims (i) manages SGIT despite being the grantor and beneficiary, (ii) instructs others (Moore herself) without any knowledge of the SGIT's assets and activities to sign documents, without reading them, on the SGIT's behalf, (iii) maintains the SGIT's seal, and (iv) is the only person with real knowledge of the SGIT's workings. Upon information and belief, Sims operates and wholly controls Defendant GIT in the same manner she does SGIT.

20.   Upon further information and belief, GIT's listed phone number is Sims' phone number, and GIT's listed e-mail addresses, GITAtlantaGeorgia@gmail.com and information@sfgit.com, are Sims' e-mail addresses. Indeed, Sims previously responded to an e-

mail sent by Plaintiff to the information@sfgit.com e-mail account, stating that an investigation had been opened on the bond, and promising that someone from GIT would contact Plaintiff within 15 days concerning Plaintiff's claim. Nobody contacted Plaintiff within that timeframe. Based on GIT's failure to perform under the Financial Guarantee, it is apparent that GIT is not sufficiently capitalized, and its Trustee, Sims, is signing agreements and bonds, including the Financial Guarantee, for amounts she is aware GIT cannot pay.

21.    Defendant Rogers is an individual who is and, at all relevant times was, an attorney and the escrow agent for the November 2019 MDA. Rogers resides in and is a citizen of Marietta, GA.

22.    Defendant Roy-Haeger is an individual who was held out (and continues to be held out) by Hanke/IOLO as a compliance officer for the trading programs into which Plaintiff's funds were purportedly invested. Upon information and belief, Roy-Haeger is not a compliance officer with any bank or any fund, as efforts by Plaintiff to reach her at the purported trading bank have uncovered that Roy-Haeger has no affiliation with the same. Though Roy-Haeger has claimed that she is now based out of Florida to care for her mother, she used to reside in and have an office in New York. Roy-Haeger now resides in and is a citizen of Florida.

23.    John Does 1-100 are entities owned and/or controlled by Hanke/IOLO, and such entities were used to perpetrate this fraudulent scheme.

**JURISDICTION AND VENUE**

24.    This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1332(a)(2), because Plaintiff is a citizen of a foreign state (United Kingdom), Defendants are all citizens of the United States, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

25.    This Court also has subject matter jurisdiction, pursuant to 28 U.S.C. §§ 1331

8

and 1367, because this case arises under the Investment Advisers Act of 1940 (15 U.S.C. §§ 80b-1 et seq.), a law of the United States, and the remaining claims arise out of the same case or controversy.

26.     This Court has personal jurisdiction over Hanke and IOLO pursuant to Federal Rule of Civil Procedure 4(k) and New York Civil Practice Laws & Rules Section 302(a)(1) because Hanke and IOLO transacted business in New York by traveling to New York to negotiate the November 2019 MDA and to discuss past performance of the trading program and expected future performance of the same concerning Plaintiff's investment. Hanke met with Plaintiff in New York and made false representations to Plaintiff in New York. Further, Hanke and IOLO purposely availed themselves of the advantage of using New York's reputation as the financial epicenter of the world as part of their scheme to entice investors into investing their money with Hanke and IOLO.  At or around the same time Hanke was meeting with Plaintiff at the New York offices of Four Points Capital Partners LLC with Mike Martino, Four Points Capital Partners' CEO, Hanke and IOLO also held meetings with other potential investors at Four Point Capitals' New York offices in order to likewise lure other investors to invest with Hanke and IOLO. As set forth above, Hanke and IOLO purposely availed themselves of the benefit of doing business in New York as part of their scheme to defraud investors into investing with Hanke and IOLO.

27.     This Court has personal jurisdiction over Hanke and IOLO pursuant to Federal Rule of Civil Procedure 4(k) and New York Civil Practice Laws & Rules Section 302(a)(1) because Hanke and IOLO committed tortious acts in New York, including making materially false statements to Plaintiff during a January 17, 2019 New York City meeting with Plaintiff to persuade Plaintiff to invest with Hanke and IOLO and to negotiate the terms of the MDA and

9

amendments thereto.

28.     This Court has personal jurisdiction over the remaining Defendants pursuant to Federal Rule of Civil Procedure 4(k) and Civil Practice Laws and Rules Section 302(a)(2) because each of the Defendants acted in concert with Hanke and IOLO to commit fraud and steal Plaintiff's investment funds. Defendants were aware that Hanke was acting in New York to lure Plaintiff, and other investors, into investing in Hanke's supposed trading programs, and that some of the effects of the fraud would be endured in New York. Hanke intended to benefit co-conspirator Defendants Rogers, GIT and Sims via direct monetary payments to them and, upon information and belief, planned to compensate co-conspirator Defendant Roy-Haeger through her active participating in the conspiracy. Hanke acted in New York on behalf of the other Defendants to obtain victims for their fraudulent scheme.

29.     Venue is proper, pursuant to 28 U.S.C. § 1391(a)(2), because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

## FACTUAL BACKGROUND

### I.     The MDAs

30.     On September 18, 2018, Plaintiff received a multiple-page document from a third-party consultant containing a detailed description of Hanke/BALA's (subsequently changed by Hanke to IOLO) trading program. The trading program was titled "Managed Leveraging Program, Program 100" (the "Trading Program") and the document described the Trading Program as, among other things, an ongoing and performing trading platform that was backed by a surety to protect the invested funds. Based on the representations made in this document, Plaintiff was interested in learning more about the investment opportunity with Hanke/BALA.

31.     Shortly after receiving the document summarizing the Trading Program, Plaintiff

was sent and received a Client Information Sheet containing numerous requests for information from Plaintiff. Plaintiff promptly completed and submitted the information requested in the Client Information Sheet, which included, among other information, copies of Plaintiff's passport, Bank Information, Capital Participation Amount, and Proof of Cash Funds (including bank statements verifying same).

32.    On October 5, 2018, Plaintiff, Defendant Hanke, and the third-party consultant participated in a conference call via SKYPE during which Hanke provided a detailed description of the program and its performance.  Hanke represented and promised, among other things, that he would provide:

(a) a transaction that would "meet the Client's needs";

(b) program funding that is and will continue to be structured to provide funds that will best meet Clients' requirements;

(c) investor protections in the form of "Private Deposit Insurance" for the original investment funds, which would be issued by a syndication of Insurance Companies, each rated "A" or better by AM Best, a rating agency that the SEC has designated a "Nationally Recognized Statistical Rating Organization" in the United States;

(d) regular distributions that would be "made to the client as specified in the MDA..."; and

(e) a performing program that Hanke would manage and supervise.

These representations were untrue and were intended to entice Plaintiff into investing with Hanke and IOLO.

33.    During the October 5, 2018 call, Plaintiff specifically stated that he would require an in-person meeting with Hanke, as Program Manager, prior to agreeing to invest Plaintiff's

11

hard-earned funds with Hanke/BALA. Hanke agreed to arrange such a meeting.

34.    Less than a week later, on October 10, 2018, Hanke sent Plaintiff a document concerning "Participation in Structured Private Financial Opportunity" that provided an executed Program Manager Information Sheet, attaching a copy of Hanke's passport.

35.    On October 13, 2018, Hanke provided another executed document, the accuracy of the information therein sworn to by Hanke under penalty of perjury, dated October 10, 2018 and titled "Client Fund Insurance Details." The Program Information sheet contained, among other things, the following representations:

(a) Alan John Hanke possessed 17 years of trading experience in Program Manager role;

(b) Mr. Sidney Mills Roger III, of Marietta, Georgia is Hanke's "Legal Advisor";

(c) HoganWillig, of Amherst, New York, is Hanke's "Attorney," with its escrow account established at Citizens Bank, N.A. in the name of "HoganWillig PLLC/IOLTA Attorney Trust Account"; and

(d) Client funds deposited into HoganWillig's Attorney Trust account (i) would be completely safe; (ii) would remain in the account until surety bond is in place; (iii) would be fully insured through Lloyds of London against loss/non-performance; and (iv) Hanke/BALA never have had legal proceedings brought against them.

36.    In an e-mail dated October 11, 2018, Plaintiff expressed to Hanke that he would be relying on Hanke's expertise because Plaintiff did "not regard [himself] as having a sophisticated knowledge of investment markets." Plaintiff also presented Hanke with a series of questions concerning Hanke/BALA and the information contained in the Program Manager's Information Sheet. In response to these questions, on October 13, 2018 Hanke provided Plaintiff with a document purporting to be BALA's Certificate of Good Standing in an effort to reassure

12

Plaintiff that his investment would be safe, and further stated that "we are proud of our reputation ... [and Hanke] look[s] forward to assisting Plaintiff with [his] financial goals."

37.     Because Plaintiff remained concerned about the issue of whether his initial $1 million investment would be secure in the HoganWillig Trust Account, Plaintiff requested and received from Hanke, attached to a November 28, 2018 e-mail, a letter from HoganWillig, dated November 27, 2018, stating, among other things, that "[i]f [an] escrow agreement is not timely and appropriately entered into by all parties, then the funds will be returned to [Plaintiff] ... unless otherwise directed by a legitimate and binding court order."

38.     Relying on the materials and information provided by Hanke concerning his investment model and performance, both orally and in writing,  Plaintiff entered into a Management and Deposit Agreement ("MDA") with Hanke/BALA, dated December 14, 2018 (the "December 2018 MDA"). The December 2018 MDA, among other things, required BALA to invest Plaintiff's funds in a trading program managed and operated by BALA and Hanke. Hanke represented that he would manage the funds invested by Plaintiff for the purpose of generating trading profits. Hanke also expressly represented that he would manage the program through BALA, and that he had direct relationships with the traders who would be operating the trading platform.

39.     On January 17, 2019, prior to any funds being transferred, Plaintiff met with Hanke at the New York City offices of Four Points Capital Partners, LLP, to discuss Plaintiff's anticipated investment with Hanke. During this meeting, Hanke made numerous false and misleading statements to induce Plaintiff to invest with Hanke, which would allow Hanke to generate illicit profits for himself, and possibly others. Those misstatements mirrored those set forth in paragraphs 22 and 25 above, but also included false statements concerning: (a) the

13

"multiple investment programs" Hanke/IOLO would utilize to meet Plaintiff's funding requirements; and (b) Bank of America's purported role as the trading/transactional bank.

40.     At about the same time as Plaintiff's January 17, 2019 New York City meeting with Hanke, along with Mike Martino, at the Four Point Capital Partners offices, Hanke was also meeting with other potential investors at that office with Mr. Martino.

41.     After the meeting in New York, on April 18, 2019, presumably on instructions from Hanke, a third-party consultant issued Plaintiff a new MDA which, among other changes to the December 2018 MDA, replaced BALA with another of Hanke's entities, IOLO.

42.     On or about May 13, 2019, Hanke notified Plaintiff that the Escrow Attorney would need to be changed from Hogan Willig to Sidney Mills Rogers III. Upon information and belief, Sidney Mills Rogers III participated with Hanke in perpetrating this and other frauds.

43.     In reliance on Hanke's false statements, many of which were made directly to Plaintiff in New York, on November 28, 2019, Plaintiff executed a new MDA, dated November 15, 2019, that replaced BALA with IOLO as the contracting party (the "November 2019 MDA").

44.     The November 2019 MDA contemplated that Plaintiff would transfer $1 million to Hanke in an escrow account in exchange for a promise that (50) international banking days following the release of Escrow, an initial minimum payment equivalent to $5,000,000 would be credited to Plaintiff for use in a subsequent transaction as agreed between the parties. To date, Plaintiff has not received this, or any other, credit and/or payment.

45.     The parties also agreed explicitly in the November 2019 MDA that IOLO and Hanke would be acting in the capacity of fiduciaries of Plaintiff. Moreover, because Hanke was actively investing and managing Plaintiff's money, Hanke also had fiduciary duties to Plaintiff as a result of the type of investing services he was providing.

14

46.    Based on the false promise that Hanke, through IOLO, would invest certain funds in trade programs, which would pay returns to Plaintiff on a periodic basis, Plaintiff transferred $1 million to IOLO/Hanke in December 2019. Although Plaintiff advanced funds as required under the November 2019 MDA, the only thing he received in return were empty excuses and lies.

47.    On December 3, 2019, Plaintiff complied with his obligation under the November 2019 MDA and returned the executed Escrow Account Agreement, which named Defendant Sidney Rogers Mills III as Escrow Agent, with numerous and commensurate duties and obligations to Plaintiff in connection with that role. The Escrow Account Agreement, and Rogers' inclusion therein, were intended and did create the fake appearance that Plaintiff's funds were secure and protected from improper use.

**II.    The Financial Guarantee**

48.    After executing the November 2019 MDA, Hanke provided to Plaintiff the notarized Financial Guarantee (Bond No 2019-010001AHIOLO#4), issued by Guarantee Investment Trust (GIT), which was executed by Defendant Sims, as Trustee, dated November 27, 2019. The Financial Guarantee was notarized by Donna Joanne Berry, Notary Public, State of Illinois, Commission Expiration date of June 5, 2023. Donna Joanna Berry was a relatively new notary in the State of Illinois at that time, having received her notary commission in May 2019. Berry has lived (and continues to live) with Hanke for an extended period of time and is apparently Hanke's wife or partner. Upon information and belief, Berry has assisted Hanke in perpetrating this and other fraudulent schemes.

49.    The Financial Guarantee is among Defendant GIT, as Guarantor and, IOLO, as Principal, and states that it "memorializes that the Guarantor (GIT) is held and firmly bound unto

15

Martin John Stevens [Plaintiff] the "Obligee," in the amount of $1,000,000 One Million USD Dollars to which [GIT] unconditionally bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents." The Financial Guarantee further provides that upon IOLO's default, GIT shall "jointly and severally indemnify [Plaintiff] against all losses and liabilities including, but, not limited to default or failure of performance on the part of any party to the [MDA]."

50.     The Financial Guarantee "declares" that it "is a cash and cash equivalent guarantee, is an operating, fully-confirmed instrument and is subject to the Uniform Customs and Practice for Documentary Credits, International Chamber of Commerce Publication No. 600." The term of the Bond is 365 days and requires prompt payment to the Plaintiff upon written notice to GIT of default by the Principal (IOLO). Although the Financial Guarantee requires that payment be made promptly, it further requires that "not later than one hundred eighty (180) days after GIT receives notice of any default … from [Plaintiff], [GIT] make payment to the [Plaintiff] under this Guarantee." Finally, the Financial Guarantee does not permit Defendant GIT to "demand of [Plaintiff] that the [Plaintiff] shall perform any thing or act, (b) give any notice, (c) furnish any clerical assistance, (d) render any service, (e) furnish any papers or documents, or (f) take any action of any nature or description which is not required of [Plaintiff] to be done" under the Financial Guarantee. The Financial Guarantee requires only that Plaintiff provide written notice of an event of default to GIT.

51.     The Financial Guarantee included a General Agreement of Indemnity ("GAI") between GIT, IOLO (through Hanke as Managing Member), and Plaintiff. The GAI defines "Event of Default" as, among other things, "[a]ny declaration of default by [Plaintiff] on any BOND, or any actual or alleged abandonment, forfeiture, or breach of, or failure, refusal or

16

inability to perform, any CONTRACT or obligation contained in a BOND, or the filing of any suit or commencement of any action or proceeding by … [Plaintiff] of an obligation against [IOLO]" or "[t]he actual or alleged failure to perform, or comply with, any of the terms, covenants, conditions or obligations in [the GAI], or of any BOND or obligation issued by [GIT] pursuant to [the GAI], including the failure to pay or discharge, when due, any indebtedness or other obligation of [IOLO] to [Plaintiff]…"

52.     Plaintiff provided GIT written notice of IOLO's default pursuant to an e-mail he sent to Defendant Sims, Trustee, on August 14, 2020. In that e-mail, Plaintiff demanded that GIT comply with its Financial Guarantee and make payment to him of $1,000,000 within 30 days, or no later than September 14, 2020. GIT failed to make Plaintiff the required payment by the September 14 deadline.

53.     On September 15, 2020, Defendant Sims told Plaintiff that she intended to speak with counsel for Hanke, IOLO's Managing Member, to confirm IOLO's default, and that GIT intended to make payment to Plaintiff promptly after that conversation.

54.     On September 16, 2020, Plaintiff's counsel sent a follow up letter to GIT through Sims, reminding Sims both of Plaintiff's written notice of IOLO's default on August 14, 2020 and Sims' promise of the previous day during her conversation with Plaintiff to have GIT make prompt payment to Plaintiff as a result of IOLO's default. GIT and Sims never responded to that letter and have defaulted and never made any payment to Plaintiff.

55.     GIT has not satisfied its obligations under the Financial Guarantee, has made no payment to Plaintiff, and has stopped responding to Plaintiff's e-mails and calls. Upon information and belief, GIT is not able to satisfy its obligations under the Financial Guarantee because it lacks sufficient (or has no) assets to comply with those obligations. But for the

collateral ensuring the GIT's creditworthiness and securing Plaintiff's investment, Plaintiff would not have invested with Hanke and IOLO. The collateral was therefore a critical part Hanke and IOLO's fraudulent scheme.

56. Plaintiff invested with Hanke and IOLO based on the false promises of Hanke, IOLO, GIT and Sims that the Financial Guarantee were backed by sufficient assets that would be available and accessible to protect Plaintiff if circumstances such as these arose. As is evident, those promises were false when made and were merely another component of the fraudulent scheme perpetrated by Defendants.

### III. The Addendum

57. Attempting to accommodate what he thought, at the time, were legitimate excuses, Plaintiff executed an amendment to the November 2019 MDA at Hanke/IOLO's request.

58. "Addendum #1," which was executed on April 8, 2020, changed Appendix A of the November 2019 MDA to (i) provide for Client (Plaintiff) Assets on deposit of $5.2 million rather than the $1 million contained in the November 2019 MDA; and (ii) added a clause titled "Payment Timing," which provides that "forty (40) international banking days following Moved Forward Date [April 6, 2020] a payment equivalent to eighty percent (80%) of Four Million One Hundred Sixty Thousand United States Dollars ($4,160,000.00) shall be credited [to Plaintiff]…" In short, according to Addendum #1, Hanke/IOLO were required to credit Plaintiff's account $4,160,000 million dollars on or about June 5, 2020 (40 international banking days after the Moved Forward Date of April 6, 2020).

59. Hanke/IOLO never credited or paid Plaintiff the $4,160,000 that was due under the Addendum #1, nor were further Addenda issued or additional payments received as

contemplated by the November 2019 MDA despite Hanke's representation to Plaintiff in a June 5, 2020 text message stating that Addendum #2 would be ready on June 4, 2020.

## IV.    Defendants' Lies to Plaintiff

60.    Plaintiff was defrauded by Hanke/IOLO into investing money with Hanke and, from the very beginning, Hanke has lied repeatedly to avoid making payments due to Plaintiff.

61.    On April 14, 2020, Plaintiff asked questions and made a number of requests of Hanke, including: (a) a schedule of approximate payment dates; (b) whether the 40 international banking days payment date set forth in Addendum #1 would apply to future payments for this investment; (c) banking coordinates for Plaintiff's sub-accounts from Hanke's attorney, Sidney Mills Rogers III; (d) statements of Plaintiff's sub-accounts from Sidney Mills Rogers III; and (e) assistance with estate succession planning. In response, Hanke suggested that he would introduce Plaintiff to Defendant Roy-Haeger, who Hanke claimed was in Hong Kong. Hanke never provided Plaintiff the requested payment schedule, sub-account banking coordinates or account statements.

62.    On June 3, 2020, Plaintiff texted Hanke requesting a call for the next day and stating Plaintiff's concern that he was due a payment in two days and had not yet received Addendum #2, as promised by Hanke. Hanke responded that he was unable to answer the phone as he was having a CT scan, but provided Plaintiff assurance that he "had already seen Plaintiff's docs … returned for one minor change … [and Plaintiff] should get [Addendum #2] in the morning." Hanke never provided Plaintiff Addendum #2 and, upon information and belief, Hanke never intended to make Plaintiff the $4,160,000 payment due pursuant to the November 2019 MDA and Addendum #1.

63.    On June 5, 2020, the day payment under Addendum #1 was due, Plaintiff texted

19

Hanke asking whether Defendant Rogers had received the payment, and whether Hanke could provide Plaintiff an update concerning the same. Because Hanke did not respond to Plaintiff's text, Plaintiff sent another text to Hanke on June 8, 2020 informing Hanke that he had not "heard anything from Mills by way of email or statement," and requesting a call for the next day. Hanke did not respond to this text.

64.     From June 5 through June 15, 2020, Plaintiff texted Hanke numerous times asking for an update regarding his investment and information concerning the payment due under Addendum #1. Hanke did not respond to any of Plaintiff's texts.

65.     On June 16, 2020, Hanke sent an e-mail to Plaintiff confirming that Hanke was aware that Plaintiff had spoken with Defendant Rogers, and that Rogers had stated that he had not yet received Plaintiff's $4,160,000 due under Addendum #1, which should have been deposited no later than June 5, 2020. Hanke claimed the deposit was "imminent" and was "tracking the progress and hope[d] to have solid update this evening..." No such update was ever received, and upon information and belief, Hanke knew that no funds were going to be deposited on Plaintiff's behalf – imminently or otherwise.

66.     After Defendant Rogers informed Plaintiff that Plaintiff should no longer contact him and refused to provide any information to Plaintiff concerning his investment, Plaintiff texted Hanke on June 20, 2020 to inform Hanke of this development. Hanke responded via text, stating that the "bank is writing a letter which I should have by the time I get to Chicago, I will forward as soon as I get it." Hanke never provided a letter from any bank to Plaintiff.

67.     In a text on that same day, Hanke also "reminded" Plaintiff that Defendants Rogers "has nothing to do with any of these transactions [and is] Paymaster only and has no additional information." Hanke made these statements concerning Rogers despite the fact that

20

Rogers served as the Escrow Agent under a binding Escrow Agreement with respect to Plaintiff's investment and, pursuant to the operative agreements, Plaintiff's distributions would be deposited in Rogers' escrow account when they were due to be paid.

68.    A few days later, on June 21, 2020, Plaintiff confirmed a call with Hanke of the previous day, and quoted Hanke's statement that "the delay [in the payment of $4,160,000] was not caused by the trading platform located in Hong Kong, which is performing as expected, but by the bank." Hanke also stated during that conversation that the trading platform bank was the China Development Bank ("CDB"), and that CDB was sending Hanke a letter "confirming the dates for the first and subsequent payments for [Plaintiff's investment], and [Hanke] would send [Plaintiff] a copy of this letter once received." Finally, Hanke stated that he would provide details for "Amy" (Defendant Roy-Haeger) for Plaintiff's succession planning. Hanke never provided Plaintiff the promised letter from CDB and, upon information and belief, CDB was not connected in any way with Plaintiff's investment or intended to issue such a letter to Hanke.

69.    Upon information and belief, in or around June 2020 Defendant Roy-Haeger was actively communicating with and misrepresenting material facts to other of Hanke's victims concerning the trading program and her role with respect to the same in an effort to further perpetuate Hanke's fraudulent scheme.

70.    Plaintiff requested a conference call in a text to Hanke on June 25, 2020 and again on June 26, 2020. Hanke did not respond to either of the texts on the days they were sent and did not participate in Plaintiff's requested conference calls.

71.    On June 27, 2020, Hanke forwarded to Plaintiff an e-mail sent to Hanke and Roy-Haeger from someone named Carl Brown with what is purported to be a "letter" – contained within the body of Brown's e-mail – from someone named "Craig Hubner." Hanke, who called

Hubner the "contract holder of our trade," provided no explanation when he forwarded Plaintiff Brown's e-mail as to why Hubner's purported "letter" was a seemingly cut and pasted into Brown's e-mail; nor did he explain who Brown was or why he was sending a purported letter from Hubner in such a strange fashion. Hanke stated in his covering e-mail to Plaintiff that the purported Hubner "letter" was "addressed to [Hanke] and Amy with the update on the funding for [Plaintiff's] and other clients trades." This e-mail is fraudulent. The e-mail sent by Brown containing Hubner's "letter" stated that (a) the delays were caused by "inaccessibility and unavailability of the limited staffing of the banks …caused by Covid 19…"; (b) the main office of Bank of China (Hong Kong) Limited has "already given approval for the receipt and clearance of these cash transfers, and within three (3) banking days … the outstanding amount will be sent to the trust account of the USA based attorney…" Upon information and belief, Covid 19 lockdowns did not cause the delay in the payment to Plaintiff and the Bank of China was not involved with Plaintiff's investment in any manner whatsoever.

72.     In an e-mail dated June 29, 2020, Plaintiff informed Hanke that the e-mail from Brown purportedly containing Hubner's "letter" lacked any credibility because it did not include letterhead, a job title, company, location or contact details for Hubner. The purported "letter" from Hubner was sent by Carl Brown, not Hubner. Hanke's response stated, among other things, that "Craig is the intake coordinator for China Development Fund ("CDF") which is owned by China Development Bank" and that "the funds are expected to [Defendant Rogers] this week." Upon information and belief, Hanke, Brown or someone else working in concert with Hanke to further Hanke's fraud wrote the purported Hubner "letter." Upon further information and belief, Hubner – if he exists – has no affiliation with the CDF or CDB.

73.     On June 30, 2020, Hanke sent an e-mail to Plaintiff responding to various

22

questions from Plaintiff. Hanke's e-mail represented that Carl Brown, Craig Hubner and Defendant Roy-Haeger all are employed by the CDB through the CDF as Intake Coordinators (Brown/Hubner) and Compliance Director (Roy-Haeger). Plaintiff called CDB on July 27, 2020 and CDB confirmed that contrary to Hanke's false statements, neither CDB nor CDF employs or has any relationship with individuals named Craig Hubner or Carl Brown.

74.     Hanke promised Plaintiff, via texts and e-mails on July 1, 2020 and July 2, 2020, that he would provide a "firm date" for Plaintiff's distribution. Hanke never provided any distribution date or made any distribution to Plaintiff.

75.     On July 14, 2020, Hanke e-mailed Plaintiff and stated that "I have now been informed that CDF has received the funding we were awaiting into their Hong Kong account...I am told that the funds will be released after sign off and clearance to [Defendant Rogers] within 72 hours." Upon information and belief, Hanke had no contact with CDF, CDF had no connection to these events, and no funds – from any source – were ever cleared to Rogers.

76.     On July 16, 2020, Hanke offered to return Plaintiff's initial investment within 10 days. Plaintiff, without terminating the November 2019 MDA or his right to distributions thereunder, accepted the return of his initial  $1 million investment under Clause 5.3: "In the event of non-performance by IOLO … Client, at its discretion, may choose to request the return of its original Assets and IOLO shall comply with this request." More than two months have now elapsed, and Plaintiff has received no money from IOLO.

77.     Based upon Hanke's representation that he knew and worked with CDB's CEO, Mr. Jyiang Shi, Plaintiff e-mailed Mr. Shi on August 14, 2020 and asked whether Mr. Shi or CDB knew of Hanke, Hubner, Brown and/or Defendant Roy-Haeger and whether Hanke has any ongoing business relationship with CDB and/or CDF.  On August 19, 2020, CDB confirmed that

23

it has no connection to the individuals mentioned above. Upon information and belief, Hanke has continued to lie to Plaintiff about virtually every aspect of Plaintiff's investment.

78.    Hanke's months-long campaign of lies and distortions must stop. It has become readily apparent that no funds are forthcoming, that Defendants have stolen Plaintiff's money, breached their fiduciary duties, committed fraud, and will not comply with their obligations to provide the contractually required payments.

## COUNT ONE - BREACH OF THE NOVEMBER 2019 MDA

### (Against Defendants Hanke and IOLO)

79.    Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

80.    Plaintiff and IOLO entered into the November 2019 MDA and Addendum #1 that required Hanke/IOLO to credit Plaintiff's account $4,160,000 million dollars on or about June 5, 2020 (40 international banking days after the Moved Forward Date of April 6, 2020).

81.    Plaintiff fulfilled all his obligations under the November 2019 MDA.

82.    IOLO breached Section 2.2 of the November 2019 MDA by failing to invest Plaintiff's funds into "one or more asset enhancement transactions."

83.    IOLO breached Section 5.3 of the November 2019 MDA, which provides, in pertinent part, that "[i]n the event of non-performance by IOLO … Client, at its discretion, may choose to request the return of its original Assets and IOLO shall comply with this request," by failing to comply with Plaintiff's demand for the return of his initial investment

84.    IOLO breached Section 7 of the November 2019 MDA by failing to undertake "commercially reasonable best efforts to satisfy the requirements of the funding and timing described [therein]," including the obligation to credit Plaintiff $4,160,000 by June 5, and to

make Plaintiff additional distributions pursuant to the November 2019 MDA.

85.    IOLO's only member, Hanke, is liable for breaches of the contract because, as set forth in paragraph 16, *supra*, IOLO is Hanke's alter ego and the corporate veil may be pierced due to Hanke's and IOLO's failure to adhere to corporate formalities.

86.    As a result of Hanke/IOLO's material breaches of the November 2019 MDA, Plaintiff has suffered damages in an amount to be determined at trial, but, in any event, no less than $5.2 million, plus interest.

## COUNT TWO - FRAUDULENT INDUCEMENT

### (Against All Defendants)

87.    Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

88.    As detailed above, Hanke, as managing member and agent of IOLO, knowingly made numerous misrepresentations of material fact to Plaintiff including (i) that Plaintiffs funds would be invested in a trading program, (ii) that the trade funds Plaintiff's money was allegedly invested in were profitable, that the investment would be fully insured by Lloyds of London, (iii) that the release of payment to Plaintiff was only being held up by staffing issues related to Covid 19 lockdowns, in addition to other phony assurances of payment and excuses for non-payment (iv) that the trading and auditing bank would be Bank of America; (v) telling Plaintiff on June 16, 2020 that Hanke confirmed that the funds would be disbursed imminently; (vi) telling Plaintiff on June 20, 2010 that the delay in payment was not caused by the trading platform located in Hong Kong, which is performing as expected, but by the bank; (vii) promising Plaintiff, via text and e-mail, that he would provide a "firm date" for Plaintiff's distribution, on July 1, 2020 and July 2, 2020 and (viii) lying to Plaintiff about the bank and the individuals

25

handling his investment at the same, including misrepresenting, among other things, those individual's employers, positions, and locations.

89.    Hanke's false representations and assurances were made with the intent to induce Plaintiff to enter into the November 2019 MDA and Addendum #1to provide IOLO and Hanke with money they never intended to return.

90.    Hanke's misrepresentations about the November 2019 MDA were material to Plaintiff as they concerned whether he would receive a return on the investment and whether the initial investment would be insured against loss -- a key factor in determining whether to invest money in these kinds of transactions.

91.    Hanke's misrepresentations about Addendum #1 were also material to Plaintiff as they concerned whether he would receive a return on the investment and whether the initial investment.

92.    Plaintiff justifiably relied on Hanke's false representations and assurances when he entered into the November 2019 MDA and Addendum #1.

93.    Had Plaintiff known that these representations and assurances were false, he would not have entered into the November 2019 MDA and Addendum #1 and would not have given IOLO and Hanke his money.

94.    IOLO and John Doe entities 1-100 are liable for Hanke's misrepresentations because he was their agent, sole member, and alter ego and because they participated in Hanke's fraud.

95.    Rogers, GIT, Sims and Roy-Haeger each participated in the fraudulent scheme and are liable for Hanke's fraud because they were part of a conspiracy to engage in fraud. Each of these Defendants was in actual and/or constructive agreement to commit fraud, and each took

intentional, overt acts to further the fraud. Rogers provided a useless escrow agreement to Plaintiff which he never intended to honor; Sims and GIT provided worthless security bonds; and Roy-Haeger impersonated a bank compliance officer as part of and to further Hanke's schemes.

96.     As a proximate result of Defendants' fraudulent conduct, Plaintiff has suffered and continues to suffer substantial damages in an amount to be determined at trial, but, in any event, no less than $1 million.

97.     Plaintiff is also entitled to an award of punitive damages given Defendants' egregious, knowing, and/or intentional behavior.

## COUNT THREE - FRAUD

### (Against All Defendants)

98.     Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

99.     As detailed above, Hanke, as managing member of IOLO, knowingly made numerous misrepresentations of material fact to Plaintiff, including:

    a. Telling Plaintiff in the Program Manager Information Sheet, dated October 10, 2018, that Plaintiffs' original investment amount would be insured through a reinsurance to Lloyds of London;

    b. Telling Plaintiff in a January 17, 2019 meeting that the trading and auditing bank would be Bank of America;

    c. Telling Plaintiff on June 16, 2020 that Hanke confirmed that the funds would be disbursed imminently;

    d. Telling Plaintiff on June 20, 2010 that the delay in payment was not caused by the trading platform located in Hong Kong, which is performing as expected, but

by the bank – none of which was true;

e. Blaming problems in Europe, Coronavirus, and religious festivals for non-payment;

f. Promising Plaintiff, via text and e-mail, that he would provide a "firm date" for Plaintiff's distribution, on July 1, 2020 and July 2, 2020. Hanke never provided any distribution date or made any distribution to Plaintiff;

g. Telling Plaintiff in an e-mail on July 14, 2020 that "I have now been informed that CDF has received the funding we were awaiting into their Hong Kong account…I am told that the funds will be released after sign off and clearance to Mills within 72 hours"; and

h. Lying to Plaintiff about the bank and the individuals handling his investment at the same, including misrepresenting, among other things, those individual's employers, positions, and locations.

100. Hanke intended to deceive Plaintiff by continually lying about the reasons for delays in providing funds and lying about whether the trades had created profits.

101. Hanke's misrepresentations were made with the intent of inducing Plaintiff to rely on the misrepresentations in agreeing to delay payments, to delay requesting his deposits back, and to delay calling the surety bond, among other actions.

102. Plaintiff reasonably relied on those material misrepresentations by, among other things, agreeing to sign the November 2019 MDA and Addendum #1, delaying payments, delaying calling the surety bond, and delaying requesting his deposits back under Section 5.3 of the November 2019 MDA.

103. Plaintiff would not have taken those actions but for Hanke's fraudulent

28

misrepresentations.

104.    IOLO and John Doe entities 1-100 are liable for Hanke's misrepresentation because he was their agent, sole member, and alter ego and they participated in his fraudulent scheme.

105.    Rogers, GIT, Sims and Roy-Haeger each participated in the fraudulent scheme and are liable for Hanke's fraud because they were part of a conspiracy to engage in fraud. Each of these Defendants was in actual and/or constructive agreement to commit fraud, and each took intentional, overt acts to further the fraud. Rogers provided a useless escrow agreement to Plaintiff which he never intended to honor; Sims and GIT provided a worthless security bond; and Roy-Haeger impersonated a bank compliance officer as part of and to further Hanke's schemes.

106.    As a proximate result of Defendants' fraudulent conduct, Plaintiff has suffered and continues to suffer substantial damages in an amount to be determined at trial, but, in any event no less than $5.2 million, plus interest.

107.    Plaintiff is also entitled to an award of punitive damages given Defendants' egregious, knowing, and/or intentional behavior.

## COUNT FOUR – AIDING AND ABETTING FRAUD

### (Against Rogers, GIT, Sims and Roy-Haeger)

108.    Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

109.    As alleged in Paragraphs 87-107, *supra*, an inherent fraud existed which was perpetrated by Hanke and IOLO acting in concert with the other Defendants.

110.    Defendants had actual knowledge of the fraud perpetrated by Hanke and IOLO.

29

Rogers provided a useless escrow agreement to Plaintiff which he never intended to honor, and then refused to provide Plaintiff with any information about the whereabouts of his investment, telling Plaintiff to have no further contact with him; GIT and its alter ego Sims, baited Plaintiff into a false sense of security by providing a worthless security bond and the Financial Guarantee without any of the promised collateral; and Roy-Haeger actually knew of the fraud because she actively impersonated a bank compliance officer as part of and to further Hanke's schemes.

111.    Defendants provided substantial assistance to Hanke and IOLO in perpetrating their fraudulent scheme. Rogers provided a seemingly legitimate front for the deposit – an IOLTA Trust Account – and refused to provide Plaintiff any information as to the whereabouts of his money. For their part, GIT and Sims procured a worthless and fraudulent security bond to fool investors, including Plaintiff, into thinking that their investments were secure, when in reality they were not. Roy-Haeger impersonated a bank and trading compliance officer to trick investors, including Plaintiff, into thinking there was an actual trading program and that payment would soon be issued.

112.    Defendants aiding and abetting of Hanke and IOLO's fraud has caused Plaintiff damages in an amount not less than $5.2 million, plus interest.

## COUNT FIVE – BREACH OF FIDUCIARY DUTIES

### (Against Defendants Hanke and IOLO)

113.    Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

114.    IOLO owed fiduciary duties under the common law, the November 2019 MDA (Section 2.1), and the Investment Advisers Act to Plaintiff by virtue of the November 2019 MDA, the fund management services that provided by IOLO to Plaintiff, and the trust and

confidence that Plaintiff placed in IOLO/Hanke.

115.    IOLO and Hanke breached their fiduciary duties to Plaintiff by misappropriating his funds for their own use, failing to invest his money as the November 2019 MDA contemplated, and by violating the duty of candor by failing to disclose that the alleged trades that IOLO and Hanke had invested Plaintiff's money in were not turning a profit and by lying about the reason for delays in making payments.

116.    Hanke is liable for IOLO's breaches because, as alleged in Paragraph 16, *supra*, IOLO is Hanke's alter ego and the corporate veil may be pierced due to Hanke and IOLO's failure to respect and adhere to corporate formalities.

117.    IOLO/Hanke's breaches of their fiduciary duties proximately caused Plaintiff harm in an amount to be determined at trial, but, in any event, no less than $5.2 million, plus interest. Plaintiff is entitled to (a) rescind the November 2019 MDA and recover all amounts paid to Hanke/IOLO under the November 2019 MDA and all costs incurred by Plaintiff (b) a preliminary injunction compelling Hanke/IOLO live up to their fiduciary duties to redress their breach of trust and candor to Plaintiff including a constructive trust directing Hanke/IOLO to deposit $5.2 million, plus interest, into an escrow account before these amounts are dissipated by Hanke/IOLO to pay other clients or to pay their debts unrelated to Plaintiff, and (c) in the alternative to recover all amounts paid to Defendants under the November 2019 MDA and all costs incurred by Plaintiff compelling Hanke/IOLO to live up to their fiduciary duties.

## COUNT SIX – AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

### (Against Defendant Hanke)

118.    Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

31

119.    As alleged in Paragraphs 113-117, *supra*, an underlying breach of fiduciary duties existed which was perpetrated by IOLO at the direction of Hanke.

120.    Hanke had actual knowledge of the breaches of fiduciary duties perpetrated by IOLO because he directed IOLO to engage in the activities which constituted a breach of fiduciary duties.

121.    Hanke provided substantial assistance to IOLO in carrying out its breaches of its fiduciary duties to Plaintiff. Hanke never caused or instructed IOLO to invest Plaintiff's funds into the Trading Program. Instead, Hanke took the money which IOLO was to use to uphold its fiduciary duties and converted that money for his own use.

122.    Hanke's aiding and abetting of IOLO's breaches of fiduciary duties has caused Plaintiff damages in an amount not less than $5.2 million, plus interest.

## COUNT SEVEN - VIOLATION OF THE INVESTMENT ADVISERS ACT

### (Against Defendants Hanke and IOLO)

123.    Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

124.    Pursuant to the November 2019 MDA, Hanke and IOLO served as investment advisers to and fund managers for Plaintiff. Plaintiff compensated IOLO and, through it, Hanke, for performing investment advisory and fund management services for Plaintiff.

125.    The November 2019 MDA stated that Plaintiff was an "accredited investor" within the meaning of the Securities Act of 1933. It also stated that IOLO had "specific experience in the areas of finance, funding, and investments," and that IOLO was making available "their various financial, insurance, and banking services" through the MDA, and that the sole purpose of IOLO and Plaintiff entering the MDA was for IOLO to provide "asset

32

management services." IOLO was advising Plaintiff as to the advisability of investing in trading programs to receive a return on investment, which meets the definition of an investment advisor.

126.    In the course of their engagement with Plaintiff, IOLO and Hanke engaged in fraudulent, deceitful, and manipulative conduct by keeping $5.2 million of Plaintiff's money to which they were not entitled under the November 2019 MDA or any other agreements, by failing to pay the minimum payout amounts required by the November 2019 MDA, and by telling blatant lies to excuse delays in making payments.

127.    The Defendants' fraudulent, deceitful, and manipulative conduct was in violation of Section 206 of the Investment Advisers Act (15 U.S.C. § 80b-6). By virtue of IOLO and Hanke's misconduct and their violation of the Investment Advisers Act, Plaintiff is entitled under Section 215 of the Investment Advisers Act (15 U.S.C. § 80b-15) to rescind the November 2019 MDA and recover all amounts paid to the Hanke/IOLO under the November 2019 MDA and all costs incurred by Plaintiff in compelling Hanke/IOLO to live up to the Act, together with a preliminary injunction in the form of a constructive trust directing that Hanke/IOLO deposit $5.2 million, plus interest, into an escrow account before these amounts are dissipated by Hanke/IOLO to pay their debts unrelated to Plaintiff or to pay other clients.

## COUNT EIGHT - BREACH OF THE FINANCIAL GUARANTEE

### (Against Defendants Sims and Guarantee Investment Trust)

128.    Plaintiff repeats and re-alleges the allegations in each of the preceding paragraphs as if fully set forth herein.

129.    Section 5.1 of the November 2019 MDA requires that Hanke/IOLO, among other things, insure Plaintiff's entire deposit "by private deposit Surety ("Surety" or "Deposit Guarantee Surety"), issued by a syndication of Surety companies or Trust, and paid for by

33

IOLO…"

130.    As alleged above, Plaintiff, IOLO and GIT entered into the Financial Guarantee (Bond No 2019-010001AHIOLO#4), which provided for, among other things, payment for the Bond amount ($1 million) if IOLO breached the November 2019 MDA.

131.    On November 27, 2019, the parties entered into an agreement titled "Financial Guarantee." The Financial Guarantee is among Defendant GIT, as Guarantor and, together with IOLO, as Principal, and provides, in pertinent part, that GIT "is held and firmly bound unto Martin John Stevens [Plaintiff] the "Obligee," in the amount of $1,000,000 One Million USD Dollars to which [GIT] unconditionally bind themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents."

132.    The Financial Guarantee further provides that upon IOLO's default, GIT shall "jointly and severally indemnify [Plaintiff] against all losses and liabilities including, but, not limited to default or failure of performance on the part of any party to the [MDA]."

133.    Plaintiff fulfilled all his obligations under the Financial Guarantee, including providing GIT written notice of IOLO's default pursuant to an e-mail he sent to S. Sims, Trustee, on August 14, 2020. In that e-mail, Plaintiff demanded that GIT comply with its Financial Guarantee and make payment to him of $1,000,000 within 30 days, or no later than September 14, 2020. GIT failed to make the required payment to Plaintiff by the September 14, 2020 deadline.

134.    On September 15, 2020, Defendant Sims told Plaintiff that she intended to speak with counsel for Hanke, IOLO's Managing Member, to confirm IOLO's default, and that GIT intended to make payment to Plaintiff promptly after that conversation. GIT never made any payment to Plaintiff.

34

135. GIT breached Section 2 of the Financial Guarantee by failing to pay Plaintiff $1 million promptly upon receipt of the notice of default.

136. GIT breached the Financial Guarantee by failing to "jointly and severally indemnify [Plaintiff] against all losses and liabilities including, but not limited to default or failure of performance on the part of any party to the [MDA]."

137. Defendant Sims is liable for GIT's breached of the Financial Guarantee because, as alleged in paragraphs 19 and 20, *supra*, GIT is Sims' alter ego and she does not respect or adhere to the formalities of the trust.

138. As a result of GIT's material breaches of the Financial Guarantee, Plaintiff has suffered damages in an amount to be determined at trial, but, in any event, no less than $1 million, plus interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court grant the following relief:

1.  Judgment in favor of Plaintiff on all his claims;

2.  An award of all compensatory and consequential damages suffered by Plaintiff resulting from IOLO and Hanke's wrongful conduct, and the remaining Defendants participation in and aiding and abetting of, that conduct;

3.  An award of compensatory and consequential damages suffered by Plaintiff from GIT and Sims' breach of the Financial Guarantee and the Bond;

4.  An award of punitive damages for IOLO and Hanke's egregious, knowing, and/or intentional fraudulent behavior, and the remaining Defendants participation in and aiding and abetting of, that conduct;

5.  Disgorgement of any profits earned from Defendants' use of Plaintiff's funds;

6.  A preliminary injunction (a) compelling Hanke/IOLO to live up to their fiduciary duties and their duties under the Investment Advisers Act and to redress their breach of trust to the Funds, including a constructive trust directing Defendants to deposit $5.2 million, plus interest, into an escrow account before these amounts are dissipated by Defendants to pay their debts unrelated to Plaintiff or to pay other clients, which will be effective during the pendency of this action, and (b) restraining and enjoining Hanke/IOLO , or any third party affiliated or associated with Defendants, from selling, transferring, assigning, encumbering, or taking any other action with respect to the funds placed into escrow, or any assets, investment returns or profits generated from the use of Plaintiff's investment funds;

7.  An award of all attorneys' fees, costs, and expenses incurred by Plaintiff in connection

with this action; and

8.  Such additional relief as the Court deems fair and just.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable in this action.

Dated: October 1, 2020                              Respectfully Submitted,

                                        By:     /s/ David D. Holahan
                                                Stan Chelney
                                                David D. Holahan
                                                Chelney Law Group PLLC
                                                28 Liberty Street, 6th Floor
                                                New York, NY 10005
                                                Telephone: (212) 653-0022
                                                Facsimile: (212) 653-0020