# Exhibit 6

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF NEW YORK
 3
 4     MOHAMMED THANI A.T. AL THANI*
                                   *
 5     VS.                         *  NO. 20-CV-4765
                                   *  (JMP)
 6     ALAN J. HANKE, ET AL        *
 7
 8
 9            --------------------------
              REMOTE ORAL DEPOSITION OF
10                    SHERRY SIMS
                   AUGUST 25, 2022
11            --------------------------
12
13
14
15          ORAL DEPOSITION OF SHERRY SIMS, produced
16     as a witness at the instance of the Plaintiff,
17     and duly sworn, was taken in the above-styled
18     and numbered cause on the 25th day of August,
19     2022, from 10:19 a.m. to 2:45 p.m. CST, before
20     Gail Spurgeon, Certified Court Reporter in and
21     for the State of Texas, reported by machine
22     shorthand remotely, with the witness being
23     located in Dallas, Texas, pursuant to the
24     Federal Rules of Civil Procedure, and the
25     provisions stated on the record.
```

Page 2

```
1        A P P E A R A N C E S
2
3    MR. MICHAEL HEFTER
     MR. PETER BAUTZ
        Hogan Lovells
4     390 Madison Avenue
      New York NY 10017
5     michael.hefter@hoganlovells.com
      peter.bautz@hoganlovells.com
6        APPEARING FOR THE PLAINTIFF
7
8    MR. PHILIPP SMAYLOVSKY
        Chelney Law Group
        28 Liberty Street
9     6th Floor
      New York NY 10005
10    philipp@chelneylaw.com
         APPEARING FOR MARTIN STEPHENS
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1           INDEX
2                      PAGE
3  Appearances.................................. 2
4  Changes and Signature...................... 131
5  Reporter's Certificate...................... 133
6
7  SHERRY SIMS
8    EXAMINATION BY MR. HEFTER............... 4
9
10          EXHIBITS
11 EXHIBITS    DESCRIPTION          PAGE
12
13 Exhibit 1  3/25/19 Email................... 39
14
15 Exhibit 2  Metro States Capital Bank Screen Shots ..... 47
16
17 Exhibit 3  Cash Photo................... 63
18
19 Exhibit 4  Business Phone Text Messages............ 64
20
21 Exhibit 5  Personal Phone Text Messages............ 96
22
23 Exhibit 6  7/29/20 Email................... 123
24
25
```

Page 4

```
1           SHERRY SIMS,
2  having been first duly sworn, testified as
3  follows:
4           EXAMINATION
5  BY MR. HEFTER:
6     Q.  Ms. Sims, hi.  I'll introduce myself
7  again.  I'm Michael Hefter.  I'm here on behalf
8  of Mr. Mohammed Al Thani, and my colleague Peter
9  Bautz is on the video as well.  We would also
10 let you know that Mr. Philipp Smaylovsky, who is
11 counsel to Martin Stephens, is also on the phone
12 and may have some questions for you after I am
13 through.
14      Do you understand, Ms. Sims, that
15 you're under oath today?
16    A.  Yes.
17    Q.  And you understand that this
18 deposition -- that you're providing deposition
19 testimony as if you were sitting in a courtroom?
20    A.  Yes.
21    Q.  Do you understand that?
22    A.  Yes.
23    Q.  I understand that you've been deposed
24 before, but before we get into the history of
25 your testimony, I want to point out some
```

Page 5

```
1  instructions, which I gave to you the last time,
2  but I want to repeat those.
3       You are not being represented here
4  today by a lawyer; is that correct?
5     A.  Correct.
6     Q.  And in connection with the case that
7  my client and Mr. Stephens has filed, at this
8  point in time, you have decided to proceed
9  pro se?
10    A.  Correct.
11    Q.  So in connection with this
12 deposition, I'll be asking you questions.  To
13 the extent that you do not understand my
14 question, please let me know and I'll try to
15 rephrase it to the best of my ability.  If you
16 feel that a question that I'm asking you is
17 objectionable, as your own counsel, you're
18 entitled to state an objection on the record.
19 I'll try not to ask objectionable questions for
20 the purposes of this deposition.
21      If at any point in time you need a
22 break for any reason, you want to get a cup of
23 coffee, water, or you need to use the rest room,
24 please let me know and we can certainly
25 accommodate you.
```

2 (Pages 2 - 5)

Page 6

1    Do you understand those instructions?
2    A.  Yes.
3    Q.  And I would add that, as you may be
4  aware, since you've been deposed before, that
5  it's important that I finish my question, and
6  then I'll let you finish your answer, so the
7  court reporter can have a clean record and we're
8  not talking over each other.  At least, I think,
9  both of us should strive to achieve that goal.
10  Do you understand that?
11    A.  Yes.
12    Q.  Let's start, Ms. Sims, with your
13  educational background.  Is it -- is my
14  understanding correct that your highest level of
15  education is high school?
16    A.  Correct.
17    Q.  And what year did you graduate from
18  high school?
19    A.  1986.
20    Q.  And after high school, what did you
21  do?
22    A.  I was working.
23    Q.  And what were you doing in connection
24  with work?
25    A.  I had three jobs when I graduated

Page 7

1  high school.
2    Q.  So just generally, as you are aware,
3  the primary focus of this deposition will be in
4  connection with the activities of yourself and
5  SGIT and GIT.  So, in a general sense, can you
6  just give me your work background from the time
7  you graduated from high school until you started
8  in business with SGIT?
9    A.  I worked in a glass company.  I
10  worked at Schwan's, sales.  I worked in the --
11  as a headhunter, and then I worked in the
12  telecom communication, and then I did real
13  estate.
14    Q.  Would it be fair to say that, prior
15  to SGIT, that real estate was your primary focus
16  to that point in time?
17    A.  Correct.
18    Q.  And what in connection with real
19  estate were you working?
20    A.  I developed some property that I had.
21    Q.  Were you the owner of those
22  properties?
23    A.  Correct.  I do not have a real estate
24  license.  Never had one.  In the state of Texas,
25  you can buy and sell your own property without a

Page 8

1  real estate license.
2    Q.  Fair enough.  Were those properties
3  commercial or residential?
4    A.  Farmland.
5    Q.  Pardon?
6    A.  Farmland.
7    Q.  Oh, farmland, okay.
8    Do you still own any of those
9  properties?
10    A.  No.
11    Q.  Describe for me the business of SGIT.
12    A.  SGIT was formed to be a private
13  surety.
14    Q.  And do you know when it was formed?
15    A.  The end of 2013, beginning of 2014.
16    Q.  And what was your role in connection
17  with establishing SGIT?
18    A.  I was -- I don't know the answer to
19  that.  Can you ask it more specific?
20    Q.  Sure, I can try.
21    So, SGIT is an acronym for
22  SubGallagher Investment Trust; is that correct?
23    A.  Correct.
24    Q.  And that is a trust that's formed
25  under the laws of Wyoming?

Page 9

1    A.  Correct.
2    Q.  And who formed the entity that became
3  SubGallagher Investment Trust?
4    A.  I don't recall.
5    Q.  Did you form the entity?
6    A.  Are you asking who made the trust?
7    Q.  Correct, yeah.
8    A.  William Slater Vincent wrote the
9  trust.
10    Q.  And what role did you play in the
11  trust?
12    A.  Basically administrative.  There
13  wasn't an office.  Office manager.  I mean,
14  whatever I was told to do.
15    Q.  Told by whom?
16    A.  Larry Wright.
17    Q.  And who is Larry Wright?
18    A.  He is the person that had 25-plus
19  years in surety.  I never even knew -- I never
20  heard the word "surety" before meeting Larry
21  Wright.  And he came to myself and my attorney
22  and talked to us in regards to putting a surety
23  together and being a surety, and he directed
24  everything to be made.
25    Q.  And when you say came to your

3 (Pages 6 - 9)

Page 10

1    attorney, is that Michael Casey?
2        A.  Yes, sir.
3        Q.  Between 2014 and 2020, was Mr. Wright
4    involved in the business of SGIT throughout that
5    time period?
6        A.  He was involved through the middle of
7    2018.
8        Q.  And what happened in 2018 that caused
9    Mr. Wright not to be involved in the SGIT?
10       A.  Well, it wasn't in 2000 -- well, it
11   started in 2017, the end of 2017, when he had
12   called and told me I had to go to deposition in
13   West Virginia.
14       Q.  And you testified that Mr. Wright, at
15   some point in time, no longer was involved in
16   the business of SGIT?
17       A.  Correct.
18       Q.  And that was sometime either at the
19   end of 2017 or early 2018?
20       A.  Correct.
21       Q.  And at that point in time, what was
22   the reason for Mr. Wright to no longer be
23   involved in the business of SGIT?
24       A.  Theft.
25       Q.  Is it your testimony that Mr. Wright

Page 11

1    had stolen money from SGIT and therefore he was
2    no longer involved for that reason?
3        A.  He was not following through with
4    what he had said he was doing and under contract
5    to do.
6        Q.  Was there a contract between
7    Mr. Wright and SGIT?
8        A.  Yes.
9        Q.  And was Mr. Wright terminated based
10   on his conduct?
11       A.  There was never a formal termination.
12   Just when I was deposed and found out what he
13   had done and did my research and everything, I
14   just never communicated again.
15       Q.  And as of that point in time,
16   Mr. Wright was no longer in the business?
17       A.  He was in the business.  He just
18   wasn't in the business with -- with SGIT
19   anymore.  He has continued --
20       Q.  Okay.
21       A.  He has continued to do the business.
22       Q.  When you say, "He has continued to do
23   the business," what does that mean?
24       A.  He has gone on to his next victim.
25       Q.  Okay.  And so, after 2018, the

Page 12

1    business of SGIT continued, correct?
2        A.  It did.
3        Q.  And who are the businesspeople who
4    ran the business of SGIT after Mr. Wright's
5    departure?
6        A.  Basically, Mr. Wright is the one that
7    had all the knowledge of surety, and so
8    everything just moved forward as is, what we
9    were understood through the agents that came to
10   SGIT, because there was never any solicitation
11   of business for SGIT, there was never anything
12   like that.  It was all based on relationships
13   that were formed from before.  So there was --
14   everything stayed basically the same, just the
15   piece of Larry being gone was removed.  So he --
16       Q.  And is it fair to say -- I'm sorry.
17       A.  So he no longer collected the funds
18   because how he had everything ran, the agents
19   would -- had the clients.  The client -- the
20   agents would send the funds through to Larry.
21   Larry would take his portion and then send the
22   rest into SubGallagher.  So that piece was just
23   removed.
24       Q.  And subsequent to Mr. Wright's
25   departure, agents continued to provide business

Page 13

1    and that process would remain the same?
2        A.  Correct.  They actually -- I was --
3    told that -- you know, we had a
4    conversation and everything because we were not
5    -- Mike and I had no knowledge of surety, never
6    been in surety, never did surety.  And they came
7    to us and said, you know, we are the ones that's
8    supposed to do it.  We are the ones that vet it
9    and check it and take care of everything so
10   there's nothing to be any different.  It'll just
11   come from us instead of through Larry.
12       Q.  And when you say it would come
13   through you, that was through you and Mr. Casey?
14       A.  No, it would come through the agents.
15       Q.  And you continued to operate SGIT
16   consistent with its past business practices at
17   the time?
18       A.  Yeah.  Using the agents, yes.
19       Q.  Other than yourself, was there any
20   other businessperson involved in using the
21   agents to collect money on behalf of SGIT?
22       A.  No one in the company collected
23   money.  The money went in to Mike Casey's IOLTA
24   account.
25       Q.  Fair enough.  I guess my question:

4 (Pages 10 - 13)

Page 14

1  Was there any other businessperson, other than
2  yourself, who was conducting the business of
3  SGIT at the time after the time that Mr. Wright
4  left the business?
5      A.  There was only the four people in all
6  of SGIT from the start.
7      Q.  Who were those people?
8      A.  Larry Wright; Michael Casey; myself;
9  and Pat Moore, the trustee.
10     Q.  Okay.  Where was the offices of the
11 SGIT located?
12     A.  There were no offices.  It wasn't a
13 brick-and-mortar type business.
14     Q.  Where were the operations of SGIT
15 handled?
16     A.  I guess on the computer.  I mean, the
17 agents, they all had their offices.  I mean,
18 these are agents that had been in business for
19 many, many years, in this specific business.
20     Q.  Where did you conduct SGIT's
21 business?
22     A.  It would depend on where I was when
23 something happened that needed to be done.
24     Q.  And you worked based on a laptop
25 computer?

Page 15

1      A.  Most of the time that laptop or my
2  iPad or my phone.
3      Q.  Is it your testimony that SGIT did
4  not have any formal office?
5      A.  Yes, they had no formal office.
6      Q.  Did it have a business address that
7  was registered with the State of Texas or any
8  other state?
9      A.  I'm not sure.  I -- I don't know.
10     Q.  Did it have a post office box or
11 anything to receive --
12     A.  Yes.  Yes.
13     Q.  -- mail?
14         Where was that post office box?
15     A.  It was PO Box 1830 in Midlothian,
16 Texas 75 -- 76065.
17     Q.  Was that the only place that it
18 received mail, as far as you know?
19     A.  Correct.
20     Q.  And would it be fair to say that
21 Mr. Casey conducted whatever business he was
22 doing from his law offices?
23     A.  He worked from his -- he didn't have
24 a brick-and-mortar building.  He had an office
25 in his home.

Page 16

1      Q.  And where was that located?  In or
2  around Dallas?
3      A.  Yes.
4      Q.  Is SGIT still in operation?
5      A.  No.
6      Q.  When did it cease its operations?
7      A.  2019.
8      Q.  And do you know if SGIT, at this
9  point in time, has a trustee?
10     A.  No, it does not.
11     Q.  Who were the beneficiaries of the
12 SGIT?
13     A.  I don't recall.
14     Q.  Do you know if anybody has taken any
15 steps to replace the trustee of SG -- of SGIT --
16     A.  Not that --
17     Q.  -- since 2000 --
18     A.  -- I'm aware of.
19         Not that I'm aware of.
20     Q.  You would indicate that one of the
21 things that SGIT did was provide surety bonds;
22 is that correct?
23     A.  Correct.
24     Q.  And did it also provide financial
25 guarantees of financial transactions?

Page 17

1      A.  There were surety bonds that were
2  labeled that.
3      Q.  Do you understand what the term
4  "credit enhancement" means?
5      A.  I believe it's like a cosigner.
6      Q.  And did SGIT provide any cosignatures
7  for credit enhancement transactions?
8      A.  Not that I'm aware of.
9      Q.  During the course of SGIT's business
10 from around 2014 to 2019 or so, how many surety
11 bonds did it issue?
12     A.  Could you repeat those dates?
13     Q.  From its inception until its -- the
14 time that it stopped doing business, how many
15 different surety bond transactions did SGIT
16 provide?
17     A.  I don't -- I don't know the exact
18 number.  It wasn't a large -- a large amount.
19 It -- I mean, they did, I'm going to say, five
20 to ten a year, I think.
21     Q.  And would it be fair to say that the
22 company -- or the trust maintained documents
23 that would indicate the different transactions
24 that it had entered into?
25     A.  No -- well, from 2013 to 2018, Larry

Page 18

1  would have. He's the one that received all
2  documents. We never received any documents.
3  The only thing we got was sent the -- the bond
4  itself, and I would go somewhere and have it
5  printed and then take it to Ms. Moore to have
6  signed and send it out.
7      Q. And after 2018, did the trust
8  maintain documents that would show the different
9  transactions that it was engaged in?
10     A. Only if they were on computer. They
11  didn't keep any hard copy documents of anything.
12     Q. Okay. Fair enough. And did the --
13  did SGIT maintain its own computer servers?
14     A. There was computer servers put in. I
15  don't remember when exactly it was. There was a
16  link that gave them their email.
17     Q. When you say link that gave them
18  email, who are you referring to when you say
19  "them"?
20     A. Instead of it being @gmail, it would
21  be @SubGallagher or SGIT. Is that what you're
22  asking?
23     Q. No, that -- that's fine.
24         And so, would it be fair to say that
25  there was a domain name @sgitllc.com?

Page 19

1      A. Yes, there was one.
2      Q. And did you have your own email
3  account through that domain name?
4      A. There was just one email. It never
5  had multiple accounts or multiple people with
6  it. It just had the one. When Larry set it up,
7  he only had the one put on it.
8      Q. So based on that testimony, is it
9  fair to say that when you were communicating as
10 part of SGIT's business, you would use the
11 sgitllc.com email account?
12     A. Yes.
13     Q. During the course of SGIT's business
14 life, did you use any other email account to
15 conduct the business of SGIT?
16     A. If somebody emailed me separately on
17 one of my personal accounts, then it would be --
18 there would be one there.
19     Q. And what are your -- what were the
20 personal accounts that you either used or
21 continue to use today?
22     A. That would be the SRS Holdings.
23     Q. And is there any other personal
24 account that you used during the period that
25 SGIT was in business?

Page 20

1      A. Mshappy.
2      Q. Any others?
3      A. Well, there's the -- (Zoom audio
4  glitch).
5      Q. You cut out for one second, ma'am.
6         (Reporter requests clarification.)
7      A. I said there was the one that was set
8  up before the domain thing was put in, and that
9  was the sgifunding@gmail.com.
10     Q. (BY MR. HEFTER) Any others?
11     A. No.
12     Q. We know you have produced texts and
13 audio files of your conversations with Mr. Alan
14 Hanke. Other than texts, do you use any other
15 app-based product to communicate with third
16 parties?
17     A. I use WhatsApp to talk to my family.
18     Q. Did you ever use WhatsApp to conduct
19 any business of SGIT?
20     A. I don't recall.
21     Q. Have you ever used any other
22 applications to communicate with third parties
23 in connection with SGIT's business?
24     A. No.
25     Q. So you're aware that there are

Page 21

1  various applications that are encrypted that
2  could be used to communicate?
3      A. You're giving me a little more credit
4  than is due. I am technologically not savvy.
5      Q. Okay. That's fair enough. But you
6  got your phone to work on this thing so that --
7  that's more than I could probably do.
8         In connection with the document
9  request that we served and you were ordered to
10 produce in connection with jurisdictional
11 discovery, did you search the files of -- did
12 you search email accounts other than the
13 sgitllc.com domain?
14     A. I searched anything that came up on
15 the -- on my iPad and my laptop, everything. I
16 searched everything to send everything over to
17 you.
18     Q. Did you search the SR -- oh, that's
19 SRS Holdings, which you currently use.
20        Did you use -- did you search mshappy
21 for any responsive documents?
22     A. Yes.
23     Q. Did you search your WhatsApp account
24 for any responsive documents?
25     A. I believe so.

6 (Pages 18 - 21)

1    Q.  You had indicated that -- let me back
2  up for a second.
3        In connection for your deposition
4  today, how did you prepare for it?
5    A.  I pray.  Read my Bible this morning.
6    Q.  Okay.  Did you review any documents
7  in advance of today or two weeks ago?
8    A.  I don't have any documents to review.
9    Q.  So is it your testimony that as of
10 right now, you've turned over to us all
11 documents in your files, plus the audio, that
12 were responsive to our request?
13   A.  Correct.
14   Q.  Prior to today, in preparation for
15 your deposition, did you consult with any
16 counsel or lawyer to prepare you?
17   A.  No.
18   Q.  Did you speak with Mr. Casey about
19 your deposition either today or two weeks ago?
20   A.  No.
21   Q.  When was the last time you spoke to
22 Mr. Casey?
23   A.  Last week.
24   Q.  Was that conversation in connection
25 with these consolidated cases, meaning Mr. Al

1  Thani's case and Mr. Stephens's case?
2    A.  No.
3    Q.  Does Mr. Casey still act as your
4  personal counsel?
5    A.  No.
6    Q.  Do you have any legal relationship
7  personally with Mr. Casey?
8    A.  No.
9    Q.  And so what was the nature of your
10 conversation with Mr. Casey the last time you
11 spoke?
12   A.  If you've watched on the news, you
13 know now that Dallas is pretty much under water,
14 and I was calling to make sure him and his
15 family were safe.
16   Q.  Okay.  Thank you.
17       Prior to that call, have you had any
18 conversation with Mr. Casey about allegations
19 that either my client or Mr. Stephens has made
20 in this case?
21   A.  No.
22   Q.  Since 2018, if you recall, how many
23 surety bonds did SGIT provide?
24   A.  From 2018?
25   Q.  Yes.

1    A.  Maybe ten.
2    Q.  So are you familiar with a gentleman
3  by the name of Joe Greco?
4    A.  Yes.
5    Q.  And did SGIT provide a surety bond to
6  Mr. Greco?
7    A.  Yes.
8    Q.  And Mr. Greco filed a lawsuit against
9  SGIT; is that correct?
10   A.  Correct.
11   Q.  As far as you know, has Mr. Greco
12 been repaid any of the amounts that he claims
13 are owed?
14   A.  I do not know.
15   Q.  And that was a transaction that was
16 put together by a gentleman by the name of Max
17 Barber?
18   A.  Correct.
19   Q.  All right.  And would -- just by way
20 of background, would Mr. Barber constitute one
21 of the agents that you were referring to before?
22   A.  No.  No.  He was actually brought to
23 SGIT by Sharlotte Croxford.  Her company name
24 was NGIA, I believe.
25   Q.  And just -- I've seen her name

1  before, but for the court reporter's benefit,
2  can you just spell that name so I have it
3  correct.  Her last name.
4    A.  Let me write it down.  I believe it's
5  C-r-o-x-f-o-r-d.
6    Q.  Oh, Croxford?
7    A.  Uh-huh.
8    Q.  Okay.  Thank you.  Thank you.
9        Would Ms. Croxford constitute an
10 agent that you were referring to before?
11   A.  Correct.
12   Q.  Okay.  Are you familiar with an
13 entity called Allnet?
14   A.  Yes.
15   Q.  Did SGIT provide a surety bond for a
16 transaction involving Allnet?
17   A.  Yes.
18   Q.  And did that transaction result in
19 litigation being filed against SGIT?
20   A.  Correct.
21   Q.  Do you know where that litigation was
22 filed?
23   A.  In Las Vegas.
24   Q.  Are you familiar with an entity
25 called Pak, P-a-k, Company?

1    A.  I don't recall that name.
2    Q.  Do you know if SGIT provided a surety
3  bond in connect with a transaction involving the
4  Pak Company?
5    A.  I don't recall that one.
6    Q.  With respect to the Allnet
7  transaction, who was the agent on that one?
8    A.  The company was AGS, and his name --
9  I can't remember his name right off the -- one
10  of those things, it's on the tip of my tongue,
11  but I don't remember it.
12    Q.  Okay.  Do you know where AGS is
13  located?
14    A.  Las Vegas.
15    Q.  Are you familiar with an entity
16  called SRM?
17    A.  I don't recall that name.
18    I have lost you guys on the screen.
19  I'm trying to get you guys back.
20    Q.  Okay.
21    A.  And I may have to get them in here
22  because --
23    Q.  Okay.  That's fair.
24    MR. HEFTER:  Let's go off
25    the record for a moment.

1    A.  Okay.  I just found you.
2    Q   (BY MR. HEFTER)  Okay.  Let's go back
3  on the record.
4    A.  Sorry about that.
5    Q.  Are you familiar -- I mean, do you
6  know if SGIT provided a surety bond for any
7  transaction involving SRM?
8    A.  I don't recall.
9    Q.  Would you or the company have files
10  that would show all of the surety bonds that
11  were provided by SGIT?
12    A.  I don't know that we would have hard
13  copy files.  I would have to go back to emails
14  where they were sent over.
15    Q.  Yeah.  I meant documents, whether
16  hard copy or emails.  I wasn't making a
17  distinction.
18    A.  Yeah.  On email, I would have to go
19  through and get -- and do it by email.
20    Q.  Okay.  Thank you.
21    Are you familiar with a gentleman by
22  the name of David Roth?
23    A.  Yes.
24    Q.  And who is David Roth?
25    A.  David Roth is a gentleman out of

1  Florida.
2    Q.  What was his role in connection with
3  SGIT?
4    A.  He did transactions with CGE, and
5  they contacted the surety to do surety for them.
6    Q.  Was Mr. Roth an agent or was he more
7  of a principal involved in the transaction?
8    A.  Principal.
9    Q.  Do you know if there's been
10  litigation filed by Mr. Roth in connection with
11  any transaction that he did with SGIT?
12    A.  I'm not aware of any.
13    Q.  Are you familiar with a gentleman by
14  the name of Lance Baraker?
15    MR. HEFTER:  B-a-r-a-k-e-r, for the
16    court reporter.
17    A.  I don't know that name.
18    Q.  (BY MR. HEFTER)  Do you know if you
19  had any email communication or telephone calls
20  with Mr. Baraker?
21    A.  I don't recognize the name.
22    Q.  Do you recall if SGIT did any
23  business with a company affiliated with
24  Mr. Baraker?
25    A.  I don't recognize the name so I don't

1  know.
2    Q.  Okay.  Are you familiar with a
3  company called Harvard Distributing?
4    A.  Yes.
5    Q.  And did SGIT provide a surety bond
6  involving a transaction involving Harvard
7  Distributing?
8    A.  I don't know if that was one of --
9  that came in but I'm not sure that was one that
10  was provided.
11    Q.  Did you have any discussions with
12  anybody at Harvard Distributing about a
13  potential surety bond transaction?
14    A.  It would have been Alan Hanke.
15    Q.  Do you recall if you personally had
16  any communications with Harvard Distributing or
17  anybody from Harvard Distributing?
18    A.  I don't recall.
19    Q.  Are you familiar with a gentleman by
20  the name of Michael Martino?
21    A.  I don't recall that name.
22    Q.  I think I know your answer to the
23  question, but do you recall any conversations
24  with Mr. Martino or email communications
25  involving the business of SGIT?

Page 30

1    A.  I don't recall.
2    Q.  When you did your search for
3  documents relating to our document request, did
4  you search your files for communications with
5  Mr. Martino or Harvard Distributing?
6    A.  I mean, I would have -- if it would
7  have been there, I would have pulled it out.
8    Q.  So is your testimony that you
9  specifically looked for communications between
10  yourself and Harvard Distributing in response to
11  our document request?
12    A.  If it was requested, I did.
13    Q.  Did you search your files for any
14  communications with Mr. Baraker in response to
15  our document request?
16    A.  I don't recall that name.
17    Q.  So if -- so it would be fair to say
18  that, based on that, you didn't look for any
19  communications with him to the extent that they
20  were in your files?
21    A.  Not that I'm aware of.
22    Q.  Are you familiar with an entity
23  called Fortitude?
24    A.  The name sounds familiar.
25    Q.  And what do you recall about the

Page 31

1  name?
2    A.  I just remember the name.  I don't
3  know where it fell under.
4    Q.  Do you recall having any
5  communications with anybody from Fortitude?
6    A.  I don't recall.
7    Q.  Did you search your files for
8  communications with Fortitude in response to our
9  document demands?
10    A.  If it was with requested, I searched.
11    Q.  Did you ever have any conversations
12  with Mr. Hanke concerning Fortitude?
13    A.  If that was one of his clients, yes.
14    Q.  Did you have any conversations with
15  Mr. Hanke about Harvard Distributing?
16    A.  Yes.
17    Q.  What do you recall about those
18  conversations?
19    A.  I don't --
20    Q.  Meaning --
21    A.  -- I just --
22    Q.  -- meaning -- I'm sorry.
23        Just meaning, for the record,
24  communications between yourself and Mr. Hanke
25  regarding Harvard Distributing?

Page 32

1    A.  I don't remember any details of it.
2  I just know that Harvard Distributing was one of
3  his clients.
4    Q.  Did SGIT provide a surety bond in
5  connection with the -- any transaction for
6  Harvard Distributing?
7    A.  Again, I'm not aware of which ones he
8  did.  Alan submitted numerous ones and certain
9  ones never did happen, never came through.
10    Q.  Did you explore providing a surety
11  bond for a transaction involving Harvard
12  Distributing on behalf of SGIT?
13    A.  I don't understand the question.
14    Q.  Sure.  I mean, did you have
15  conversations with Mr. Hanke about SGIT's
16  potential to provide a surety bond to Harvard
17  Distributing?
18    A.  Correct.
19    Q.  And I'm going to ask you the same
20  question with respect to Fortitude.  Do you
21  recall having conversations with Mr. Hanke about
22  the potential for SGIT to provide a surety bond
23  for a transaction involving Fortitude?
24    A.  I recall Fortitude's name.  I don't
25  recall if that was an Alan Hanke bond.  If it

Page 33

1  was an Alan Hanke transaction, yes, I would have
2  then spoke with Alan Hanke.
3    Q.  And is it also true that you and
4  Mr. Hanke had communications involving providing
5  a surety bond for a transaction involving SRM?
6    A.  The name sounds familiar, but I don't
7  recall any details of that transaction.
8    Q.  And you had multiple conversations
9  with Mr. Hanke regarding SGIT providing a surety
10  bond for Mr. Al Thani, correct?
11    A.  Not multiple conversations.  He would
12  submit that he needed a bond and provide the
13  backup documentation.
14    Q.  Let me ask it a different way.  Isn't
15  it true that you had multiple communications,
16  orally and written, about SGIT providing a
17  surety bond for a transaction involving
18  Mr. Al Thani?
19    A.  Incorrect.
20    Q.  Your testimony is you didn't have
21  multiple written or oral communications?
22    A.  Correct.  Multiple requires more than
23  one, and I'm not aware of more than one bond,
24  written or verbal.
25    Q.  Are you familiar with -- okay.  Are

9 (Pages 30 - 33)

Page 34

1 you familiar with a woman by the name of Tammy
2 Allen?
3     A.  Tammy Allen?
4     Q.  Yes.
5     A.  I don't know that name.
6     Q.  Are you familiar with a law firm of
7 the name of HoganWillig?
8     A.  HoganWillig?
9     Q.  Yes.
10     A.  No.  Only Hogan Lovells.
11     Q.  Not to be confused with my firm but
12 --
13     A.  Yeah, I don't know that other --
14     Q.  -- are you --
15     A.  I don't know that other name.
16     Q   All right.  Do you know if SGIT ever
17 did any transactions involving HoganWillig being
18 an escrow agent?
19     A.  No.  The only escrow agent SGIT had
20 was Mike Casey on the bond fees.
21     Q.  Are you familiar with a gentleman by
22 the name of Sidney Mills Rogers?
23     A.  Yes.
24     Q.  And how do you know Mr. Mills Rogers?
25     A.  Alan Hanke informed me he was his

Page 35

1 attorney.
2     Q.  Did you have communications with
3 Mr. Mills Rogers?
4     A.  No.
5     Q.  Neither written nor oral?
6     A.  No.
7     Q.  Did you have any written or oral
8 communications with a woman by the name of Laura
9 Romeo?
10     A.  No.
11     Q   And did you have any written or oral
12 communications with a woman by the name of Amy
13 Roy-Haeger?
14     A.  No.
15     Q.  With respect to GIT, Guaranteed
16 Investment Trust --
17     A.  Yes.
18     Q.  -- did that operate in the same
19 manner in which SGIT operated, as you've
20 testified today?
21     A.  Yes.
22     Q.  And how many surety bond deals did
23 GIT do during its existence?
24     A.  One, maybe two.
25     Q.  And one of those being Mr. Martin

Page 36

1 Stephens's transaction?
2     A.  Correct.
3     Q.  And that was a transaction that was
4 sourced by Mr. Hanke?
5     A.  Correct.
6     Q.  How many transactions did SGIT or GIT
7 do that was sourced by Mr. Hanke?
8     A.  He submitted approximately ten and I
9 -- off the top of my head, I'm wanting to say
10 six is what actually were done.
11     Q.  Sitting here today, can you name
12 those transactions for me, the six or so?
13     A.  I probably can't, I mean.  I know
14 there was three that were for Al Thani and the
15 one for Martin Stephens.  There's four or five
16 there that he submitted and only one or two of
17 them actually followed through, or that's what
18 he informed me of.
19     Q.  Okay.  Sitting here today, you don't
20 have a recollection of the names of those people
21 or principals in those transactions?
22     A.  I don't.  It's been four years.  It's
23 been COVID and it's been a complete
24 hysterectomy.
25     Q.  I understand.

Page 37

1     A.  Glad you do because I don't.  I've
2 always been very sharp.
3     Q.  Other than -- I think we already
4 talked about the Greco case, the Allnet case;
5 we're here today on two cases.  Has SGIT or GIT
6 been sued in any other case involving any surety
7 transaction?
8     A.  Yes.
9     Q.  Can you name those litigations for
10 me?
11     A.  The one that was in West Virginia
12 that I went and was deposed on.  And I'm sad to
13 say I can't remember the name of it, but
14 basically it was a large contractor squeezing
15 out a smaller contractor.
16     Q.  Any other litigation that you can
17 think of?
18     A.  There was one in Hawaii.  And that
19 was -- I'm trying to remember the name of that.
20 It's been cleared.  There's the one in
21 Las Vegas.  There's the Greco.  There is a few
22 others that I don't know off the top of my head
23 that actually Larry handled when he was a part
24 of the -- handling everything on the company.  I
25 never was made aware until I was told that I had

Page 38

1    to go to deposition.
2        Q.  How many times have you been deposed?
3        A.  I think this is my fourth, I think.
4        Q.  And those depo -- I know you can't
5    remember the names of all the cases, but would
6    it be fair to say that the four depositions took
7    place in one or more of those cases?
8        A.  0h, definitely.  All of them have
9    been with the surety.
10       Q.  And we know that you've provided
11   testimony in your bankruptcy proceeding pursuant
12   to the bankruptcy rules.  But have you -- other
13   than that testimony or deposition testimony that
14   you've mentioned, have you provided testimony in
15   any other case or forum?
16       A.  No.
17       Q.  Have you ever testified at trial?
18       A.  No.
19       Q.  How are you doing in terms of timing?
20   Would you like to take a break?
21       A.  I'm good.
22       Q.  Okay.  Can you explain to me how you
23   met Mr. Hanke?
24       A.  I don't recall how I met him, but I
25   know I met him in person in Dallas, Texas.

Page 39

1        Q.  Do you remember when that was?
2        A.  I believe 2018.
3        Q.  Why don't we pull up a document we
4    can refresh your recollection on --
5        A.  Okay.
6        Q.  -- perhaps the date of your meeting
7    with him.
8            (Exhibit No. 1 introduced.)
9        Q.  (MR. HEFTER) So let's just go --
10   let's go to the top.  So, Ms. Sims, what I've
11   marked as Sims 1,is an email exchange between
12   yourself and Mr. Hanke.  You can ignore, I
13   think, the top part of it.
14       A.  I'm only seeing the top part.
15       Q.  Yeah, I know.  We're going to scroll
16   down to give you an opportunity to look at the
17   -- look at the document if you would like.  It's
18   only a one-page email.  So if you would like to
19   refresh your recollection, please take the time
20   to read the document.
21       A.  Okay.
22       Q.  And when you're ready, Peter can
23   scroll down for you.
24       A.  Okay.
25       Q.  Have you had an opportunity to review

Page 40

1    this document?
2        A.  Yes.
3        Q.  Do you recall receiving this email
4    from Mr. Hanke?
5        A.  Yes.
6        Q   He says at the top of the email, "I
7    cannot tell enough how much of a pleasure it was
8    to meet you while I was in Dallas visiting
9    Tammy."  Do you see that?
10       A.  Correct.
11       Q.  And does this refresh your
12   recollection as to when the meeting between you
13   and Mr. Hanke took place?
14       A.  Okay.  Early '19, I guess, not '18.
15       Q.  That's fair, you know.
16       A.  Yes.
17       Q   And how did the meeting in Dallas
18   come about?
19       A.  Tammy introduced the two of us
20   because she said he was doing something that was
21   the same thing that I did.
22       Q.  And I think I asked you this question
23   before, but does this email refresh your
24   recollection of who Tammy was?
25       A.  Yes.

Page 41

1        Q.  And who is Tammy?
2        A.  Tammy Border.  She's a friend.  She
3    went with me to Israel with my church.
4        Q.  So he's a friend of yours, not
5    necessarily Mr. Hanke?
6        A.  I don't know how they're friends.
7        Q.  Was it your understanding that Tammy
8    had known Mr. Hanke prior to this meeting?
9        A.  Correct.
10       Q.  And do you know if Mr. Hanke traveled
11   to Dallas just to meet you?  Or did he have
12   other business in Dallas while he was there, as
13   far as you remember?
14       A.  As far as I remember, he had other
15   business.  This was a very quick, unexpected
16   meeting.
17       Q.  And where did you meet?
18       A.  It was a hotel in Irving.
19       Q.  How long did the meeting last?
20       A.  Less then an hour.
21       Q.  And what was discussed?
22       A.  What he did in business and what he
23   was looking for.
24       Q   What did he tell you he was looking
25   for?

11 (Pages 38 - 41)

Page 42

1    A.  That he was looking for a new surety
2  company.
3    Q.  And during that meeting, did you talk
4  to him about SGIT or GIT providing those
5  services?
6    A.  SGIT.  GIT was not even a thought at
7  that point in time.
8    Q.  So is it fair to say that during that
9  discussion, you were discussing SGIT providing
10  those services to deals generated by Mr. Hanke?
11    A.  Correct.
12    Q.  He indicates that he -- he says, "I
13  am glad we spent the time together and look
14  forward to an equal amount of business
15  together."  Do you see that?
16    A.  Correct.
17    Q.  Do you know what Mr. Hanke meant when
18  he said "look forward to an equal amount of
19  business together"?
20    A.  I do not.
21    Q.  Did you discuss working together on
22  deals going forward?
23    A.  He just said that if he needed a --
24  needed surety, he would contact me.
25    Q.  And after the bullet points, he say,

Page 43

1  "In addition to the above, I would really like
2  to get together and determine the next steps in
3  hopes of you being our surety provider."  Do you
4  understand that?
5    A.  Correct.
6    Q.  Did SGIT become his surety provider
7  for his transactions?
8    A.  I don't know if we were the only one,
9  but we did start doing surety together, yes.
10    Q.  Do you know how long after this
11  meeting occurred did SGIT do its first deal as a
12  surety provider for Mr. Hanke's deals?
13    A.  I don't recall the date.
14    Q.  During that meeting, did he discuss
15  any particular client?
16    A.  No, there was no clients discussed at
17  all.
18    Q.  And I'll be more specific.  During
19  that meeting, did he talk about any potential
20  transaction involving Mr. Al Thani?
21    A.  None at all.
22    Q.  When was the first time that you had
23  any conversation with Mr. -- I'll withdraw that.
24       When was the first time that you had
25  any communication, orally or written, with

Page 44

1  Mr. Hanke involving a transaction for
2  Mr. Al Thani?
3    A.  I don't know when the date was that
4  he called and said that he was looking to move
5  forward.
6    Q   And SGIT moved forward thereafter?
7    A.  Correct.
8    Q.  During that period of time, did you
9  have any communication with Mr. Al Thani or any
10  of his representatives?
11    A.  I've never had any communications
12  with him.  I've only had communication with my
13  attorney.
14    Q.  Your attorney being Mr. Casey or Mr.
15  (Indiscernible)?
16    A.  William Slater Vincent, who wrote the
17  trust, who was my attorney in 2013, and
18  continued to be my attorney through 2020, and
19  then took on Mr. Al Thani as a client.  And so I
20  don't know what you attorneys call that, but you
21  were playing on both sides of the fence.
22       MR. HEFTER:  We'll move to
23    strike.  Nonresponsive.
24    Q   (BY MR. HEFTER)  Let's go up to the
25  top of the email.  And you see the attachments,

Page 45

1  Ms. Sims?  Those are just file names.  Do you
2  see where I'm directing you?
3       Ms. Sims, can you hear me?
4    A.  Can you hear me?
5    Q.  Now we can.
6    A.  Okay.  I lost their computer so I
7  don't know what it's doing.
8    Q.  So you can't see the document on the
9  screen at this point?
10    A.  I can.  I can see it on my phone.
11    Q.  Oh, okay.  Okay.  That's fine.
12       You see where I'm directing you to
13  the attachments?
14    A.  To the attachments?  Yes.
15    Q.  Okay.  And I take it from this email
16  that Mr. Hanke was forwarding you a number of
17  different templates for deals that he had done
18  before.  Is that your understanding?
19    A.  Yes.
20    Q.  And one of the deals was something
21  for R2 Global Energy.  Do you see that?  Bala
22  Trading?
23    A.  Yes.
24    Q.  Did you or SGIT ever do any
25  transactions with Bala Trading?

12 (Pages 42 - 45)

Page 46

1    A.  No.
2    Q.  And I'll point you to the top of the
3  first attachment.  It says, "IOLTA Hogan"?
4    A.  Oh.  Is that you guys?
5    Q.  No, it's not.  It's HoganWillig.  And
6  my question is:  Does that refresh your
7  recollection as to whether SGIT had done any
8  transactions in which the IOLTA account was with
9  the HoganWillig firm?
10    A.  No, I know nothing about that.
11    Q.  Okay.  But SGIT did do transactions
12  involving the IOLTA account of Rogers, correct?
13    A.  I don't know where or how the funds
14  were done with him.  I -- that wasn't our
15  concern.
16    Q.  But you're aware that in connection
17  with Mr. Al Thani's transaction that the IOLTA
18  account formed by Mr. Rogers was used as the
19  escrow?
20    A.  I understand that now, yes.
21    Q.  That wasn't your understanding at the
22  time?
23    A.  I wasn't aware of how that was being
24  done, no.
25    Q.  If we go to the end of the email, to

Page 47

1  the regards, it says, "Regards, Alan J. Hanke."
2  Do you see that?
3    A.  Yes.
4    Q.  And then it has a telephone number
5  and it has a Skype ID.  Do you recall having any
6  communications with Mr. Hanke over Skype?
7    A.  I don't know if we had that over
8  Skype or not.
9        MR. HEFTER:  Peter, let's
10    bring up the screenshots from Metro
11    State Bank.
12    Q.  (BY MR. HEFTER) Ms. Sims, I've shown
13  you a screenshot from Metro State Bank, which
14  I'm going to mark as Sims 2 for identification.
15        (Exhibit No. 2 introduced.)
16    A.  Okay.  Mine is showing that Peter has
17  started screen sharing.
18    Q.  (MR. HEFTER) Okay.  I will not rush
19  ahead without you -- showing you the document.
20    A.  I'm going to get them real quick to
21  come in here, if we could take a break a second,
22  because I think it has something to do with
23  these -- the computer and the phone together.
24    Q.  That's fine.
25        MR. HEFTER:  We've been

Page 48

1    going for, like, an hour and 20
2    minutes, so why don't we take a
3    break for five or ten minutes and we
4    can figure that out and then we can
5    get back on the record.
6      (Recess 11:32 a.m. to 11:45 a.m.)
7    Q.  (BY MR. HEFTER) Welcome back,
8  Ms. Sims.  What I've shown you is several
9  screenshots from an account at Metro States
10  Capital Bank that I want to ask you a few
11  questions about.  And I've marked it as Sims 2
12  for identification.
13        And so, can you describe what this
14  document is?
15    A.  Yes, that's a screenshot of my
16  computer.
17    Q.  Okay.  And is it your understanding
18  that SGIT had a bank account at a financial
19  institution called Metro Bank -- Metro States
20  Capital Bank?
21    A.  Correct.
22    Q.  Is that account still active?
23    A.  That bank ain't active.
24    Q.  Okay.  Yeah.
25        So is this a bank that Mr. Hanke used

Page 49

1  to do his transactions?
2    A.  Not that I'm aware of.
3    Q.  Who established the account at Metro
4  States Capital Bank?
5    A.  Alan Hanke.
6    Q.  And did SGIT have an account at that
7  bank?
8    A.  This is the account you see on the
9  screen.
10    Q.  And is it your testimony that Alan
11  Hanke created a bank account for SGIT at Metro
12  States Capital Bank?
13    A.  Yes.
14    Q.  And you were aware of that, correct?
15    A.  Yes.
16    Q.  And you had no objection to that,
17  correct?
18    A.  No.
19    Q.  There is a question here, Name of
20  your first pet is Penny.  Is that your pet or
21  was that Ms. Moore's pet?
22    A.  That was Ms. Moore's roommate's pet.
23    Q.  Okay.  Did you have access to this
24  account?
25    A.  Yes.

13 (Pages 46 - 49)

1      Q.   And is it correct to say that
2   January 30, 1942, is Ms. Moore's birth date?
3      A.   Correct.
4      Q.   And would it be -- well, let me ask
5   you this question before getting into the actual
6   bank account.
7      A.   Okay.
8      Q.   As a general matter, how was SGIT
9   compensated for the services that it provided in
10  providing surety bonds.
11     A.   As I explained before, when there is
12  an agent involved, the agent collects the funds
13  from the client.  They take their part.  And
14  then they filter it down, and the surety is the
15  last person to get the final pay.
16     Q.   And was there a particular percentage
17  or the manner in which the fee that you received
18  was calculated?
19     A.   There was a set percentage that was
20  paid per surety and all of them are different.
21  There wasn't anything set besides Alan Hanke's.
22     Q.   And when you say besides Alan Hanke,
23  what did you mean by that?
24     A.   Alan wanted to do a blanket policy.
25  He wanted to pay for X amount of bonds.  And

1   then, as he asked for them, that's how it went
2   -- they would come out.  But he would go ahead
3   and pay up front for a certain amount of bonds
4   on the front end.
5      Q.   Was that your agreement with him?
6      A.   That's how he wanted to do it so that
7   was the agreement.
8      Q.   And when you first developed the
9   relationship with Mr. Hanke, was there a
10  particular amount that he paid up front for a
11  certain amount of bonds?
12     A.   His original amount he came in with
13  was he wanted 10 million in bonds.
14     Q.   And how much would SGIT get paid for
15  providing $10 million worth of bonds?
16     A.   I believe the number he agreed upon
17  was 2.5.
18     Q.   $2.5 million?
19     A.   No.  No, no.  2.5 percent.
20     Q.   Thank you.
21          And did you receive -- or did SGIT
22  receive the 2.5 percent as proposed by
23  Mr. Hanke?
24     A.   Correct.
25     Q.   Do you recall the total amount of

1   fees that SGIT received for doing all of the
2   transactions with Mr. Hanke?
3      A.   He did two blanket policies.  He did
4   10 million and then he came in behind that and
5   did a 5 million.
6      Q.   And would it be fair to say that SGIT
7   received 2.5 percent of $15 million?
8      A.   Correct.
9      Q.   And with respect to the 2.5 percent
10  of the $15 million, was that amount deposited at
11  Metro States Capital Bank?
12     A.   No.  Metro States never -- never did
13  anything.  There was never a transaction done
14  using Metro States.  It was a -- when I met
15  Mr. Hanke, he informed me he owned a bank and
16  this was the bank, and the best way for me to
17  vet him was open SubGallagher a bank account.
18  And he did.  And I was at least smart enough to
19  screenshot everything, since it's completely
20  disappeared off the Internet.  All fees went
21  through Mike Casey's IOLTA account.
22     Q.   And is there any money left in Mr.
23  Casey's IOLTA account as a result of the payment
24  of the 2.5 percent?
25     A.   No.

1      Q.   Where did all that money go?
2      A.   Whatever bills SubGallagher had.
3          MR. HEFTER:  So let's go to one of
4   the screenshots, Peter, that's part of Sims 2
5   that shows this one.
6          THE WITNESS:  Can you make it a
7   little bigger?  Thank you.
8      Q.   (BY MR. HEFTER)  So, can you see it
9   fine,
10  Ms. Sims, at this --
11     A.   Yes.
12     Q.   Okay.  So, if we look on the
13  left-hand side, it says US dollars available,
14  368,456?
15     A.   Yes.
16     Q.   See that?
17     A.   Correct.
18     Q.   And where did that money come from?
19  Do you know?
20     A.   That's just something that Alan put
21  in there.  As you can see where it says "AJH
22  credit."
23     Q.   Yeah.
24     A.   He put that in there, then he took it
25  back out, but it was not anything of ours.  He

14 (Pages 50 - 53)

Page 54

1  was just showing me that it was a live and real
2  account.
3      Q.  Based on the screenshot, isn't it --
4  it's correct, though, that that amount of US
5  dollars was in SGIT's bank account at Metro
6  States Capital Bank?
7      A.  Correct.
8      Q.  And you are aware that SGIT received
9  funds as a result of the transaction with
10  Mr. Al Thani?
11      A.  No.
12      Q.  It's your testimony that SGIT never
13  received any money from the transaction with
14  Mr. Al Thani?
15      A.  No.  The SGIT just wrote a surety on
16  the transaction.  It was before anything was
17  ever done.
18      Q.  And it's correct to say that once
19  Mr. Al Thani had made his investment, that SGIT
20  received a fee for providing the surety bond in
21  connection with the transaction, correct?
22      A.  I don't know where the fee came from,
23  and I don't know the timing of them putting
24  stuff in and out.  I was not privy to that.  He
25  bought a blanket policy.  I didn't know what

Page 55

1  bonds would be paid for using that blanket.  And
2  that's where I'm saying from earlier, when you
3  asked me certain names, there are certain names
4  that he asked for bonds, but then came back and
5  said they never transpired.
6      Q.  But during this period of time, SGIT
7  received fees from transactions that Mr. Hanke
8  was doing?
9      A.  SGIT doesn't know where the funds
10  came from for the fees that SGIT received.  SGIT
11  received a blanket and then when you would get
12  an email stating you needed this bond, that bond
13  would be printed and sent out.  And then
14  following that would be a commencement letter
15  stating that the transaction came in and
16  commenced as in process.  That's what I
17  understood it to be.
18      Q.  Okay.  So if I'm understanding your
19  testimony correctly, you're testifying that
20  Mr. Hanke, in essence, prepaid at a certain fee
21  to SGIT for the purposes of providing surety
22  bonds for transactions he was working on?
23      A.  Correct, correct.
24      Q.  And sitting here today, you don't
25  know one way or another whether SGIT received

Page 56

1  any funds directly from the transaction or the
2  proceeds of the transaction with Mr. Al Thani?
3      A.  Correct.
4      Q.  Okay.  And is your answer the same
5  with respect to Mr. Stephens' transaction?
6      A.  Correct.
7      Q.  And now, did -- did GIT have the same
8  financial agreement with Mr. Hanke regarding the
9  payment of fees for transactions that GIT was
10  providing the surety bond for?
11      A.  No.  What happened with GIT, when the
12  trustee resigned from the trust, Alan had
13  already made -- paid for his two blanket
14  policies.  He paid them through SubGallagher.
15  But with the trustee not appointing another
16  trustee, the attorneys told me there's no way we
17  could move forward, and Mr. Vincent, my
18  attorney, informed me he would write another
19  trust that would appoint me as trustee.  And
20  that's how GIT came about.
21      Q.  During this period of time, did you
22  have any other source of income?
23      A.  I continued to do real estate.
24      Q.  Okay.  Did you receive personally any
25  compensation from the transactions that

Page 57

1  Mr. Hanke prepaid for?
2      A.  I've never received funds from any of
3  his transactions.  He paid for sureties before
4  these were done.  Where he got the funds, I
5  don't know.
6      Q.  And of the amount -- of the
7  2.5 percent that he paid to SGIT, did you
8  receive any funds from that amount of money?
9      A.  The trust received all that funds,
10  the two point -- the two and a half percent.
11      Q.  And of that, did you take home any
12  money out of that -- of those funds?
13      A.  I'm sure there was some that I did.
14      Q.  Okay.  And have you looked at your
15  bank account statements and provided them to us
16  in response to our document request?
17      A.  I believe so.
18      Q.  Did Mr. Casey receive any of the fees
19  -- any portion of the fees that were paid in
20  connection with the 2.5 percent?
21      A.  Yes.
22      Q.  Who else received any of those funds?
23      A.  The trustee if -- if there was
24  something that was needed on her behalf.
25  Otherwise, bills within the company would have

Page 58

1   been paid.  At that time it would have been
2   probably more of attorney fees and things like
3   that.
4       Q.   Other than attorney fees, can you
5   recall any other bill within the company that
6   was paid out of those funds?
7       A.   I mean, regular stuff like the domain
8   fees or anything like that or paper, whatever
9   was needed.
10      Q.   Of the money that you received out of
11  the fees that SGIT generated, what happened with
12  those funds?
13      A.   My personal funds?
14      Q.   Correct, yeah.
15      A.   Probably paid gas, water, electric,
16  car.
17      Q.   Do you know the source of the funds
18  that SGIT received from Mr. Hanke?
19      A.   I do not.
20      Q.   You're aware, though, that you
21  received funds through the IOLTA account of
22  Mr. Mills Rogers?
23      A.   Correct.
24      Q.   Did you ever have any conversation
25  with Mills Rogers as to what the source of those

Page 59

1   funds were?
2       A.   No.
3       Q.   With respect to the Metro States
4   Capital Bank account, did SGIT ever make any
5   withdrawals from that account?
6       A.   We never had any money to make
7   withdrawals.  I never put any money into the
8   account.
9       Q.   Well, the -- the screenshot, at
10  least, shows there was over $300,000 in the --
11  as the available current balance.  Did you ever
12  --
13      A.   That wasn't our money.
14      Q.   So I -- my question is:  Did you ever
15  make any withdrawal from that account?
16      A.   No.
17      Q.   And did you have any -- what was Mr.
18  Hanke's purpose of transferring $368,000 to that
19  account, your account, at Metro States Capital
20  Bank?
21      A.   I don't know how he came up with the
22  number.  He just wanted to prove to me that he
23  had the right to it and that he owned the bank.
24      Q.   Did you do any due diligence with
25  respect to that request, that statement by him?

Page 60

1       A.   Well, I Googled the bank and I was
2   able to pull up the bank and I was able to log
3   in with the credentials he gave me.
4       Q.   Did you do any other due diligence?
5       A.   Anytime I do anything, I Google and
6   see what -- if there is anything out there on
7   anyone.  Until recently, you didn't get a whole
8   lot.
9       Q.   Can you recall anything else that you
10  did in connection with due diligencing the
11  amount of funds in this account?
12      A.   No, nothing in this account.
13      Q.   Did you receive any salary from SGIT
14  or GIT for the surety bonds that it was
15  providing?
16      A.   There wasn't really a salary about
17  it.  If there was something left over after
18  paying bills, then I got paid.
19      Q.   And other than SGIT and GIT, were
20  there any other trusts that you were using to
21  conduct surety business at the time?
22      A.   No.
23      Q.   And I may have asked you this
24  question already, but for 2018, do you know how
25  many -- how many -- the amount of funds that you

Page 61

1   received personally as a result of the business
2   of SGIT?
3       A.   I do not recollect.
4       Q.   Okay.  And would you give the same
5   answer with respect to 2019 and 2020?
6       A.   I don't know.  '19 -- yeah, I don't
7   know any of those numbers.
8       Q.   Was it -- let's take 2019, for
9   example.  Do you think that you received over
10  $100,000 relating to any fees paid to SGIT as a
11  result of any of its transactions?
12      A.   I don't know.
13      Q.   And what about 2020, do you know if
14  you received over $100,000?
15      A.   No, not at all.  The -- the -- like I
16  said, the company was closed.  We only had one
17  or two bonds that happened.  And the Stephens
18  bond had been paid from prior so there was no
19  money exchanged there.
20      Q.   When you say the Stephens bond was
21  paid from prior, what do you mean by that?
22      A.   Alan ordered the second bulk bond,
23  the 5 million, he ordered it prior to
24  SubGallagher shutting down, prior to the trustee
25  resigning.  So it was paid into SGIT.  When it

Page 62

1  was ordered, SGIT could not write that bond, and
2  my attorney directed me to do it this way.
3      Q.  Can you give me on an order of
4  magnitude of how many -- how much money you were
5  generating from your real estate business in
6  2019?
7      A.  I don't know.  Maybe 50,000.
8      Q.  And how did that compare to the
9  amount of money that you had received in 2019
10  from the business of SGIT?
11      A.  I don't -- I don't know.
12      Q.  Was the agreement between -- sorry.
13          Was the --
14  (Technical discussion off the record.)
15      Q   (BY MR. HEFTER)  Was there any
16  document memorializing the agreement between
17  Hanke and SGIT about the payment of the
18  2.5 percent fee?
19      A.  I don't believe so.  I don't recall.
20      Q.  So that was an oral agreement between
21  you and Mr. Hanke?
22      A.  Correct.
23      Q.  And did you orally agree to that at
24  the meeting in Dallas in early 2019?
25      A.  I don't recall if it was agreed there

Page 63

1  or not.
2      Q.  Do you recall whether it was over the
3  phone or in person?
4      A.  I only met him the one time in
5  Dallas, so it had to have been over the phone.
6      Q.  Let's turn our attention to a
7  document that you've produced.
8          MR. HEFTER:  Peter, if we can have
9  the document of the table full of cash.
10      A.  Did you guys send me this book?
11      Q.  (BY MR. HEFTER)  What book?
12      A.  That you're using.
13      Q.  Those are my preparation materials.
14      A.  Oh, okay.  In the past at
15  depositions, they've provided all of us with a
16  book so we all had the same thing.  Only reason
17  I ask.
18      Q.  I figured as much.
19          (Exhibit No. 3 introduced.)
20      Q   (BY MR. HEFTER)  Let me mark as Sims
21  3 a document which is a -- looks like a picture
22  of a table full of cash.  Have you seen this
23  document before, Ms. Sims?
24      A.  I don't recollect that document at
25  all.

Page 64

1      Q.  Do you know whether this was produced
2  in the documents that you provided to us?
3      A.  I don't recall that one.
4      Q.  So you have no recollection of ever
5  seeing this photograph that I've marked as Sims
6  3?
7      A.  It's not ringing a bell.
8      Q.  Okay.  Let's turn our attention now
9  to some of the text exchanges that you've had
10  with Mr. Hanke.
11          (Exhibit No. 4 introduced.)
12      Q   (BY MR. HEFTER)  I've marked as Sims
13  4 a table that reflects text messages between
14  Alan Hanke and Ms. Sims.  And have you seen this
15  document before, Ms. Sims?
16      A.  Yes.
17      Q.  Did you compile the chart and table
18  after going through your phones?
19      A.  I did not.  I had it done.
20      Q.  And who did that for you?
21      A.  It's a program that's very old that
22  you can't get anymore, but I had that on my
23  phone.
24      Q.  Okay.
25      A.  It's a very nice document.  I think

Page 65

1  you guys ought to appreciate my texts very much.
2      Q.  The texts tell a lot.
3      A.  That's what I'm telling you.  They
4  tell you everything.
5      Q.  So, just so the record is clear, what
6  I've shown Ms. Sims is a chart that we now know
7  that she or somebody with the help of a computer
8  program prepared.  And on the left-hand column,
9  for the record, is a number which corresponds to
10  a particular text, and it shows contact, time of
11  the text received and sent.
12          Ms. Sims, just as a foundational
13  question, does the -- the sent column is you,
14  correct?
15      A.  I don't -- can you go up some?  I'm
16  not -- that doesn't look like my text, but can
17  you go up -- move up some?
18          MR. HEFTER:  Yeah, Peter, show the
19  witness as much as she needs to answer that
20  question.
21          MR. BAUTZ:  So this is the
22          top of the document.  Do you want me
23          to scroll down a little bit so you
24          can see some more text messages and
25          see if that looks like you?

17 (Pages 62 - 65)

Page 66

1      THE WITNESS:  Yes, please.
2   Yes, please.
3      MR. BAUTZ:  Okay.  I'll scroll
4   down.
5      A.  Okay.  So I guess I would be on the
6   right.
7      Q   (BY MR. HEFTER)  Okay.  And then the
8   received is Mr. Hanke.  Did you search -- now,
9   my understanding is that you've provided to us
10  in table form a list of your texts with
11  Mr. Hanke on your business phone and your
12  personal phone; is that correct?
13     A.  Correct.
14     Q.  And did you search your phone for any
15  texts with respect to any other person who was
16  involved in the Al Thani or Stephens
17  transactions?
18     A.  I wouldn't have had anyone else
19  involved.  I only spoke to Alan.
20     Q.  And is it your testimony that you did
21  not speak with Mr. Casey with respect to the
22  Al Thani or Stephens transactions?
23     A.  No.
24     Q.  And your testimony is that the only
25  person that you text with with respect to the

Page 67

1   Al Thani and Stephens transactions was
2   Mr. Hanke?
3      A.  Correct.
4      Q.  So let's go to the first one.  You
5   say to Mr. Hanke, on November 11th in Text
6   No. 1, it says, "Please call me ASAP.  I am
7   getting ready to get on a plane and the guys are
8   ready to move forward but have some questions."
9   Do you see that?
10     A.  Correct.
11     Q.  Okay.  Do you recall what that text
12  related to?
13     A.  I do not.
14     Q.  Okay.  When it says you're ready to
15  get on a plane, do you recall traveling on or
16  around November 11th, 2019?
17     A.  I don't remember it but if it says
18  it, I'm sure I did.
19     Q.  Have you ever traveled to New York?
20     A.  Yes.  I -- my church got offered to
21  sing in Carnegie Hall, and I went there to
22  support them.  We were there three days, I
23  believe.
24     Q.  And when was that?
25     A.  Can I look at my phone?

Page 68

1      Q.  Yeah.  I'm okay with that.
2      A.  I just have to find a picture from
3   that time, and then I can tell you.
4      Okay.  We were in Carnegie Hall
5   November 15th, 2019.
6      Q.  Okay.  Thank you.
7      Going back to that text, it says "the
8   guys are ready to move."  Do you know who you
9   were referring to when you said "the guys"?
10     A.  I do not.
11     Q.  Was that a transaction that you were
12  proposing to Mr. Hanke?
13     A.  No.  It would have been something to
14  do -- he asked for various different things with
15  other things that he did.  So I'm sure he asked
16  for something, and I was trying to put him with
17  whoever he needed to talk with.
18     Q.  And do you recall who those persons
19  were that you were trying to put him in contact
20  with?
21     A.  I do not because I don't remember
22  what transaction this was.  He would off the
23  wall come up with various stuff.
24     Q.  So let's go down to the text a little
25  bit later in the day, No. 5.  It says -- you say

Page 69

1   to him, on November 11th at 12:31 p.m., "Hey on
2   gold, top 3 cripto or silver if they use this as
3   down for you mobilize it and it is gone or in
4   safe keeping so it can be returned??"  Do you
5   see that?
6      A.  Yes.  He was wanting to -- that's --
7   he was wanting to either buy or sell gold is
8   what that was.  So more than likely, the person
9   that I was enter -- or trying to get him
10  connected with was Max Barber, because Max
11  Barber was the one that does gold.  And if you
12  read in No. 6, he says, "I can monetize gold or
13  silver with their SKR if from top bank."  So he
14  was the one -- they had the gold.  He was the
15  one that was receiving it, or monetizing it.
16     Q.  And you were aware of Mr. Barber from
17  your deal with Mr. Greco?
18     A.  Correct.
19     Q.  All right.  And you introduced
20  Mr. Barber to Mr. Hanke?
21     A.  I don't know if they ever got
22  introduced because I don't think -- whichever
23  side fell through and never produced anything
24  that could move forward.
25     Q.  Is it fair to say, then, that

18 (Pages 66 - 69)

Page 70

1  Mr. Hanke had the idea of doing a gold
2  transaction.  You knew Mr. Barber and attempted
3  to connect the two of them?
4      A.  I just told him that's the only
5  person I knew of that did any type of gold.
6      Q.  Go to No. 9.  Yeah.  You indicate to
7  him a little bit later in the day, at 1:46 p.m.,
8  you say, "Bitcoin or other top 3 what is that
9  process."
10     A.  Somebody's come back and asked a
11  question and I just asked it to him.
12     Q.  Yeah.  And who was that?
13     A.  I don't know.  I have no idea.
14     Q.  During that point in time, were you
15  in discussions with anybody --
16     A.  It could have been Max Barber.  I
17  don't know.
18     Q.  During that period of time, were you
19  in the process of talking to people about
20  potential Bitcoin or other cryptocurrency
21  transactions?
22     A.  No.  I know absolutely nothing about
23  crypto.  It's, again, on a computer, and I am
24  not computer literate enough to keep that one
25  going.

Page 71

1      Q.  You indicate on No. 11, on the same
2  day, "Please email application if you have one
3  my people have six immediate file to bring to
4  the table."  What did you mean by that?
5      A.  I'm assuming it's with whatever this
6  Bitcoin thing was, that they had six different
7  files, meaning six different cryptos, I guess.
8      Q.  Let's go to No. 13.  You indicate on
9  November 13th at 10:22, you say, "Can you send
10  me blank agreement for his review before the
11  call.  Remember they are doing this as a loan so
12  we need to address before the call."  Do you see
13  that?
14     A.  Yes.
15     Q.  And what were you referring to at
16  that point about those people working on a loan?
17     A.  I don't know because I don't recall
18  this at all.  This -- any of this transaction, I
19  don't recall.
20     Q.  Okay.  And it says, "Can you send me
21  blank agreement for his review before the call."
22  Do you know who you were going to be talking to
23  about this particular loan transaction?
24     A.  I can't recall this transaction so I
25  have no idea.

Page 72

1      Q.  And then at 12:59, after Mr. Hanke
2  says, "I'm looking for some loan docs now," in
3  the next text you say to him -- you propose to
4  him just changing your doc to read lending
5  deposit agreement and we can get loan docs
6  later.  Do you see that?
7      A.  Uh-huh.  I have no idea.
8      Q.  And then you say, "Are you ready for
9  the call?" at 1:00 p.m.  Do you recall on
10  November 13th having a call at 1:00 p.m. with
11  somebody about a lending transaction?
12     A.  I do not.
13     Q.  And then on No. 17, you say, "Can you
14  lend/leverage someone else's sblc from top
15  bank."  Does that refresh your --
16     A.  I don't know.  No, somebody has
17  asked.  I
18  don't -- I don't know.  Because he owns a bank,
19  it would be the reason I would ask this.
20     Q.  And who are you asking on behalf of?
21     A.  I have no clue.
22     Q.  Were you talking to anybody about
23  doing a potential leverage transaction using an
24  SBLC?
25     A.  No.

Page 73

1      Q.  Have you ever done an SBLC
2  transaction before?
3      A.  No.
4      Q.  In No. 19, you indicate, "Please call
5  me," and then it says, "Sherry, talk to me.
6  I've got things to advance but need info first.
7  What can we do to get things rolling?"  It looks
8  like that particular text may have come from him
9  and not from you, even though it's on that
10  column.  Does that seem right?
11     A.  I don't know.
12     Q.  So Mr. Hanke indicates at 3:27 p.m.
13  on November 19th, it says, "Please address to
14  DiMora Enterprises, LLC."  Does that refresh
15  your recollection as to the transaction that you
16  were talking about at that point?
17     A.  No idea.  I've never heard of DiMora
18  Enterprises.
19     Q.  And then November 19th at 3:28, he
20  says, "location to follow.  25b in Dubai
21  afterwards.  Same owners."  Does that ring a
22  bell as to what you were talking about?
23     A.  He had something in Dubai and -- and
24  the one next to, in Ghana, that he was -- he was
25  -- he was in cannabis business.

Page 74

1    Q.  Flesh that out for me.  Who was in
2  the cannabis business?
3    A.  Alan.
4    Q.  And this particular text refreshes
5  your recollection that what he was describing at
6  that point was a cannabis business?
7    A.  Yeah.  25b is money that he -- in --
8  that's sitting in Dubai.  And then he has 400
9  million in Ghana.  And then it says up to 4b,
10  which is half.
11    Q.  And so what's your recollection of
12  your involvement in these transactions at the
13  time?
14    A.  He would call and ask various
15  different things, if I knew people that could do
16  various things, just like with the gold, and I
17  -- you know, I didn't have anything on that.
18    Q.  You indicate this -- November 20th at
19  3:55 it says, "Does TRay Howard have email
20  address and phone number?"  Do you see that?
21    A.  Yeah, and I don't even recollect T.
22  Ray Howard.
23    Q.  Okay.  So you have no recollection of
24  who T. Ray Howard was?
25    A.  No.

Page 75

1    Q.  Do you have any recollection of ever
2  having a conversation with T. Ray Howard?
3    A.  No.
4    Q.  Let's go to December 12th, No. 28.
5  Well, let's go back up to 27 first.
6      27, do you see that, Ms. Sims?
7    A.  Uh-huh.
8    Q.  December 3rd at 3:53, 2019, it says,
9  "Please call me," with an exclamation point.
10    A.  Correct.
11    Q.  Do you recall reaching out to
12  Mr. Hanke to ask for a telephone call on that
13  day?
14    A.  On that day, I have no idea.
15    Q.  And the next text exchange is
16  December 12th, so there is a nine-day period.
17  Do you recall having any conversations with Mr.
18  Hanke between December 3rd and December 12th,
19  2019?
20    A.  I do not.  I don't.
21    Q.  Okay.  Now, the --
22    A.  But that -- in 28, see, that's where
23  it says "6 dispensaries in Colorado."  Like I
24  said, he was -- he had something to do with --
25  with cannabis.

Page 76

1    Q.  Uh-huh.
2    A.  Alan did.
3    Q.  Got it.  And so, that text, is it
4  fair to say that you were copying and pasting a
5  text that you had received from Jeff and sending
6  it to Mr. Hanke on that date?
7    A.  I guess, but I don't know who Jeff
8  is.
9    Q.  Okay.  Well, that was my next
10  question.  Do you have any idea who Jeff is?
11    A.  I do not.
12    Q.  But Mr. -- but Mr. Jeff here is
13  asking you or Alan to send an overview email
14  listing three to four profiling deals example.
15  Do you see that?
16    A.  Correct.
17    Q.  Okay.  And did you have a discussion
18  with Mr. Hanke about putting together that
19  information for Jeff?
20    A.  I don't recall.
21    Q.  And do you recall anything about
22  working on a transaction relating to a cannabis
23  business in Colorado in or around December 12th
24  with Mr. Hanke?
25    A.  I -- I mean, again, Alan had all

Page 77

1  kinds of things working.  I don't remember.  I
2  don't recollect this at all.
3    Q.  Okay.  Let's go to No. 31.  Am I
4  correct that this entry shows that you were
5  cutting and pasting something -- a text from
6  Jeff and sending it to Mr. Hanke?
7    A.  Okay.  I -- I guess.  I don't -- like
8  I said, I don't recollect this call at all.
9    Q.  So a little bit later down the --
10  stay there, Peter -- but it says, in this text,
11  "Wouldn't the escrow and bond process take a
12  little time," question mark.  Do you recall
13  being involved with Mr. Hanke about a bond
14  relating to Mr. Jeff's transaction in the
15  cannabis world?
16    A.  No, not at all.
17    Q.  Now, December 13th, No. 32, the next
18  one, you indicate to Mr. Hanke, it says, "Call
19  me."  Do you see that?
20    A.  Right.
21    Q.  Right.  And then it says have $100+
22  million potential real estate situation with a
23  borrower that will have somebody post a fresh
24  issued sblc from Barclays London."  Do you
25  recall having any discussions with Mr. Hanke

20 (Pages 74 - 77)

Page 78

1 about a potential $100 million real estate
2 situation involving an SBLC from Barclays
3 London?
4     A. I do not.
5     Q. Do you know what an SBLC is?
6     A. Standby letter of credit.
7     Q. Did SGIT ever do any SBLC
8 transactions?
9     A. No.
10     Q. Did GIT?
11     A. No.
12     Q. Did you personally, through any other
13 corporate vehicle, do any SBLC transactions with
14 Mr. Hanke?
15     A. No.
16     Q. Do you recall --
17     A. Nothing was ever done -- nothing was
18 ever done with Mr. Hanke except his bonds.
19     Q. In No. 33, you say, "Please please
20 call me very very important!!"  Do you recall
21 what the urgency was to talk to Mr. Hanke on
22 that day?
23     A. No idea.
24     Q. And then he responds to that four
25 minutes later at 7:28 p.m. on December 13th, he

Page 79

1 says, "Ok. Just landed. Need few."  And you
2 respond, "Please call me we have issues."  Do
3 you know what you were referring to when it said
4 "we have issues"?
5     A. I don't.  But I mean, I would guess
6 that something came in that's not -- one of
7 his bonds, and I would immediately want to speak
8 to him.
9     Q. Let's go to No. 43. On January 16,
10 2020, you ask him, "Just got this can you please
11 answer.  Good afternoon.  A few questions:"  And
12 then it goes into several details about a
13 transaction.  Do you recall working with
14 Mr. Hanke on a transaction involving Kenya
15 clients, Willy and Ibrahim?
16     A. No.
17     Q. And then it says -- it says "Just got
18 this."  Do you recall who you received that
19 from?
20     A. I do not.
21     Q. Go to 44. He says, "Hi Sherry," and
22 then he -- "The client is Willy Bonga."  Does
23 the name Willy Bonga refresh your --
24     A. Doesn't recollect, nothing
25 whatsoever.  This is just more of what he was

Page 80

1 trying to do cannabis-wise is what I'm
2 understanding from what he's saying.
3     Q. And then you -- you -- on
4 February 7th, you say, "Please call," question
5 mark, question mark [sic], and then -- I mean
6 exclamation point, exclamation point, excuse me.
7 And then on -- at short time after, within the
8 hour, you say, "Having a call with the cash guys
9 do you want to be a part of it or not??"
10     A. That was more of his cannabis stuff.
11     Q. But you were having a call with the
12 cash guys, right?
13     A. Correct.
14     Q. Do you know if he was part of that
15 conversation?
16     A. I don't know.
17     Q. Okay.  And who were the cash guys?
18     A. I don't know which time this was.
19     Q. Well, the text messages on
20 February 7th, does that refresh your
21 recollection of who might the cash guys be?
22     A. No.
23     Q. Did you have calls with various
24 businesspeople concerning Mr. Hanke's
25 transactions without him, when he was not on the

Page 81

1 call?
2     A. No.  I would just refer him over and
3 they would talk.  If he asks for something and I
4 had somebody, just like the Max Barber, I would
5 just give him that and they would go forward.
6     Q. But on February 7th, you had a call
7 with the cash guys about some transaction
8 involving Mr. Hanke, right?
9     A. Correct, but read the one before.  It
10 says, "Please please call me."  That means Alan
11 did his typical thing and didn't get back with
12 people, and so they're going to come back to
13 whoever referred it and see -- have a call.
14     Q. And it fell on you to have that
15 conversation?
16     A. I'd just tell him, He ain't got back
17 with me. Wait until he does.  If he does, he
18 gets with you. If he doesn't, he doesn't.
19 Write him off.
20     Q. So on 48 on February 7th, you say,
21 "Oh wow so did funds hit and did other" --
22     A. I can't see it.  Can they move it up?
23     Q. Sure.  Yeah, for sure.
24     A. Okay.  Thank you.
25     Q. Here, you're having a text exchange

21 (Pages 78 - 81)

Page 82

1  about funds hitting bank accounts, correct?
2      A.  Correct.
3      Q.  And did you know -- sitting here
4  today, do you have a recollection of what funds
5  you were talking about when you said, "Oh wow so
6  did funds hit and did other funds clear??"
7      A.  It had to be done with one of his
8  transactions.
9      Q.  So on 54, you say, "So did 7m come
10 back and what about shek wire??"  Do you see
11 that?
12     A.  Right.
13     Q.  Is that --
14     A.  That would have been when -- that
15 would have been in reference to a call with
16 William.
17     Q.  Okay.  And the "shek" there is really
18 a reference to the sheikh; is that right?
19     A.  Correct.
20     Q.  And you were inquiring of Mr. Hanke
21 of the whereabouts of the sheikh's wire
22 transfer?
23     A.  Yes, because William had called and
24 asked in regards to it.
25     Q.  So let's go to 58.  On February 10th,

Page 83

1  you indicate, quote, Email me specifics on 3.1
2  and 500 million so I can get you best pricing.
3  Do you know what that refers to?
4      A.  I think it refers to William had
5  something that he was dealing with that he would
6  be able to leverage people's funds, and that's
7  all I can guess that that's what it's about.
8      Q.  Do you have any other recollection
9  besides your --
10     A.  No.
11     Q.  -- guess?
12     A.  No.
13     Q.  So on No. 65, you ask Mr. Hanke, "Is
14 QNB finansbank, which you can read about in the
15 attached link, a bank you can receive an SBLC
16 from for a loan deposit?"  What's your
17 recollection of a transaction with QNB
18 Finansbank?
19     A.  I believe that was something from
20 Max.
21     Q.  And do you remember what Max -- and
22 that's Max Barber, right?  Do you know what --
23     A.  Correct.
24     Q.  -- Max Barber was proposing there?
25     A.  No idea.

Page 84

1      Q.  And then on No. 70, you're asking
2  Mr. Hanke here, am I correct, that --
3      A.  Correct.
4      Q.  -- for an update because you could
5  really use some good news today?
6      A.  Correct.
7      Q.  Do you remember --
8      A.  That's just badgering of him again to
9  get me something on an update of where
10 everything is at because I'm sure William had
11 called that day.
12     Q.  So on No. 72, you say, "Hey," to
13 Mr. Hanke on February 11th in the evening, 9:49
14 p.m., "Hey my guys just called your guy is over
15 there and getting ready to do the video and
16 hopefully can start mid week."  What were you
17 talking about there?
18     A.  That don't even make sense -- that
19 doesn't make sense at all.  I mean, it almost
20 seems like that text is on the wrong side.
21     Q.  Do you have a recollection of saying
22 that to Mr. Hanke?
23     A.  No, not at all.
24     Q.  Do you ever -- during this time
25 frame, do you ever recall traveling to the

Page 85

1  West Coast?
2      A.  To the West Coast?
3      Q.  Yeah.  On business.
4      A.  I don't know if I had traveled.  The
5  furthest I've gone west is Vegas.  So the only
6  thing, if I was in -- can you go up a little
7  bit?
8      Q.  Sure.
9      A.  Okay.  A little bit more.  Little
10 further.  Because there was someone here --
11 somewhere here where it says that I was getting
12 ready to go back into court.  The only thing I
13 could see is that it was -- that I was on the
14 West Coast with Jackie -- I mean, the Allnet
15 situation.
16     Q.  Okay.
17     A.  I seen it somewhere in there.  It had
18 something, I'm getting ready to walk in, but I
19 don't see it now.
20         MR. BAUTZ:  I think it may
21     be Line 66, "In hearing can you
22     please -- or can you reply please."
23     A.  Oh, there we go, "In hearing can you
24 reply please," yeah, that -- that may be it
25 right there.

22 (Pages 82 - 85)

1    Q   (BY MR. HEFTER)  That's your
2  recollection that that was a reference to a
3  hearing in the Allnet case?
4    A.  I don't know.  I'm just saying it --
5  you're asking west.  The furthest west I've ever
6  been is Vegas --
7    Q.  Got it.  The reason why I ask --
8    A.  With the -- with the surety.
9    Q.  Let's go down to 77.
10   A.  77.  We have a bond that we did for a
11  lady who that -- it's a California cannabis
12  license.  And they defaulted on the bond and my
13  attorneys had said we could take the license, do
14  the license.  Well, again, I know nothing about
15  the cannabis side of it so I was asking him
16  about that.
17   Q.  So that was a case where you were not
18  the obligor on the bond.  You were the -- you
19  were seeking to enforce a bond against this
20  person in California?
21   A.  Yes.
22   Q.  Did SGIT have other transactions like
23  that, where it was not the surety but it -- that
24  it had -- it received or held bonds as
25  collateral from other obligations?

1    A.  No.  We were the surety on this bond.
2    Q.  And was that a transaction that
3  involved Hanke, or were you just asking him a
4  question?
5    A.  No, just asking a question.  We were
6  never anything on bonds except the surety.  And
7  this one -- this specific one, I'm wanting to
8  say Larry had done it and it had defaulted.  And
9  I didn't know anything about it, and Mike was
10  asking me about licensing and everything.  And I
11  told him the only person I know that knows
12  anything on cannabis would be Alan Hanke.
13   Q.  Got it.  Go to 83.  You attach a
14  website or a URL of www.bancoprovincia.com.ar?
15   A.  Right.
16   Q.  Does that refresh your recollection
17  of doing a transaction involving this particular
18  bank?
19   A.  No, that -- that's where CGE had
20  asked about an SBLC from a bank, and I didn't
21  know if Alan's bank could do something like
22  that.
23   Q.  And that led to your sending No. 84?
24   A.  Correct.
25   Q.  We'll go to 91.  On February 19,

1  Hanke says, at 1:51 p.m., "With Sheikh guys.
2  Gonna be a bit.  Will call soon as I can."  Do
3  you recall having any conversations about that
4  particular meeting?
5    A.  No, he had just told me that he was
6  meeting with them.
7    Q.  And do you know where that meeting
8  took place?
9    A.  I don't -- there's various meetings.
10  I don't know.  Because I know there was a
11  meeting in Chicago, and there was a meeting in
12  New York.  I don't know which meeting this is.
13   Q.  Fair enough.  Let me ask you another
14  foundational question here because all these
15  texts say Alan J. Hanke Illinois from Tammy B?
16   A.  Yep.
17   Q.  Was Tammy the person who sort of
18  compiled this table and used that software
19  product?
20   A.  No.  Tammy is who introduced me to
21  Alan.
22   Q.  Oh, fair enough.  But you had
23  indicated that she was a friend of yours?
24   A.  Correct.
25   Q.  Why are these texts saying Alan J.

1  Hanke Illinois from Tammy B?
2    A.  Alan J. Hanke, he lives in Illinois,
3  and he's from Tammy B.  That's how I met him.
4    Q.  Okay.  Got it.
5    A.  So if he's in my phone and 15 years
6  later, and I don't have a clue what his name --
7  what it was about, I know where it came from.
8    Q.  Let's go to 122.  And I'll ask you to
9  maybe read a few of the texts before 122 and
10  then after, just to give you a...
11       Let me know when you've done that.
12   A.  Okay.
13   Q.  And then on February 24th, 2020, you
14  indicate, "Is there a % you have in mind for the
15  4 of us."  Do you see that?
16   A.  Correct.
17   Q.  Do you have a recollection of what
18  you were talking about there?
19   A.  It had something to do with a
20  cannabis deal, because if you do down and read
21  124, it says, Is this the cultivation or
22  dispensary side.
23   Q.  And were you expecting some
24  percentage of profit or fee as a result of the
25  transaction?

23 (Pages 86 - 89)

1    A.  If I refer something, I would.
2    Q.  If we go to 134 to 138.
3    A.  Okay.
4    Q.  So is it fair to say that in 135, you
5  were asking whether you could change the name of
6  the account in Metro States Capital Bank?
7    A.  Correct.
8    Q.  And that you then -- he said yes, and
9  then you provided your personal name and the PO
10  Box for SGIT?
11    A.  Correct.
12    Q.  Go to 168.  Back to Mr. Jeff here, at
13  February 29th, correct me if I'm wrong, but it
14  looks like you are cutting and pasting a text
15  that you received from Jeff and sending it no
16  Mr. Hanke.  Is that correct?
17    A.  Yes.
18    Q.  And Jeff is saying, Good call
19  yesterday, thanks.  If you can help get the sblc
20  language for latam bank, and the revised draw
21  schedule for Corp. deal.  Thx!"  Do you see
22  that?
23    A.  Yes.
24    Q.  Does that refresh your recollection
25  of the transaction you were working on with

1  Jeff?
2    A.  It doesn't but I'm sure it replies --
3  it stems around something Alan had that was a
4  cannabis transaction.
5        MR. HEFTER:  Why don't we
6    take a break.
7      (Recess 12:55 p.m. to 1:17 p.m.)
8    Q   (BY MR. HEFTER)  Ms. Sims, I want to
9  continue to go through some of your texts, not
10  all of them, but some of them.  But before I get
11  there, I have a question for you about this
12  particular litigation.  At any point in time was
13  Alan Hanke paying your legal fees for the
14  defense of this action prior to your counsel's
15  withdraw?
16    A.  No.
17    Q.  Did you ever ask him to pay your
18  legal fees?
19    A.  No.
20    Q.  Did you ever have an agreement that
21  in the event there was litigation involving his
22  transactions that he would pay your legal fees?
23    A.  His GIA he signed says he would.
24    Q.  And did you make a demand under the
25  GIA for him to pay your fees?

1    A.  A demand to something that has
2  nothing?
3    Q.  I'm asking you whether you made a
4  demand.
5    A.  No.  I made a verbal to him telling
6  him he was supposed to.  He assured me
7  everything was good and he was taking care of
8  it.
9    Q.  Okay.  But he never conformed to his
10  promise?
11    A.  No.  That's when I started letting
12  the attorneys listen to his phone calls.
13    Q.  Let's go back to the business phone
14  texts, and let's go to 276.  Do you see that?
15  Do you see that you asked him, "Do you have any
16  commercial real estate deals between 5-10m that
17  have stalled possible lenders asking we can do?"
18    A.  Correct.
19    Q.  And what did that refer to?
20    A.  Me going back to doing real estate
21  again.
22    Q.  And so between 2018 and 2020, would
23  it be fair to say that you were not doing any
24  real estate transactions?
25    A.  No, I was.  But this here, when this

1  came up, I wanted to see what he had.  I needed
2  to see what he was working with.
3    Q.  Okay.  And you were looking to do
4  commercial real estate deals between 5 and
5  10 million dollars?
6    A.  No, I just pulled that out of the air
7  to find out what he had.
8    Q.  Okay.  Well, putting aside the actual
9  figure, size of the deal, you were looking at
10  that point to discuss with him potential real
11  estate deals?
12    A.  It was a question to see what he had.
13  If he would come back and say, Yes, I have a
14  house in Chicago worth 5 million, I don't owe on
15  it.  It was a question.  I was being fed through
16  my attorney to ask questions.
17    Q.  Which attorney?
18    A.  William Slater Vincent.
19    Q.  And what did you mean when saying
20  "possible lenders asking we can do"?
21    A.  It's just a way of asking if he has
22  anything available.
23    Q.  And at that point in time, you were
24  looking to do real estate transactions?
25    A.  No.  I was looking to find out what

Page 94

1  Alan Hanke had.
2      Q.  Okay.  Putting aside this text,
3  between 2018 and 2020, were you still in the
4  business of doing real estate transactions?
5      A.  I would pick up one here or there or
6  assist somebody with it.
7      Q.  Were you getting any fees for those
8  services?
9      A.  Not unless I closed -- I mean, I did
10 one on my own.  I don't remember closing one
11 besides my own personal home.
12     Q.  Okay.  And how many closings on your
13 own personal home did occur between 2018 and
14 2020?
15     A.  I bought and sold a home and bought
16 another home.
17     Q.  Did you do any transactions for third
18 parties during that period of time?
19     A.  I don't recollect.
20     Q.  Let's go to 337.  You see you refer
21 to a Vietnam deal?
22     A.  Correct.  That was a cannabis deal he
23 had.
24     Q.  And you're asking him, I need to know
25 if you're still interested or not.  Please call

Page 95

1  me."  Do you see that?
2      A.  Correct.
3      Q.  And with respect to this particular
4  deal, SGIT was going to issue surety bonds?
5      A.  No.
6      Q.  What was SGIT's or your role in
7  connection with the Vietnam deal?
8      A.  On the cannabis, I was just getting
9  him in contact with the people he needed to do
10 whatever he needed done.
11         MR. HEFTER:  Can I have that read
12 back, please.
13         (Requested portion was read.)
14     Q   (BY MR. HEFTER)  And so you were
15 acting as an intermediary between people in
16 Vietnam and Hanke in connection with that deal?
17     A.  No, I just put the two together.
18     Q.  And who in Vietnam were you putting
19 together with him?
20     A.  I couldn't tell you.  I don't know
21 what -- I don't know -- I don't know what that
22 deal was.
23         When did -- when did COVID start?
24     Q.  March of 2020.
25     A.  Okay.  Then that Vietnam deal was not

Page 96

1  cannabis.  It was COVID related.  Because Alan
2  started doing PP -- PPP, or something like that,
3  transactions and needed people -- he was doing
4  gloves and gowns, I think.
5      Q.  And what was your role in connection
6  with that transaction?
7      A.  He had asked for something.  I don't
8  know what it was at the time.  But it had
9  something to do with him providing -- he had
10 somebody who needed gowns or gloves or was
11 furnishing them.
12     Q.  And you would have proceeded to put
13 those two parties together?
14     A.  If he called and asked for it.  He
15 asked if I knew anybody, just like he did with
16 the gold.
17     Q.  And do you remember the name of the
18 people -- names of the people in Vietnam at this
19 point?
20     A.  No idea.
21     Q.  Okay.  Let's go to -- let's mark Sims
22 Exhibit 5, the log of texts between Alan Hanke
23 and
24 Ms. Sims on her personal phone.
25         (Exhibit No. 5 introduced.)

Page 97

1      Q   (BY MR. HEFTER)  As I have just
2  indicated,
3  Ms. Sims, I have marked as Sims 5 the log of
4  your text messages on your personal phone with
5  Mr. Hanke.  Did I describe this document
6  accurately?
7      A.  Yep.
8      Q.  And was this document prepared in the
9  same manner as the table for your business
10 phone?
11     A.  Correct.
12     Q.  Now I notice that the first text is
13 dated February 1st, 2019.  Do you see that?
14     A.  Correct.
15     Q.  Do you know why these text only go
16 back to February of 2019 and not before that
17 period of time?
18     A.  Probably phone broke or whatever.  I
19 had to get a new phone.  I don't know.
20     Q.  And I think we've talked about the
21 first text of your business phone was
22 November 11, 2019.  Do you know why texts didn't
23 go back further than that period of time on that
24 phone?
25     A.  I don't know.  But what it may be

Page 98

1  that, when I met him, he had my personal phone,
2  and then he had gotten my business number.  I
3  don't know.
4      Q.  Do you still carry two phones around
5  with you?
6      A.  No.
7      Q.  The log of this personal phone text,
8  is that still the phone that you use as your
9  personal phone?
10     A.  Yeah.
11     Q.  And just so we get the document clear
12  on the column on the furthest side of the right
13  says "Sent Message" and next to it is "Received
14  Message."  Is it fair to say that the received
15  message is Mr. Hanke talking and the sent
16  messages is you talking?
17     A.  Correct.
18     Q.  So let's go to No. 33.
19         MR. HEFTER:  Maybe just for context,
20  Peter, can we just move up so Ms. Sims can read
21  a few of them.  That's probably good.
22     Q.  (BY MR. HEFTER)  And if you would,
23  just read through 33 for me.
24         Sitting here today, do you have any
25  idea what transaction that you were discussing

Page 99

1  with Mr. Hanke in these set of texts?
2      A.  No.
3      Q.  When you see this, does it refresh
4  your recollection that the transaction was
5  Mr. Al Thani's transaction?
6      A.  I don't recollect that from these.
7      Q.  In 38 there is -- you asked Mr. Hanke
8  a question, "Are you working with a Rita Henry
9  out of Georgia?"  Who is Rita Henry?
10     A.  I don't have a clue.  It could be
11  somebody that just came across my desk, and I
12  asked him if he had ever heard of her.
13     Q.  Okay.  Now, let's go to 48 on
14  April 1st, 2019.  You indicate to Mr. Hanke in
15  -- hold on -- in 48, okay.
16         You indicate to Mr. Hanke on April
17  1st at 8:54 p.m., 2019, Line Item 48, that,
18  "Alan please call me I need to talk to you to
19  finish this.  Thanks."
20         Do you know whether you were
21  referring to the transaction with Mr. Al Thani
22  at that time?
23     A.  No idea.  No idea.
24     Q.  And then if we go down to No. 57, I
25  -- I refer you to 57 just to give you some

Page 100

1  context.
2      A.  Okay.
3      Q.  Where you indicate, "Sorry I'm in
4  Vegas in depositions this week."
5      A.  Okay.
6      Q.  I'm not going to ask you any
7  questions about that.  I just wanted to give you
8  a sense of where you were in the world at that
9  point in time.
10     A.  Okay.
11     Q.  But if you go up to 53, Mr. Hanke is
12  providing you with the name of Lance Baraker at
13  Fortitude Capital.  Do you see that?
14     A.  I do.
15     Q.  And then -- and then -- and he
16  provides his mobile telephone number?
17     A.  Uh-huh.
18     Q.  And then you indicate that you --
19  "All good just spoke to lance!!"  Do you see
20  that?
21     A.  I do.
22     Q.  Does that refresh your recollection
23  as to who Mr. Baraker was and whether you had a
24  conversation with him?
25     A.  It does not.

Page 101

1      Q.  But this confirms, based on your
2  text, that you had a conversation with
3  Mr. Baraker, correct?
4      A.  Correct.
5      Q.  If we go to -- hold on one second --
6  62, text dated 9:05 p.m., May 29, 2019, you --
7  you're exchanging texts with him about having a
8  conversation and says -- you say, "Later at a
9  graduation!"  Do you see that?
10     A.  Uh-huh.
11     Q.  Does that refresh your recollection
12  as that -- time period?  Who was graduating?
13     A.  Probably my nephew.
14     Q.  Do you recall attending your nephew's
15  graduation?
16     A.  I did.
17     Q.  Okay.  And what was he graduating
18  from?
19     A.  High school.
20     Q.  Several minutes later, at
21  9:11 p.m. -- well, strike that.
22         At 9:06 p.m., in response to your
23  text that you were going to a graduation,
24  Mr. Hanke says, "Ok.  No issues.  Whenever you
25  can would be great.  Or tomorrow if better

26 (Pages 98 - 101)

Page 102

1  suited.  Best."  Do you see that?
2      A.  Uh-huh.
3      Q.  And then you say, "Ok it will be late
4  tonight so lets do tomorrow am."  And he
5  responds four minutes later, at 9:11 p.m. on May
6  29th, "Thank you.  I land in la guardia at 9
7  eastern so any time afterwards.  Thank you."  My
8  question is:  So at that point in time, you were
9  aware that Mr. Hanke was traveling to New York?
10      A.  Okay.
11      Q.  Is that -- as of that point in time,
12  you were aware, correct?
13      A.  I guess.  I mean, I don't know that I
14  put two and two together with LaGuardia, but
15  traveling, I would assume.
16      Q.  Okay.  You're aware that LaGuardia
17  airport is located in New York City, correct?
18      A.  I do.
19      Q.  And you respond, "Ok travel safe."
20  Do you recall having any conversations with
21  Mr. Hanke while he was in New York?
22      A.  I do not.
23      Q.  Do you recall actually -- in response
24  to this set of texts about trying to set up a
25  call, do you recall getting on the phone with

Page 103

1  him at any point in time while he was in
2  New York?
3      A.  No.
4      Q.  On May 31st, you indicate to
5  Mr. Hanke, "Alan I am so so so sorry.  Please
6  call me when you are free."  What were you
7  referring to about when you were sending your
8  apologies to him?
9      A.  No idea.  Probably one of his many
10  either deaths or sicknesses or something like
11  that.
12      Q.  Does this refresh your recollection
13  as to whether you had a conversation with
14  Mr. Hanke during this time period?
15      A.  No idea.
16      Q.  Does this refresh your recollection
17  as to whether you had any email exchange or
18  other written exchange?
19      A.  No.  No, I could have gotten it from
20  some other person.
21      Q.  That's what I was going to ask.  You
22  know, do you recall having any conversation with
23  any third party about something that happened to
24  Mr. Hanke that caused you to say, I'm so so
25  sorry?

Page 104

1      A.  I do not unless it would be William
2  Slater Vincent.
3      Q.  Let's turn our attention to -- strike
4  that.
5          Do you recall having any conversation
6  with Mr. Hanke about who he was meeting with in
7  New York during --
8      A.  No.
9      Q.  -- on or about May 29th?
10      A.  No.
11      Q.  If you go down to No. 69 and 70,
12  there's a reference to RJ Barnes.  Do you know
13  who RJ Barnes is?
14      A.  I don't recollect that name.
15      Q.  Do you have a recollection of a name
16  of Tom Ward?
17      A.  Yes.
18      Q.  Who is Tom Ward?
19      A.  Tom Ward is a -- one of his partner
20  or business acquaintance of Alan Hanke's.
21      Q.  Did you have communications with him?
22      A.  I had met Tom Ward through something
23  else many, many years ago.  It was just a common
24  name that -- or person that we had both run
25  across in our past.

Page 105

1      Q.  And during the 2018 to 2020 time
2  period, did you have any written or oral
3  communications with Tom Ward?
4      A.  Not that I'm aware of.
5      Q.  When you conducted a search of your
6  files, did you search for any communications
7  with Mr. Ward?
8      A.  Not that I'm aware of.  I haven't
9  talked to this man in many, many, many years.  I
10  don't know that I would even have anything.
11      Q.  So if you go to 92, if you look at
12  93, there's a reference -- you ask -- you ask
13  Mr. Hanke in 92, "Are you still working with
14  that guy we spoke about that was your partner?"
15  He responds that day, "Tom Ward?"  You say,
16  "Yes."  Do you -- do know why you were asking
17  Mr. Hanke if he was still working with Tom Ward
18  at that point in time?
19      A.  No.  I'm sure somebody asked
20  something and -- or asked if I had ever -- if I
21  had talked with him or something to that nature
22  that would make me even reach out and ask that.
23      Q.  Mr. Hanke, in 95, says, "Good
24  evening.  I'm in the hopes -- I am hopes things
25  are getting better.  I've gone some work on your

27 (Pages 102 - 105)

Page 106

1  older bond with tom."  What does that refer to?
2      A.  I don't know.
3      Q.   And then he says, "Olivas" -- okay.
4      "Olivas has requested that we maybe
5  meet 3 of us together in Dallas."  Do you see
6  that?
7      A.   Correct.
8      Q.  Do you know who Olivas is?
9      A.  I don't know that name.
10      Q.   And then he asked you the status of
11  the Al Thani $3.5 new bond, and you respond,
12  "Sorry for delay bond is in your email."
13      A.   That meant he had sent the documents
14  over to do the bond -- for me to do the bond.
15      Q.   Right.  And you said, "Sorry for
16  delay."  Do you recall what the reason for the
17  delay was?
18      A.  I don't know if I was traveling or
19  wasn't there.  I don't know what -- what would
20  have caused that there was a delay on doing it,
21  or you know, the trustee, she may have been
22  out-of-pocket.
23      Q.   And at 8:41 on August 10, 2019, you
24  ask a question, "How did your meeting go last
25  night," and he responds.  Do you recall what

Page 107

1  meeting he was in that caused you to ask how the
2  meeting went the previous night?
3      A.  No idea.  No idea.
4      Q.   And then on August 15, you say,
5  "Alan, please call me."  A few days later you
6  say, "Good morning Alan please call me."  Do you
7  recall having any conversations with Mr. Hanke
8  during that period of time?
9      A.  I don't recall.
10      Q.   And on 117, on September 3, 2019, you
11  say, "Please call me.  Are we still meeting your
12  client in Atlanta this week I fly in Thursday."
13  Do you see that?
14      A.   Correct.
15      Q.  Is it fair to say that in the early
16  September 2019 time frame that you flew to
17  Atlanta?
18      A.   Yes, to meet with William Slater
19  Vincent.
20      Q.   Okay.
21      A.  My attorney.
22      Q.   And where you say, "Are we still
23  meeting your client in Atlanta this week," who
24  is --
25      A.  I don't know -- I don't know who he

Page 108

1  would be speaking about.  That may be one of
2  them that did not -- did not transpire that he
3  was putting together.
4      Q.  Do you recall meeting somebody who
5  was Hanke's client even if you can't remember
6  their name?
7      A.  No, I never met -- I never met any of
8  Hanke's clients, never -- none of that.
9      Q.  Did you meet Hanke in Atlanta in or
10  around September 3rd?
11      A.  Nope.  Nope. I've only met him in
12  Dallas, Texas -- Irving, Texas, at the hotel.
13  Sorry.
14      Q.  Okay.  If you go down to 123, he
15  provides --
16      A.  Yes.
17      Q.  -- he provides you the name of John
18  Evans SRM?
19      A.  Yes, I know the name John Evans.
20      Q.  Yeah.  Did you have a telephone
21  conversation with Mr. Evans after Mr. Hanke
22  forwarded you his cell phone number?
23      A.  I've talked to John Evans multiple
24  times.
25      Q.   And Mr. Evans, on behalf of SRM,

Page 109

1  threatened to sue you, correct?
2      A.  Correct.
3      Q.  And did you have conversations with
4  Mr. Evans prior to -- prior to those threats?
5      A.  I don't recall.
6      Q.  Let's go to 135.  Hanke on
7  September 17th at 4:30 says, "Airport boarding
8  plane.  You need me quick, or can I call in the
9  morning?"  Do you see that?
10      A.  Yes.
11      Q.  And you say, "Call me in the morning.
12  Thanks."  That was on September 17th.  Do you
13  recall having a conversation on the morning of
14  September 18th with Hanke?
15      A.  No.
16      Q.  There's a reference in 137 to -- a
17  reference to Clarient Capital?
18      A.  Correct.
19      Q.  Do you have a recollection of what or
20  who Clarient Capital was?
21      A.  I had no idea.  That's why I was
22  asking anyone that I had been talking to.
23      Q.  So it says, "A Beau" -- A Beau
24  called."  Is that the -- is that a person's
25  name, A B-e-a-u?

28 (Pages 106 - 109)

Page 110

1    A.  I don't know.
2    Q.  You don't recall?
3    A.  I don't recall.
4    Q.  You exchanged some texts with Hanke
5  on September 20th, and you asked him politely to
6  call you and he says he's getting his hair cut.
7  And do you remember speaking to him on
8  September 20th in or around the time he was
9  getting his hair cut?
10   A.  No.
11   Q.  Go to 169.  You indicate in a text at
12 5:57 p.m. on October 15, 2019, to Mr. Hanke,
13 "Just had heart to heart with them may be
14 sliding you in sooner than we thought."  Do you
15 have a recollection of what you were talking
16 about there?
17   A.  I think that had to do with him
18 needing something medically sick-wise, needing a
19 -- a call or something for something being sick.
20 I mean, he's a very sick person.
21   Q.  And when you say "may be sliding you
22 in sooner than we thought," what was your role
23 in connection with any medical issue that
24 Mr. Hanke was experiencing at that point?
25   A.  I don't know if he needed something.

Page 111

1  I don't know.  I don't know what that's
2  referencing.
3    Q.  Who did you have a heart to heart
4  with?
5    A.  I don't know.  I don't know what that
6  statement is referencing.
7    Q.  You don't have a recollection sitting
8  here today?
9    A.  None.
10   Q.  Let's go to 185.  Well, let's --
11 let's go back to 184, but it's just right there,
12 and 185.  On October 24th at 3:00 p.m., you
13 asked Mr. Hanke, quote, "Any luck on getting the
14 loan??"  And then you repeat the same
15 communication verbatim on October 27th at
16 9:39 p.m., "Any luck on getting the loan??"
17 What was that reference to?
18   A.  I don't know.  That's one of the
19 times he was looking at doing some sort of
20 lending.  I don't know if this was one of his
21 real estate pieces or not.
22   Q.  He responds, "No not yet.  Going to
23 nyc in morning."  So as of October 27th at
24 9:42 p.m., you were aware that on October 28th,
25 Mr. Hanke was traveling to New York?

Page 112

1    A.  From that text, I did.
2    Q.  Did you have any conversation with
3  him about what he was doing in New York?
4    A.  No.
5    Q.  He indicates, "Also group will do the
6  200m bond against trade.  Let me know if you may
7  be interested in that."  And you respond, "Yes
8  definitely."  Do you see that?
9    A.  Correct.
10   Q.  And what was that in reference to?
11   A.  I don't know the transaction.  I
12 can't recall what that was about.
13   Q.  And then on the 31st at 9:00 a.m.,
14 you say, "Please call me I have that transaction
15 that is wanting to move forward."  What
16 transaction was that?
17   A.  I don't know what it is.
18   Q.  And then on November 1st at
19 1:32 p.m., 2019, you say, "Got green light on
20 pickup of cash!!  Need to talk."
21   A.  That's his cannabis stuff.  So that
22 would be what the 190 is about is his
23 transaction with his cannabis stuff.
24   Q.  What did you mean when you say "Got
25 green light on pickup of cash"?  Are you going

Page 113

1  somewhere to pick up cash?
2    A.  No.  Within his cannabis business, he
3  has -- he had -- it's a cash business.
4    Q.  Correct me if I'm wrong, but you are
5  the one that said you got the green light on
6  pickup of cash, right?
7    A.  Correct.
8    Q.  Okay.  And what were you doing to
9  pick up the cash?
10   A.  I don't have a clue there.
11   Q.  So you don't -- sitting here today,
12 you don't have a recollection of what it means
13 to say, "I got the green light on pickup of
14 cash.  Need to talk"?
15   A.  No.  Well, no.  He was -- he was
16 always looking for various different places he
17 could have cash picked up with cannabis
18 business.
19   Q.  And did you pick up cash on his
20 behalf?
21   A.  Nope.  Nothing ever transpired.  He
22 never -- he never -- he never did anything
23 outside of bonds.
24   Q.  Who gave you the green light to pick
25 up the cash?

29 (Pages 110 - 113)

Page 114

1    A.  I have no idea.
2    Q.  He responds, "Ok."  Did you speak to
3  him about the picking up of the cash?
4    A.  I don't recall.
5    Q.  You propose to him, correct?  "Alan
6  standard fees are 2% that includes pickup and
7  process."
8    A.  I'm not seeing that.  I don't see
9  where you're seeing that.
10    Q.  On November 1st at 2:46 p.m.  Sorry.
11  Yeah.  It's the text right after "Got green
12  light on" --
13    A.  Okay.
14    Q.  -- "pickup of cash?"
15    A.  Okay.  I must have put him with
16  somebody that could do that -- do that
17  transaction and pick it up
18  for Pacific Bank.  And whatever transaction it
19  was, he had -- was asking for wire to Indonesia.
20    Q.  And did you have a relationship with
21  anybody at Pacific Bank that you put him in
22  touch with?
23    A.  Not that I'm aware of.
24    Q.  You say, "Pacific Bank.  Direct with
25  owners."  What does that mean?

Page 115

1    A.  I don't know.  I don't know if that
2  goes with the same one.  I don't know.
3    Q.  You indicate, "Please send me a
4  detail outline of what you are thinking on first
5  batch and I will have process and dates ready!"
6  Do you see that?
7    A.  Correct.
8    Q.  And so were you -- were you involved
9  in this particular deal involving Indonesia?
10    A.  It never -- there was never a deal
11  transpired.  He never provided everything.  He
12  would ask the question.  You would go ask
13  somebody.  They would come back, say yes, it's
14  okay, and he would never move forward.  He never
15  had the -- had the -- the paperwork
16  documentation to do it.
17    Q.  Let's go on 2010 -- I mean 210.
18    A.  Right there it states he doesn't --
19  he still don't anything -- I still don't know
20  anything about it.  He has not provided
21  anything.
22    Q.  He indicates on November 6th, says,
23  "Sherry let's use DSC Holding LLC or MAC Global
24  Partners LLC.  Both in Wyoming.  Also, what if
25  property has mortgage or balance owed for your

Page 116

1  Reit program."  What was he talking about "your
2  Reit program"?
3    A.  I don't know.  I guess somebody had,
4  at that time, had a -- a REIT that was taking
5  loans in.
6    Q.  Do you have any recollection of what
7  DCS Holdings LLC is?
8    A.  No idea.  I guess -- I know MAC
9  Global is one of his entities.  I guess DCS is
10  one of his also.  I don't know.
11    Q.  Let's go to 226.  You say to him,
12  "Definitely have new pipeline I can bring forth,
13  even tonight had 2 calls but stayed high level."
14  Who were you having calls with?
15    A.  I don't have a clue, but that could
16  -- that could be another cut-and-paste one and
17  not be mine.
18    Q.  Sitting here today, you don't know
19  that to be true, correct?
20    A.  I don't know that at all.
21    Q.  Right.  On November 15th you asked
22  Mr. Hanke, "What's happening on the 150m bond
23  deal and bank is calling where we at on currency
24  out of jacarda?"
25    A.  Same thing.  He would call with

Page 117

1  various different things and then never follow
2  up and never get anything in.
3    Q.  And where you said "bank is calling
4  where we at on the currency out of jacarda," you
5  were working with the bank on that particular
6  transaction?
7    A.  No, they were wanting -- he was
8  wanting to engage with them, but he never got
9  them anything over.
10    Q.  So what was your role in connection
11  with this?  And why are you asking him to talk
12  or --
13    A.  Again, if they tried --
14    Q.  -- asking what's happen --
15    A.  Again, if they tried and get ahold of
16  him, they can't get ahold of him, then they
17  would call me.
18    Q.  And then you turn around and you're
19  asking what the status of the bond deal is,
20  correct?
21    A.  Correct.
22    Q.  Do you have a recollection of who
23  Reed Collinsworth is?
24    A.  Who?
25    Q.  Reed Collinsworth.

30 (Pages 114 - 117)

Page 118

1    A.  I don't recall that name.
2    Q.  How about a Cain McKnight?
3    A.  Know that one very well.
4    Q.  Who is Cain McKnight?
5    A.  A thief in Dallas.
6    Q.  Pardon me?
7    A.  A thief in Dallas.
8    Q.  Okay.  And you asked Hanke whether
9  he's ever dealt Cain McKnight?
10    A.  Correct.
11    Q.  And what was the purpose of your
12  question?
13    A.  Because I wanted to see if he had
14  been screwed over by Cain McKnight.
15    MR. HEFTER:  Go to 399, if you will,
16  Peter.
17    Q.  (BY MR. HEFTER)  Have you read that
18  text?
19    A.  Yeah.  I don't know where -- who it's
20  about.
21    Q.  Am I correct in noting that "skr" is
22  a reference to Swedish Krona?
23    A.  I don't know what that means.  SKR in
24  my book is what Max used with his gold.
25    Q.  Okay.  Sitting here today, you don't

Page 119

1  know whether that's a reference to the currency
2  of Swedish, which is Swedish Krona?
3    A.  No.  That has nothing to do with
4  that.  I typed it.  It has nothing to do with
5  that.  SKR is a safekeeping receipt.
6    Q.  Okay.  Thank you.  That helps.
7    A.  That's used in gold, and that's Max.
8    Q.  Okay.  So on 473 and 474, you're
9  having an exchange with Mr. Hanke right after
10  New Year's, and he indicates, "On the plane.
11  I'm good on bond.  What I was looking for was
12  the info on the people for currencyvtanfer."  Do
13  you know what he was referring to?
14    A.  I don't know what he's referring to.
15    Q.  That may be a typo.  He also
16  indicates you mentioned that they -- he said to
17  you, you mentioned that they also owned bank
18  (name I forgot?) And can open accounts too if
19  needed.  Call you when I land."  And you say,
20  "Ok yes."  What were you responding in the
21  affirmative to?
22    A.  I don't know.
23    Q.  Do you recall --
24    A.  That doesn't make sense.
25    Q.  Do you have a -- do you recall

Page 120

1  providing a name of a bank to Mr. Hanke for the
2  purposes of this transaction?
3    A.  I don't recall.
4    Q.  On 505, Hanke on -- Mr. Hanke on
5  January 9, 2020, at 4:07, says, "Sherry.
6  Landed.  Any call time?"  Do you have a
7  recollection as to where Mr. Hanke was traveling
8  at this?
9    A.  No idea.
10    Q.  Were you aware that Mr. Hanke was in
11  New York on January 9th?
12    A.  I don't recall.
13    Q.  You say, "Can you check on $$.  My
14  attorney is just all over me"?
15    A.  That would be William Slater Vincent.
16    Q.  So that's a -- that's a reference to
17  a conversation that you had with Mr. Vincent?
18    A.  I'm sure.  He's the only attorney
19  that would be all over me.
20    Q.  On January 10th at 11:41 a.m., Text
21  No. 531, it says, "Just spoke to Rick."  Who is
22  Rick?  Do you know?
23    A.  I don't have a clue.
24    Q.  No recollection when you told
25  Mr. Hanke that you just to Rick what you were

Page 121

1  referring to?
2    A.  Can you go -- can you go down?  And
3  is there any more correspondence that would
4  bring anything up?
5    Q.  We can show those to you, for sure.
6    A.  No.  I don't know who it would be.
7    Q.  On 537 you indicate to Mr. Hanke --
8  you asked him, I should say, "Can you do
9  anything with an MTN backed by gold but not
10  trading?"  Do you see that?
11    A.  I don't because it's not moved up.
12    Q.  Fair enough.  We'll get there.
13    MR. BAUTZ:  Which number was that,
14  Michael?
15    A.  537?
16    Q.  (BY MR. HEFTER)  537, yeah.
17    A.  There we go.
18    No.
19    Q.  Are you familiar with MTN being a
20  reference for medium term notes?
21    A.  Correct.
22    Q.  But you -- this doesn't ring a bell
23  as to what you were talking about here?
24    A.  No.  It could have been something
25  William and I put together to try and flush

31 (Pages 118 - 121)

Page 122

1  anything out we could with Alan. Just like 539.
2      Q. All right. Go to 578. It says,
3  "Call me just spoke to cash guys." You keep on
4  referring to these cash guys. Does this refresh
5  your recollection as to who they were?
6      A. No. It was with -- anything of the
7  cash guys is his cannabis stuff. It would have
8  been something that I referred over to him and
9  he hadn't gotten back with them and they would
10  call me.
11      Q. On January 21st at 585, it says,
12  "Just spoke to nick putting fire under their
13  ass: Do you have a recollection who Nick was?
14      A. I don't have a clue. I don't know if
15  it someone on his side. I don't know.
16      Q. Okay.
17      A. You can see where it states, "Still
18  getting the strange calls," so I don't know if
19  that may be part of it.
20      Q. On 789, it says, "Nicks on standby to
21  start demetries deal." Does your refresh your
22  recollection of who Nick was?
23      A. Nick was a guy that I knew that did
24  payrolling. And Alan must have asked for a
25  payrolling service or had somebody that was

Page 123

1  needing payrolling service.
2      Q. And do you have a recollection as to
3  what you (Zoom distortion) when you said
4  "demetries deal"?
5      A. I don't know who Demetries is. It
6  must have been somebody that Alan was talking
7  about.
8      Q. By the way, I see a reference to
9  (Zoom distortion) in your text to Maki, M-a-k-i.
10      A. Right.
11      Q. That was another --
12      A. That is the -- that's the cannabis
13  license deal.
14      Q. And that was a deal that also
15  resulted in litigation?
16      A. No, it didn't -- I don't think it
17  went to litigation because -- I don't know
18  exactly what happened to it. Mike was handling
19  it. I didn't get involved until deposition.
20          MR. HEFTER: Why don't we
21      take a break.
22          (Recess 2:14 p.m. to 2:26 p.m.)
23          (Exhibit No. 6 introduced.)
24      Q   (BY MR. HEFTER) Let me mark for
25  identification as Sims 6 an email exchange

Page 124

1  between Mr. Hanke and
2  Ms. Sims dated around July 29th, 2020. I'll
3  just ask you to look at this document, Ms. Sims,
4  which is an email exchange as I've just
5  described.
6          MR. BAUTZ: Ms. Sims, this
7      is a fairly lengthy document, and so
8      you can just let me know when you're
9      ready for me to scroll down so you
10      can keep reviewing. That would be
11      great. Thank you.
12      Q   (BY MR. HEFTER) Ms. Sims, are you
13  reading this document?
14      A. I am.
15      Q. Okay. Fine. Take your time. That's
16  fine.
17          Have you had a chance to read through
18  it?
19      A. Yes.
20          MR. HEFTER: Stop. If you
21      can stop there where you were. I
22      think it was closer to the bottom.
23      Q   (BY MR. HEFTER) I want to ask you
24  this question, Ms. Sims.
25      A. Yes.

Page 125

1      Q. You were aware that SRM had raised a
2  dispute about the performance under the bonds
3  issued in that transaction?
4      A. Correct.
5      Q. And did you have direct conversations
6  with SRM about a resolution of that matter?
7      A. John Evans and I had spoke numerous
8  times in regards to it because there was various
9  emails with -- regarding Alan. There would be a
10  dispute. They would send the thing. Then I
11  would get a counter email from Alan saying they
12  signed off and everything was fine. It went
13  back and forth and back and forth. So it was
14  kind of a yo-yo situation.
15      Q. And you would have noted that they
16  threatened to come to us with damaging
17  information for our lawsuit. Do you recall
18  reading that?
19      A. Correct.
20      Q. And how did you respond to that?
21      A. In talking with my attorney, he
22  informed me that how the --
23      Q. Hold on. Hold on. Hold on.
24          I don't want to hear anything -- I'm
25  protecting you here. So I don't want to --

32 (Pages 122 - 125)

Page 126

1    A.  Right.
2    Q.  -- I don't want to hear anything that
3  was communicated between you and your attorney.
4    A.  Okay.
5    Q.  I'm not entitled to that.
6    A.  Okay.
7    Q.  Let me ask you this.  Can you answer
8  that question without revealing communications
9  with your attorney?
10       I'm going to withdraw the question in
11 its entirety.
12       Do you know whether funds were paid
13 to SRM to prevent SRM from providing information
14 to us as threatened in their letter?
15    A.  Through SubGallagher?  Or through
16 Alan Hanke?
17    Q.  From any source.
18    A.  I know SubGallagher did not.  Alan, I
19 can't answer that.  He always stated that he was
20 taking care of everything, everything was fine,
21 there's not a problem.
22    Q.  Okay.  So you don't have any
23 independent knowledge whether he took care of
24 that, but as far as you know, SubGallagher did
25 not?

Page 127

1    A.  SubGallagher did not.
2    Q.  Okay.  Fair enough.  Thank you.
3       Am I correct -- I'm switching topics
4  and you can take the document off the screen.
5       Am I correct that SGIT provided a
6  surety bond for a transaction involving Harvard
7  Distributing?
8    A.  Again, I don't know if that's one of
9  them that went forward through because Alan had
10 -- there was about four or five in there that he
11 did but they did not -- and I don't know if
12 Harvard was one of them that did or did not go.
13    Q.  So sitting here today, you don't
14 recall one way or the other whether it was a
15 surety bond issued by SGIT for the purposes of
16 completing a transaction with Harvard
17 Distributing?
18    A.  I don't know if it was a live bond,
19 if Alan commenced on it, if he acted on it,
20 because there was two or three in there that he
21 had asked for.  And once done, after review, I
22 would call him and say, What's the status of
23 each and every bond, and he would, like, Oh,
24 that one didn't happen, that one didn't happen,
25 that one's okay.  And I don't know if that was

Page 128

1  one of them that was okay or didn't happen.  I
2  know the name.  The name was a part of it, but I
3  don't know which side they were on without
4  looking it up.
5    Q.  Do you know whether Harvard
6  Distributing was paid out anything in connection
7  with any transaction involving SGIT?
8    A.  I don't -- as confirmation, only one
9  that I know that ever got paid was one of
10 Al Thani's was the only thing that I know of
11 that Alan ever paid anyone.
12    Q.  So it's your understanding that
13 Mr. Al Thani was paid money as a result of his
14 investment?
15    A.  Well, it's not really per him paid,
16 but through knowledge of money being wired to
17 the attorney's account and the people involved
18 with his transaction were paid?
19    Q.  Oh, you're talking about the Mills
20 Rogers account?
21    A.  No.
22    Q.  Are you aware of whether Harvard
23 Distributing received any funds as a result of
24 the Al Thani transaction or the Stephens
25 transaction?

Page 129

1    A.  I don't know anything about that.
2    Q.  Okay.  Are you aware that SGIT also
3  issued a surety bond in connection with a
4  transaction for Fortitude?
5    A.  Again, that's going to fall in some
6  of those that I don't know which ones were live
7  and which ones he canceled.  I don't know that
8  without researching.
9    Q.  And do you know, sitting here today,
10 whether Fortitude received any funds out of the
11 proceeds of either the Al Thani transaction or
12 Stephens transaction?
13    A.  I don't know of any funds being
14 transferred except the Al Thani one.
15    Q.  Okay.
16    A.  That received money.
17       MR. HEFTER:  Okay.  I have
18 no further questions for the witness
19 at this time.
20       MR. SMAYLOVSKY:  I have no
21 questions.
22       (Deposition concluded at 2:45 p.m.)
23
24
25

33 (Pages 126 - 129)

Page 130

1  Sherry Sims
2  srsholdings@gmail.com
3          September 7, 2022.
4  RE: Mohammed Thani A.T. Al Thani  v. Alan J. Hanke, et al.
5   8/25/2022, Sherry Sims (#5378175)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

Page 131

1        CHANGES AND SIGNATURE
2  SHERRY SIMS          08/25/2022
3  PAGE LINE      CHANGE      REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 132

1        SIGNATURE BY WITNESS
2      I, SHERRY SIMS, have read the
3  foregoing deposition and hereby affix my
4  signature that same is true and correct, except
5  as noted above.
6      _____
7        SHERRY SIMS
8
9  THE STATE OF _____ )
10  COUNTY OF        _____ )
11    Before me, _____, on
12  this day personally appeared SHERRY SIMS, known
13  to me (or proved to me under oath or through
14  _____ (description of identity card or
15  other document) to be the person whose name is
16  subscribed to the foregoing instrument and
17  acknowledged to me that they executed the same
18  for the purposes and consideration therein
19  expressed.
20      Given under my hand and seal of
21  office this _____ day of _____, 2022.
22
23      _____
24      NOTARY PUBLIC IN AND FOR
25      THE STATE OF TEXAS

Page 133

1      UNITED STATES DISTRICT COURT
2      SOUTHERN DISTRICT OF NEW YORK
3
4  MOHAMMED THANI A.T. AL THANI*
                    *
5  VS.          * NO. 20-CV-4765
                 * (JMP)
6  ALAN J. HANKE, ET AL   *
7
      REPORTER'S CERTIFICATION
8      DEPOSITION OF SHERRY SIMS
        AUGUST 25, 2022
9
10
      I, GAIL SPURGEON, Certified
11  Shorthand Reporter in and for the State of
    Texas, hereby certify to the following:
12
      That the foregoing deposition of
13  SHERRY SIMS was reported by me stenographically
    at the time and place indicated, said witness
14  having been placed under oath by me, and that
    the transcript is a true record of the testimony
15  given by the witness;
16      I further certify that pursuant to
    FRCP Rule 30(f)(1) that the signature of the
17  deponent:
        X was requested by the deponent or
18  a party before the completion of the deposition
    and is to be returned within 30 days from date
19  of receipt of the transcript.  If returned, the
    attached Changes and Signature Page contains any
20  changes and the reasons therefor;
        _____ was not requested by the
21  deponent or a party before the completion of the
    deposition;
22
      I further certify that I am neither
23  counsel for, related to, nor employed by any of
    the parties or attorneys in the action in which
24  this proceeding was taken, and further that I am
    not financially or otherwise interested in the
25  outcome of the action.

34 (Pages 130 - 133)

Page 134

```
 1          Given under my hand this the
        7th day of  September, 2022.
 2
 3
 4          GAIL SPURGEON
            Texas CSR 1718
 5          Expires: 11/30/22
            Firm No. 571
 6          Veritext Legal Solutions
            300 Throckmorton Street
 7          Suite 1600
            Fort Worth, Texas  76102
 8          817.336.3042
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

35 (Page 134)

| **0** |
|---|

**08/25/2022**
  131:2
**0h**   38:8

| **1** |
|---|

**1**   3:13 39:8,11
  67:6 133:16
**10**   51:13,15 52:4
  93:5 106:23
**100**   77:21 78:1
**100,000**   61:10,14
**10005**   2:9
**10017**   2:4
**10:19**   1:19
**10:22**   71:9
**10th**   82:25
  120:20
**11**   71:1 97:22
**11/30/22**   134:5
**117**   107:10
**11:32**   48:6
**11:41**   120:20
**11:45**   48:6
**11th**   67:5,16
  69:1 84:13
**122**   89:8,9
**123**   3:23 108:14
**124**   89:21
**12562**   134:3
**12:31**   69:1
**12:55**   91:7
**12:59**   72:1
**12th**   75:4,16,18
  76:23
**13**   71:8
**131**   3:4

**133**   3:5
**134**   90:2
**135**   90:4 109:6
**137**   109:16
**138**   90:2
**13th**   71:9 72:10
  77:17 78:25
**15**   52:7,10 89:5
  107:4 110:12
**150m**   116:22
**15th**   68:5 116:21
**16**   79:9
**1600**   134:7
**168**   90:12
**169**   110:11
**17**   72:13
**1718**   134:4
**17th**   109:7,12
**18**   40:14
**1830**   15:15
**184**   111:11
**185**   111:10,12
**18th**   109:14
**19**   40:14 61:6
  73:4 87:25
**190**   112:22
**1942**   50:2
**1986**   6:19
**19th**   73:13,19
**1:00**   72:9,10
**1:17**   91:7
**1:32**   112:19
**1:46**   70:7
**1:51**   88:1
**1st**   97:13 99:14
  99:17 112:18
  114:10

| **2** |
|---|

**2**   3:3,15 47:14,15
  48:11 53:4
  114:6 116:13
**2.5**   51:18,19,22
  52:7,9,24 57:7
  57:20 62:18
**2.5.**   51:17
**20**   1:5 48:1
  133:5
**2000**   10:10 16:17
**200m**   112:6
**2010**   115:17
**2013**   8:15 17:25
  44:17
**2014**   8:15 10:3
  17:10
**2017**   10:11,11,19
**2018**   10:7,8,19
  11:25 17:25
  18:7 23:22,24
  39:2 60:24
  92:22 94:3,13
  105:1
**2019**   16:7 17:10
  61:5,8 62:6,9,24
  67:16 68:5 75:8
  75:19 97:13,16
  97:22 99:14,17
  101:6 106:23
  107:10,16
  110:12 112:19
**2020**   10:3 44:18
  61:5,13 79:10
  89:13 92:22
  94:3,14 95:24
  105:1 120:5
  124:2

**2022**   1:10,19
  130:3 132:21
  133:8 134:1
**20th**   74:18 110:5
  110:8
**210**   115:17
**21st**   122:11
**226**   116:11
**24th**   89:13
  111:12
**25**   1:10 9:18
  133:8
**25b**   73:20 74:7
**25th**   1:18
**27**   75:5,6
**276**   92:14
**27th**   111:15,23
**28**   2:8 75:4,22
**28th**   111:24
**29**   101:6
**29th**   90:13 102:6
  104:9 124:2
**2:14**   123:22
**2:26**   123:22
**2:45**   1:19 129:22
**2:46**   114:10

| **3** |
|---|

**3**   3:17 63:19,21
  64:6 69:2 70:8
  106:5 107:10
**3.1**   83:1
**3.5**   106:11
**3/25/19**   3:13
**30**   50:2 130:17
  133:16,18
**300**   134:6

**300,000**   59:10
**31**   77:3
**31st**   103:4
  112:13
**32**   77:17
**33**   78:19 98:18
  98:23
**337**   94:20
**368,000**   59:18
**368,456**   53:14
**38**   99:7
**39**   3:13
**390**   2:4
**399**   118:15
**3:00**   111:12
**3:27**   73:12
**3:28**   73:19
**3:53**   75:8
**3:55**   74:19
**3rd**   75:8,18
  108:10

**4**

**4**   3:8,19 64:11,13
  89:15
**400**   74:8
**43**   79:9
**44**   79:21
**47**   3:15
**473**   119:8
**474**   119:8
**4765**   1:5 133:5
**48**   81:20 99:13
  99:15,17
**4:07**   120:5
**4:30**   109:7
**4b**   74:9

**5**

**5**   3:21 52:5
  61:23 68:25
  93:4,14 96:22,25
  97:3
**5-10m**   92:16
**50,000**   62:7
**500**   83:2
**505**   120:4
**53**   100:11
**531**   120:21
**537**   121:7,15,16
**5378175**   130:5
**539**   122:1
**54**   82:9
**57**   99:24,25
**571**   134:5
**578**   122:2
**58**   82:25
**585**   122:11
**5:57**   110:12

**6**

**6**   3:23 69:12
  75:23 123:23,25
**62**   101:6
**63**   3:17
**64**   3:19
**65**   83:13
**66**   85:21
**69**   104:11
**6th**   2:9 115:22

**7**

**7**   130:3
**7/29/20**   3:23
**70**   84:1 104:11
**72**   84:12

**75**   15:16
**76065**   15:16
**76102**   134:7
**77**   86:9,10
**789**   122:20
**7:28**   78:25
**7m**   82:9
**7th**   80:4,20 81:6
  81:20 134:1

**8**

**8/25/2022**   130:5
**817.336.3042**
  134:8
**83**   87:13
**84**   87:23
**8:41**   106:23
**8:54**   99:17

**9**

**9**   70:6 102:6
  120:5
**91**   87:25
**92**   105:11,13
**93**   105:12
**95**   105:23
**96**   3:21
**9:00**   112:13
**9:05**   101:6
**9:06**   101:22
**9:11**   101:21
  102:5
**9:39**   111:16
**9:42**   111:24
**9th**   120:11

**a**

**a.m.**   1:19 48:6,6
  112:13 120:20

**a.t.**   1:4 130:4
  133:4
**ability**   5:15
**able**   60:2,2 83:6
**absolutely**   70:22
**access**   49:23
**accommodate**
  5:25
**account**   13:24
  19:3,11,14,24
  21:23 46:8,12,18
  48:9,18,22 49:3
  49:6,8,11,24
  50:6 52:17,21,23
  54:2,5 57:15
  58:21 59:4,5,8
  59:15,19,19
  60:11,12 90:6
  128:17,20
**accounts**   19:5,17
  19:20 21:12
  82:1 119:18
**accuracy**   130:9
**accurately**   97:6
**achieve**   6:9
**acknowledged**
  132:17
**acknowledgm...**
  130:12
**acquaintance**
  104:20
**acronym**   8:21
**act**   23:3
**acted**   127:19
**acting**   95:15
**action**   91:14
  133:23,25

**active**  48:22,23
**activities**  7:4
**actual**  50:5 93:8
**add**  6:3
**addition**  43:1
**address**  15:6
  71:12 73:13
  74:20
**administrative**
  9:12
**advance**  22:7
  73:6
**affiliated**  28:23
**affirmative**
  119:21
**affix**  132:3
**afternoon**  79:11
**agent**  25:10 26:7
  28:6 34:18,19
  50:12,12
**agents**  12:9,18
  12:20,25 13:14
  13:18,21 14:17
  14:18 24:21
**ago**  22:7,19
  104:23
**agree**  62:23
**agreed**  51:16
  62:25
**agreement**  51:5
  51:7 56:8 62:12
  62:16,20 71:10
  71:21 72:5
  91:20
**ags**  26:8,12
**ahead**  47:19
  51:2

**ahold**  117:15,16
**ain't**  48:23 81:16
**air**  93:6
**airport**  102:17
  109:7
**ajh**  53:21
**al**  1:4,6 4:8
  22:25 33:10,18
  36:14 43:20
  44:2,9,19 46:17
  54:10,14,19 56:2
  66:16,22 67:1
  99:5,21 106:11
  128:10,13,24
  129:11,14 130:4
  130:4 133:4,6
**alan**  1:6 20:13
  29:14 32:8,25
  33:1,2 34:25
  47:1 49:5,10
  50:21,22,24
  53:20 56:12
  61:22 64:14
  66:19 74:3 76:2
  76:13,25 81:10
  87:12 88:15,21
  88:25 89:2 91:3
  91:13 94:1 96:1
  96:22 99:18
  103:5 104:20
  107:5,6 114:5
  122:1,24 123:6
  125:9,11 126:16
  126:18 127:9,19
  128:11 130:4
  133:6
**alan's**  87:21

**allegations**
  23:18
**allen**  34:2,3
**allnet**  25:13,16
  26:6 37:4 85:14
  86:3
**allotted**  130:20
**amount**  17:18
  42:14,18 50:25
  51:3,10,11,12,25
  52:10 54:4 57:6
  57:8 60:11,25
  62:9
**amounts**  24:12
**amy**  35:12
**answer**  6:6 8:18
  29:22 56:4 61:5
  65:19 79:11
  126:7,19
**anybody**  16:14
  29:12,17 31:5
  70:15 72:22
  96:15 114:21
**anymore**  11:19
  64:22
**anytime**  60:5
**apologies**  103:8
**app**  20:15
**appearances**  3:3
**appeared**  132:12
**appearing**  2:6
  2:10
**applicable**  130:8
**application**  71:2
**applications**
  20:22 21:1
**appoint**  56:19

**appointing**
  56:15
**appreciate**  65:1
**approximately**
  36:8
**april**  99:14,16
**asap**  67:6
**aside**  93:8 94:2
**asked**  40:22 51:1
  55:3,4 60:23
  68:14,15 70:10
  70:11 72:17
  82:24 87:20
  92:15 96:7,14,15
  99:7,12 105:19
  105:20 106:10
  110:5 111:13
  116:21 118:8
  121:8 122:24
  127:21
**asking**  5:12,16
  9:6 18:22 72:20
  76:13 84:1 86:5
  86:15 87:3,5,10
  90:5 92:3,17
  93:20,21 94:24
  105:16 109:22
  114:19 117:11
  117:14,19
**asks**  81:3
**ass**  122:13
**assist**  94:6
**assume**  102:15
**assuming**  71:5
**assured**  92:6
**atlanta**  107:12
  107:17,23 108:9

attach 87:13
attached 83:15
   130:11 133:19
attachment 46:3
attachments
   44:25 45:13,14
attempted 70:2
attending 101:14
attention 63:6
   64:8 104:3
attorney 9:21
   10:1 35:1 44:13
   44:14,17,18
   56:18 58:2,4
   62:2 93:16,17
   107:21 120:14
   120:18 125:21
   126:3,9 130:13
attorney's
   128:17
attorneys 44:20
   56:16 86:13
   92:12 133:23
audio 20:3,13
   22:11
august 1:10,18
   106:23 107:4
   133:8
available 53:13
   59:11 93:22
   130:6
avenue 2:4
aware 6:4 7:2
   16:18,19 17:8
   20:25 28:12
   30:21 32:7
   33:23 37:25
   46:16,23 49:2,14

54:8 58:20
69:16 102:9,12
102:16 105:4,8
111:24 114:23
120:10 125:1
128:22 129:2

**b**

**b** 28:15 88:15
   89:1,3 109:25
**back** 22:1 26:19
   27:2,13 48:5,7
   53:25 55:4 68:7
   70:10 75:5
   81:11,12,16
   82:10 85:12
   90:12 92:13,20
   93:13 95:12
   97:16,23 111:11
   115:13 122:9
   125:13,13
**backed** 121:9
**background**
   6:13 7:6 24:20
**backup** 33:13
**badgering** 84:8
**bala** 45:21,25
**balance** 59:11
   115:25
**bank** 3:15 47:11
   47:13 48:10,18
   48:19,20,23,25
   49:4,7,11,12
   50:6 52:11,15,16
   52:17 54:5,6
   57:15 59:4,20,23
   60:1,2 69:13
   72:15,18 82:1

83:15 87:18,20
87:21 90:6,20
114:18,21,24
116:23 117:3,5
119:17 120:1
**bankruptcy**
   38:11,12
**baraker** 28:14
   28:20,24 30:14
   100:12,23 101:3
**barber** 24:17,20
   69:10,11,16,20
   70:2,16 81:4
   83:22,24
**barclays** 77:24
   78:2
**barnes** 104:12
   104:13
**based** 11:9 12:12
   14:24 19:8
   20:15 30:18
   54:3 101:1
**basically** 9:12
   12:6,14 37:14
**batch** 115:5
**bautz** 2:3 4:9
   65:21 66:3
   85:20 121:13
   124:6
**beau** 109:23,23
**beginning** 8:15
**behalf** 4:7 13:21
   32:12 57:24
   72:20 108:25
   113:20
**believe** 17:5
   21:25 24:24
   25:4 39:2 51:16

57:17 62:19
67:23 83:19
**bell** 64:7 73:22
   121:22
**beneficiaries**
   16:11
**benefit** 25:1
**best** 5:15 52:16
   83:2 102:1
**better** 101:25
   105:25
**bible** 22:5
**bigger** 53:7
**bill** 58:5
**bills** 53:2 57:25
   60:18
**birth** 50:2
**bit** 65:23 68:25
   70:7 77:9 85:7,9
   88:2
**bitcoin** 70:8,20
   71:6
**blank** 71:10,21
**blanket** 50:24
   52:3 54:25 55:1
   55:11 56:13
**boarding** 109:7
**bond** 17:15 18:3
   24:5 25:15 26:3
   27:6 29:5,13
   32:4,11,16,22,25
   33:5,10,12,17,23
   34:20 35:22
   54:20 55:12,12
   56:10 61:18,20
   61:22 62:1
   77:11,13 86:10
   86:12,18,19 87:1

**[bond - certification]**

106:1,11,12,14
106:14 112:6
116:22 117:19
119:11 127:6,15
127:18,23 129:3
**bonds**  16:21
17:1,11 23:23
27:10 50:10,25
51:3,11,13,15
55:1,4,22 60:14
61:17 78:18
79:7 86:24 87:6
95:4 113:23
125:2
**bonga**  79:22,23
**book**  63:10,11
63:16 118:24
**border**  41:2
**borrower**  77:23
**bottom**  124:22
**bought**  54:25
94:15,15
**box**  15:10,14,15
90:10
**break**  5:22 38:20
47:21 48:3 91:6
123:21
**brick**  14:13
15:24
**bring**  47:10 71:3
116:12 121:4
**broke**  97:18
**brought**  24:22
**building**  15:24
**bulk**  61:22
**bullet**  42:25
**business**  3:19
7:8 8:11 10:4,16

10:23 11:16,17
11:18,21,23 12:1
12:4,11,25 13:16
14:2,4,13,18,19
14:21 15:6,21
17:9,14 19:10,13
19:15,25 20:19
20:23 28:23
29:25 41:12,15
41:22 42:14,19
60:21 61:1 62:5
62:10 66:11
73:25 74:2,6
76:23 85:3
92:13 94:4 97:9
97:21 98:2
104:20 113:2,3
113:18
**businesspeople**
12:3 80:24
**businessperson**
13:20 14:1
**buy**  7:25 69:7

**c**

**c**  2:1 25:5
**cain**  118:2,4,9,14
**calculated**  50:18
**california**  86:11
86:20
**call**  23:17 44:20
67:6 71:11,12,21
72:9,10 73:4
74:14 75:9,12
77:8,18 78:20
79:2 80:4,8,11
81:1,6,10,13
82:15 88:2

90:18 94:25
99:18 102:25
103:6 107:5,6,11
109:8,11 110:6
110:19 112:14
116:25 117:17
119:19 120:6
122:3,10 127:22
**called**  10:12
25:13,25 26:16
29:3 30:23 44:4
48:19 82:23
84:11,14 96:14
109:24
**calling**  23:14
116:23 117:3
**calls**  28:19 80:23
92:12 116:13,14
122:18
**canceled**  129:7
**cannabis**  73:25
74:2,6 75:25
76:22 77:15
80:1,10 86:11,15
87:12 89:20
91:4 94:22 95:8
96:1 112:21,23
113:2,17 122:7
123:12
**capital**  3:15
48:10,20 49:4,12
52:11 54:6 59:4
59:19 90:6
100:13 109:17
109:20
**car**  58:16
**card**  132:14

**care**  13:9 92:7
126:20,23
**carnegie**  67:21
68:4
**carry**  98:4
**case**  5:6 23:1,1
23:20 37:4,4,6
38:15 86:3,17
**cases**  22:25 37:5
38:5,7
**casey**  10:1 13:13
14:8 15:21
22:18,22 23:3,7
23:10,18 34:20
44:14 57:18
66:21
**casey's**  13:23
52:21,23
**cash**  3:17 63:9
63:22 80:8,12,17
80:21 81:7
112:20,25 113:1
113:3,6,9,14,17
113:19,25 114:3
114:14 122:3,4,7
**cause**  1:18
**caused**  10:8
103:24 106:20
107:1
**cease**  16:6
**cell**  108:22
**certain**  32:8 51:3
51:11 55:3,3,20
**certainly**  5:24
**certificate**  3:5
**certification**
133:7

certified 1:20
133:10
certify 133:11,16
133:22
cge 28:4 87:19
chance 124:17
change 90:5
131:3
changes 3:4
130:10 131:1
133:19,20
changing 72:4
chart 64:17 65:6
check 13:9
120:13
chelney 2:8
chelneylaw.com
2:10
chicago 88:11
93:14
church 41:3
67:20
city 102:17
civil 1:24
claims 24:12
clarient 109:17
109:20
clarification
20:6
clean 6:7
clear 65:5 82:6
98:11
cleared 37:20
client 5:7 12:19
23:19 43:15
44:19 50:13
79:22 107:12,23
108:5

clients 12:19
31:13 32:3
43:16 79:15
108:8
closed 61:16
94:9
closer 124:22
closing 94:10
closings 94:12
clue 72:21 89:6
99:10 113:10
116:15 120:23
122:14
coast 85:1,2,14
coffee 5:23
collateral 86:25
colleague 4:8
collect 13:21
collected 12:17
13:22
collects 50:12
collinsworth
117:23,25
colorado 75:23
76:23
column 65:8,13
73:10 98:12
come 13:11,12
13:14 40:18
47:21 51:2
53:18 68:23
70:10 73:8
81:12 82:9
93:13 115:13
125:16
commenced
55:16 127:19

commencement
55:14
commercial 8:3
92:16 93:4
common 104:23
communicate
20:15,22 21:2
communicated
11:14 126:3
communicating
19:9
communication
7:12 28:19
43:25 44:9,12
111:15
communications
29:16,24 30:4,9
30:14,19 31:5,8
31:24 33:4,15,21
35:2,8,12 44:11
47:6 104:21
105:3,6 126:8
company 7:9
13:22 17:22
24:23 25:25
26:4,8 27:9
28:23 29:3
37:24 42:2
57:25 58:5
61:16
compare 62:8
compensated
50:9
compensation
56:25
compile 64:17
compiled 88:18

complete 36:23
completed
130:17
completely
52:19
completing
127:16
completion
133:18,21
computer 14:16
14:25 18:10,13
18:14 45:6
47:23 48:16
65:7 70:23,24
concern 46:15
concerning
31:12 80:24
concluded
129:22
conduct 11:10
14:20 19:15
20:18 60:21
conducted 15:21
105:5
conducting 14:2
confirmation
128:8
confirms 101:1
conformed 92:9
confused 34:11
connect 26:3
70:3
connected 69:10
connection 5:6
5:11 6:23 7:4,18
8:16 20:23 21:8
21:10 22:3,24
28:2,10 32:5

46:16 54:21
57:20 60:10
95:7,16 96:5
110:23 117:10
128:6 129:3
**consideration**
132:18
**consistent** 13:16
**consolidated**
22:25
**constitute** 24:20
25:9
**consult** 22:15
**contact** 42:24
65:10 68:19
95:9
**contacted** 28:5
**contains** 133:19
**context** 98:19
100:1
**continue** 19:21
91:9
**continued** 11:19
11:21,22 12:1,25
13:15 44:18
56:23
**contract** 11:4,6
**contractor** 37:14
37:15
**conversation**
13:4 22:24
23:10,18 43:23
58:24 75:2
80:15 81:15
100:24 101:2,8
103:13,22 104:5
108:21 109:13
112:2 120:17

**conversations**
20:13 29:23
31:11,14,18
32:15,21 33:8,11
75:17 88:3
102:20 107:7
109:3 125:5
**copies** 130:14
**copy** 18:11 27:13
27:16
**copying** 76:4
**corp** 90:21
**corporate** 78:13
**correct** 5:4,5,10
6:14,16 7:17,23
8:22,23 9:1,7
10:17,20 12:1
13:2 15:19
16:22,23 22:13
24:9,10,18 25:3
25:11,20 32:18
33:10,22 36:2,5
40:10 41:9
42:11,16 43:5
44:7 46:12
48:21 49:14,17
50:1,3 51:24
52:8 53:17 54:4
54:7,18,21 55:23
55:23 56:3,6
58:14,23 62:22
65:14 66:12,13
67:3,10 69:18
75:10 76:16
77:4 80:13 81:9
82:1,2,19 83:23
84:2,3,6 87:24
88:24 89:16

90:7,11,13,16
92:18 94:22
95:2 97:11,14
98:17 101:3,4
102:12,17 106:7
107:14 109:1,2
109:18 112:9
113:4,7 114:5
115:7 116:19
117:20,21
118:10,21
121:21 125:4,19
127:3,5 132:4
**correctly** 55:19
**correspondence**
121:3
**corresponds**
65:9
**cosignatures**
17:6
**cosigner** 17:5
**counsel** 4:11
5:17 22:16 23:4
130:14 133:23
**counsel's** 91:14
**counter** 125:11
**county** 132:10
**course** 17:9
19:13
**court** 1:1,20 6:7
25:1 28:16
85:12 133:1
**courtroom** 4:19
**covid** 36:23
95:23 96:1
**created** 49:11
**credentials** 60:3

**credit** 17:4,7
21:3 53:22 78:6
**cripto** 69:2
**croxford** 24:23
25:6,9
**crypto** 70:23
**cryptocurrency**
70:20
**cryptos** 71:7
**cs** 130:15
**csr** 134:4
**cst** 1:19
**cultivation**
89:21
**cup** 5:22
**currency** 116:23
117:4 119:1
**currencyvtanfer**
119:12
**current** 59:11
**currently** 21:19
**cut** 20:5 110:6,9
116:16
**cutting** 77:5
90:14
**cv** 1:5 133:5

| d |
|---|

**d** 25:5
**dallas** 1:23 16:2
23:13 38:25
40:8,17 41:11,12
62:24 63:5
106:5 108:12
118:5,7
**damaging**
125:16

**date** 39:6 43:13
44:3 50:2 76:6
133:18
**dated** 97:13,21
101:6 124:2
**dates** 17:12
115:5
**david** 27:22,24
27:25
**day** 1:18 68:25
70:7 71:2 75:13
75:14,16 78:22
84:11 105:15
132:12,21 134:1
**days** 67:22 107:5
130:17 133:18
**dcs** 116:7,9
**deal** 43:11 69:17
89:20 90:21
93:9 94:21,22
95:4,7,16,22,25
115:9,10 116:23
117:19 122:21
123:4,13,14
**dealing** 83:5
**deals** 35:22
42:10,22 43:12
45:17,20 76:14
92:16 93:4,11
**dealt** 118:9
**deaths** 103:10
**december** 75:4,8
75:16,18,18
76:23 77:17
78:25
**decided** 5:8
**defaulted** 86:12
87:8

**defense** 91:14
**definitely** 38:8
112:8 116:12
**delay** 106:12,16
106:17,20
**demand** 91:24
92:1,4
**demands** 31:9
**demetries**
122:21 123:4,5
**departure** 12:5
12:25
**depend** 14:22
**depo** 38:4
**deponent** 130:13
133:17,17,21
**deposed** 4:23 6:4
11:12 37:12
38:2
**deposing** 130:13
**deposit** 72:5
83:16
**deposited** 52:10
**deposition** 1:9
1:15 4:18,18
5:12,20 7:3
10:12 22:3,15,19
38:1,13 123:19
129:22 132:3
133:8,12,18,21
**depositions** 38:6
63:15 100:4
**describe** 8:11
48:13 97:5
**described** 124:5
**describing** 74:5
**description** 3:11
132:14

**desk** 99:11
**detail** 115:4
**details** 32:1 33:7
79:12
**determine** 43:2
**developed** 7:20
51:8
**different** 13:10
17:15,23 18:8
33:14 45:17
50:20 68:14
71:6,7 74:15
113:16 117:1
**diligence** 59:24
60:4
**diligencing**
60:10
**dimora** 73:14,17
**direct** 114:24
125:5
**directed** 9:23
62:2
**directing** 45:2
45:12
**directly** 56:1
**disappeared**
52:20
**discovery** 21:11
**discuss** 42:21
43:14 93:10
**discussed** 41:21
43:16
**discussing** 42:9
98:25
**discussion** 42:9
62:14 76:17
**discussions**
29:11 70:15

77:25
**dispensaries**
75:23
**dispensary**
89:22
**dispute** 125:2,10
**distinction** 27:17
**distortion** 123:3
123:9
**distributing** 29:3
29:7,12,16,17
30:5,10 31:15,25
32:2,6,12,17
127:7,17 128:6
128:23
**district** 1:1,2
133:1,2
**doc** 72:4
**docs** 72:2,5
**document** 21:8
30:3,11,15 31:9
39:3,17,20 40:1
45:8 47:19
48:14 57:16
62:16 63:7,9,21
63:23,24 64:15
64:25 65:22
97:5,8 98:11
124:3,7,13 127:4
132:15
**documentation**
33:13 115:16
**documents**
17:22 18:2,2,8
18:11 21:21,24
22:6,8,11 27:15
30:3 64:2
106:13

**[doing - fair]** Page 9

**doing** 6:23 11:4
 15:22 17:14
 38:19 40:20
 43:9 45:7 52:1
 55:8 70:1 71:11
 72:23 87:17
 92:20,23 94:4
 96:2,3 106:20
 111:19 112:3
 113:8
**dollars** 53:13
 54:5 93:5
**domain** 18:25
 19:3 20:8 21:13
 58:7
**draw** 90:20
**dsc** 115:23
**dubai** 73:20,23
 74:8
**due** 21:4 59:24
 60:4,10
**duly** 1:17 4:2

**e**

**e** 2:1,1 28:15
 109:25
**earlier** 55:2
**early** 10:19
 40:14 62:24
 107:15
**eastern** 102:7
**education** 6:15
**educational** 6:13
**either** 10:18
 19:20 22:19
 23:19 69:7
 103:10 129:11

**electric** 58:15
**else's** 72:14
**email** 3:13,23
 18:16,18 19:2,4
 19:11,14 21:12
 27:18,19 28:19
 29:24 39:11,18
 40:3,6,23 44:25
 45:15 46:25
 55:12 71:2
 74:19 76:13
 83:1 103:17
 106:12 123:25
 124:4 125:11
**emailed** 19:16
**emails** 27:13,16
 125:9
**employed**
 133:23
**encrypted** 21:1
**energy** 45:21
**enforce** 86:19
**engage** 117:8
**engaged** 18:9
**enhancement**
 17:4,7
**enter** 69:9
**entered** 17:24
**enterprises**
 73:14,18
**entirety** 126:11
**entities** 116:9
**entitled** 5:18
 126:5
**entity** 9:2,5
 25:13,24 26:15
 30:22

**entry** 77:4
**equal** 42:14,18
**errata** 130:11,13
 130:17
**escrow** 34:18,19
 46:19 77:11
**essence** 55:20
**established** 49:3
**establishing**
 8:17
**estate** 7:13,15,19
 7:23 8:1 56:23
 62:5 77:22 78:1
 92:16,20,24 93:4
 93:11,24 94:4
 111:21
**et** 1:6 130:4
 133:6
**evans** 108:18,19
 108:21,23,25
 109:4 125:7
**evening** 84:13
 105:24
**event** 91:21
**exact** 17:17
**exactly** 18:15
 123:18
**examination** 3:8
 4:4
**example** 61:9
 76:14
**exchange** 39:11
 75:15 81:25
 103:17,18 119:9
 123:25 124:4
**exchanged** 61:19
 110:4

**exchanges** 64:9
**exchanging**
 101:7
**exclamation**
 75:9 80:6,6
**excuse** 80:6
**executed** 132:17
**exhibit** 3:13,15
 3:17,19,21,23
 39:8 47:15
 63:19 64:11
 96:22,25 123:23
**exhibits** 3:10,11
**existence** 35:23
**expecting** 89:23
**experiencing**
 110:24
**expires** 134:5
**explain** 38:22
**explained** 50:11
**explore** 32:10
**expressed**
 132:19
**extent** 5:13
 30:19

**f**

**f** 25:5 133:16
**fails** 130:19
**fair** 7:14 8:2
 12:16 13:25
 15:20 17:21
 18:12,24 19:9
 21:5 26:23
 30:17 38:6
 40:15 42:8 52:6
 69:25 76:4
 88:13,22 90:4

92:23 98:14
107:15 121:12
127:2
**fairly** 124:7
**fall** 129:5
**familiar** 24:2
25:12,24 26:15
27:5,21 28:13
29:2,19 30:22,24
33:6,25 34:1,6
34:21 121:19
**family** 20:17
23:15
**far** 15:18 24:11
41:13,14 126:24
**farmland** 8:4,6,7
**february** 80:4,20
81:6,20 82:25
84:13 87:25
89:13 90:13
97:13,16
**fed** 93:15
**federal** 1:24
**fee** 50:17 54:20
54:22 55:20
62:18 89:24
**feel** 5:16
**fees** 34:20 52:1
52:20 55:7,10
56:9 57:18,19
58:2,4,8,11
61:10 91:13,18
91:22,25 94:7
114:6
**fell** 31:3 69:23
81:14
**fence** 44:21

**figure** 48:4 93:9
**figured** 63:18
**file** 45:1 71:3
**filed** 5:7 24:8
25:19,22 28:10
**files** 20:13 21:11
22:11 27:9,13
30:4,13,20 31:7
71:7 105:6
**filter** 50:14
**final** 50:15
**financial** 16:24
16:25 48:18
56:8
**financially**
133:24
**finansbank**
83:14,18
**find** 68:2 93:7,25
**fine** 18:23 45:11
47:24 53:9
124:15,16
125:12 126:20
**finish** 6:5,6
99:19
**fire** 122:12
**firm** 34:6,11
46:9 134:5
**first** 4:2 43:11
43:22,24 46:3
49:20 51:8 67:4
73:6 75:5 97:12
97:21 115:4
**five** 17:19 36:15
48:3 127:10
**flesh** 74:1
**flew** 107:16

**floor** 2:9
**florida** 28:1
**flush** 121:25
**fly** 107:12
**focus** 7:3,15
**follow** 73:20
117:1
**followed** 36:17
**following** 11:3
55:14 133:11
**follows** 4:3
**foregoing** 132:3
132:16 133:12
**forgot** 119:18
**form** 9:5 66:10
**formal** 11:11
15:4,5
**formed** 8:12,14
8:24 9:2 12:13
46:18
**fort** 134:7
**forth** 116:12
125:13,13
**fortitude** 30:23
31:5,8,12 32:20
32:23 100:13
129:4,10
**fortitude's** 32:24
**forum** 38:15
**forward** 12:8
42:14,18,22 44:5
44:6 56:17 67:8
69:24 81:5
112:15 115:14
127:9
**forwarded**
108:22

**forwarding**
45:16
**found** 11:12 27:1
**foundational**
65:12 88:14
**four** 14:5 36:15
36:22 38:6
76:14 78:24
102:5 127:10
**fourth** 38:3
**frame** 84:25
107:16
**frcp** 133:16
**free** 103:6
**fresh** 77:23
**friend** 41:2,4
88:23
**friends** 41:6
**front** 51:3,4,10
**full** 63:9,22
**funds** 12:17,20
46:13 50:12
54:9 55:9 56:1
57:2,4,8,9,12,22
58:6,12,13,17,21
59:1 60:11,25
81:21 82:1,4,6,6
83:6 126:12
128:23 129:10
129:13
**furnishing** 96:11
**further** 85:10
97:23 129:18
133:16,22,24
**furthest** 85:5
86:5 98:12

| g | | | |

**g**

**gail** 1:20 133:10
134:4
**gas** 58:15
**general** 7:5 50:8
**generally** 7:2
**generated** 42:10
58:11
**generating** 62:5
**gentleman** 24:2
24:16 27:21,25
28:13 29:19
34:21
**georgia** 99:9
**getting** 50:5 67:7
84:15 85:11,18
94:7 95:8
102:25 105:25
110:6,9 111:13
111:16 122:18
**ghana** 73:24
74:9
**gia** 91:23,25
**git** 7:5 35:15,23
36:6 37:5 42:4,6
56:7,9,11,20
60:14,19 78:10
**give** 7:6 39:16
61:4 62:3 81:5
89:10 99:25
100:7
**given** 132:20
133:15 134:1
**giving** 21:3
**glad** 37:1 42:13
**glass** 7:9
**glitch** 20:4

**global** 45:21
115:23 116:9
**gloves** 96:4,10
**gmail** 18:20
**gmail.com** 130:2
**gmail.com.** 20:9
**go** 10:12 18:4
26:24 27:2,13,18
38:1 39:9,10
44:24 46:25
51:2 53:1,3
65:15,17 67:4
68:24 70:6 71:8
75:4,5 77:3 79:9
79:21 81:5
82:25 85:6,12,23
86:9 87:13,25
89:8 90:2,12
91:9 92:13,14
94:20 96:21
97:15,23 98:18
99:13,24 100:11
101:5 104:11
105:11 106:24
108:14 109:6
110:11 111:10
111:11 115:12
115:17 116:11
118:15 121:2,2
121:17 122:2
127:12
**goal** 6:9
**goes** 79:12 115:2
**going** 17:19
32:19 39:15
42:22 47:14,20
48:1 64:18 68:7
70:25 71:22

81:12 92:20
95:4 100:6
101:23 103:21
111:22 112:25
126:10 129:5
**gold** 69:2,7,11
69:12,14 70:1,5
74:16 96:16
118:24 119:7
121:9
**gonna** 88:2
**good** 38:21
79:11 84:5
90:18 92:7
98:21 100:19
105:23 107:6
119:11
**google** 60:5
**googled** 60:1
**gotten** 98:2
103:19 122:9
**gowns** 96:4,10
**graduate** 6:17
**graduated** 6:25
7:7
**graduating**
101:12,17
**graduation**
101:9,15,23
**great** 101:25
124:11
**greco** 24:3,6,8
24:11 37:4,21
69:17
**green** 112:19,25
113:5,13,24
114:11

**group** 2:8 112:5
**guaranteed**
35:15
**guarantees**
16:25
**guardia** 102:6
**guess** 13:25
14:16 40:14
66:5 71:7 76:7
77:7 79:5 83:7
83:11 102:13
116:3,8,9
**guy** 84:14
105:14 122:23
**guys** 26:18,19
46:4 63:10 65:1
67:7 68:8,9 80:8
80:12,17,21 81:7
84:14 88:1
122:3,4,7

**h**

**haeger** 35:13
**hair** 110:6,9
**half** 57:10 74:10
**hall** 67:21 68:4
**hand** 53:13 65:8
132:20 134:1
**handled** 14:15
37:23
**handling** 37:24
123:18
**hanke** 1:6 20:14
29:14 31:12,15
31:24 32:15,21
32:25 33:1,2,4,9
34:25 36:4,7
38:23 39:12

40:4,13 41:5,8
41:10 42:10,17
44:1 45:16 47:1
47:6 48:25 49:5
49:11 50:22
51:9,23 52:2,15
55:7,20 56:8
57:1 58:18
62:17,21 64:10
64:14 66:8,11
67:2,5 68:12
69:20 70:1 72:1
73:12 75:12,18
76:6,18,24 77:6
77:13,18,25
78:14,18,21
79:14 81:8
82:20 83:13
84:2,13,22 87:3
87:12 88:1,15
89:1,2 90:16
91:13 94:1
95:16 96:22
97:5 98:15 99:1
99:7,14,16
100:11 101:24
102:9,21 103:5
103:14,24 104:6
105:13,17,23
107:7 108:9,21
109:6,14 110:4
110:12,24
111:13,25
116:22 118:8
119:9 120:1,4,4
120:7,10,25
121:7 124:1
126:16 130:4

133:6
**hanke's** 43:12
  50:21 59:18
  80:24 104:20
  108:5,8
**happen** 32:9
  117:14 127:24
  127:24 128:1
**happened** 10:8
  14:23 56:11
  58:11 61:17
  103:23 123:18
**happening**
  116:22
**hard** 18:11
  27:12,16
**harvard** 29:3,6
  29:12,16,17 30:5
  30:10 31:15,25
  32:2,6,11,16
  127:6,12,16
  128:5,22
**hawaii** 37:18
**head** 36:9 37:22
**headhunter** 7:11
**hear** 45:3,4
  125:24 126:2
**heard** 9:20 73:17
  99:12
**hearing** 85:21,23
  86:3
**heart** 110:13,13
  111:3,3
**hefter** 2:2 3:8
  4:5,7 20:10
  26:24 27:2
  28:15,18 39:9
  44:22,24 47:9,12

47:18,25 48:7
53:3,8 62:15
63:8,11,20 64:12
65:18 66:7 86:1
91:5,8 95:11,14
97:1 98:19,22
118:15,17
121:16 123:20
123:24 124:12
124:20,23
129:17
**held** 86:24
**help** 65:7 90:19
**helps** 119:6
**henry** 99:8,9
**hey** 69:1 84:12
  84:14
**hi** 4:6 79:21
**high** 6:15,18,20
  7:1,7 101:19
  116:13
**highest** 6:14
**history** 4:24
**hit** 81:21 82:6
**hitting** 82:1
**hogan** 2:3 34:10
  46:3
**hoganlovells.c...**
  2:5,5
**hoganwillig** 34:7
  34:8,17 46:5,9
**hold** 99:15 101:5
  125:23,23,23
**holding** 115:23
**holdings** 19:22
  21:19 116:7
**home** 15:25
  57:11 94:11,13

94:15,16
**hopefully** 84:16
**hopes** 43:3
  105:24,24
**hotel** 41:18
  108:12
**hour** 41:20 48:1
  80:8
**house** 93:14
**howard** 74:19,22
  74:24 75:2
**huh** 25:7 72:7
  75:7 76:1
  100:17 101:10
  102:2
**hysterectomy**
  36:24

**i**

**ibrahim** 79:15
**idea** 70:1,13
  71:25 72:7
  73:17 75:14
  76:10 78:23
  83:25 96:20
  98:25 99:23,23
  103:9,15 107:3,3
  109:21 114:1
  116:8 120:9
**identification**
  47:14 48:12
  123:25
**identity** 132:14
**ignore** 39:12
**illinois** 88:15
  89:1,2
**immediate** 71:3

**immediately** 79:7
**important** 6:5 78:20
**inception** 17:13
**includes** 114:6
**income** 56:22
**incorrect** 33:19
**independent** 126:23
**index** 3:1
**indicate** 16:20 17:23 70:6 71:1 71:8 73:4 74:18 77:18 83:1 89:14 99:14,16 100:3,18 103:4 110:11 115:3 121:7
**indicated** 22:1 88:23 97:2 133:13
**indicates** 42:12 73:12 112:5 115:22 119:10 119:16
**indiscernible** 44:15
**indonesia** 114:19 115:9
**info** 73:6 119:12
**information** 76:19 125:17 126:13
**informed** 34:25 36:18 52:15 56:18 125:22

**inquiring** 82:20
**instance** 1:16
**institution** 48:19
**instructions** 5:1 6:1
**instrument** 132:16
**interested** 94:25 112:7 133:24
**intermediary** 95:15
**internet** 52:20
**introduce** 4:6
**introduced** 39:8 40:19 47:15 63:19 64:11 69:19,22 88:20 96:25 123:23
**investment** 8:22 9:3 35:16 54:19 128:14
**involved** 10:4,6 10:9,15,23 11:2 13:20 28:7 50:12 66:16,19 77:13 87:3 115:8 123:19 128:17
**involvement** 74:12
**involving** 25:16 26:3 27:7 29:6,6 29:25 32:11,23 33:4,5,17 34:17 37:6 43:20 44:1 46:12 78:2 79:14 81:8 87:17 91:21

115:9 127:6 128:7
**iolta** 13:23 46:3 46:8,12,17 52:21 52:23 58:21
**ipad** 15:2 21:15
**irving** 41:18 108:12
**israel** 41:3
**issue** 17:11 95:4 110:23
**issued** 77:24 125:3 127:15 129:3
**issues** 79:2,4 101:24
**it'll** 13:10
**item** 99:17

**j**

**j** 1:6 47:1 88:15 88:25 89:2 130:4 133:6
**jacarda** 116:24 117:4
**jackie** 85:14
**january** 50:2 79:9 120:5,11,20 122:11
**jeff** 76:5,7,10,12 76:19 77:6 90:12,15,18 91:1
**jeff's** 77:14
**jmp** 1:5 133:5
**jobs** 6:25
**joe** 24:3
**john** 108:17,19 108:23 125:7

**july** 124:2
**jurisdictional** 21:10

**k**

**k** 25:25 28:15 123:9
**keep** 18:11 70:24 122:3 124:10
**keeping** 69:4
**kenya** 79:14
**kind** 125:14
**kinds** 77:1
**knew** 9:19 70:2,5 74:15 96:15 122:23
**know** 4:10 5:14 5:24 8:14,18 13:3,7 15:9,18 16:8,14 17:17 20:12 23:13 24:11,14 25:21 26:2,12 27:6,12 28:9,17,18 29:1 29:8,22 31:3 32:2 34:5,13,15 34:16,24 36:13 37:22 38:4,10,25 39:15 40:15 41:6,10 42:17 43:8,10 44:3,20 45:7 46:10,13 47:7 53:19 54:22,23,25 55:9 55:25 57:5 58:17 59:21 60:24 61:6,7,12 61:13 62:7,11

64:1 65:6 68:8
69:21 70:13,17
70:22 71:17,22
72:16,18 73:11
74:17 76:7 78:5
79:3 80:14,16,18
82:3 83:3,22
85:4 86:4,14
87:9,11,21 88:7
88:10,10,12 89:7
89:11 94:24
95:20,21,21 96:8
97:15,19,22,25
98:3 99:20
102:13 103:22
104:12 105:10
105:16 106:2,8,9
106:18,19,21
107:25,25
108:19 110:1,25
111:1,1,5,5,18
111:20 112:6,11
112:17 115:1,1,2
115:19 116:3,8
116:10,18,20
118:3,19,23
119:1,13,14,22
120:22 121:6
122:14,15,18
123:5,17 124:8
126:12,18,24
127:8,11,18,25
128:2,3,5,9,10
129:1,6,7,9,13
**knowledge**   12:7
13:5 126:23
128:16

**known**   41:8
132:12
**knows**   87:11
**krona**   118:22
119:2

**l**

**la**   102:6
**labeled**   17:2
**lady**   86:11
**laguardia**
102:14,16
**lance**   28:14
100:12,19
**land**   102:6
119:19
**landed**   79:1
120:6
**language**   90:20
**laptop**   14:24
15:1 21:15
**large**   17:18,18
37:14
**larry**   9:16,17,20
12:15,20,21
13:11 14:8
17:25 19:6
37:23 87:8
**las**   25:23 26:14
37:21
**latam**   90:20
**late**   102:3
**laura**   35:8
**law**   2:8 15:22
34:6
**laws**   8:25
**lawsuit**   24:8
125:17

**lawyer**   5:4 22:16
**led**   87:23
**left**   14:4 52:22
53:13 60:17
65:8
**legal**   23:6 91:13
91:18,22 130:23
134:6
**lend**   72:14
**lenders**   92:17
93:20
**lending**   72:4,11
111:20
**lengthy**   124:7
**letter**   55:14 78:6
126:14
**letting**   92:11
**level**   6:14 116:13
**leverage**   72:14
72:23 83:6
**liberty**   2:8
**license**   7:24 8:1
86:12,13,14
123:13
**licensing**   87:10
**life**   19:14
**light**   112:19,25
113:5,13,24
114:12
**line**   85:21 99:17
131:3
**link**   18:16,17
83:15
**list**   66:10
**listen**   92:12
**listing**   76:14
**literate**   70:24

**litigation**   25:19
25:21 28:10
37:16 91:12,21
123:15,17
**litigations**   37:9
**little**   21:3 53:7
65:23 68:24
70:7 77:9,12
85:6,9,9
**live**   54:1 127:18
129:6
**lives**   89:2
**llc**   73:14 115:23
115:24 116:7
**loan**   71:11,16,23
72:2,5 83:16
111:14,16
**loans**   116:5
**located**   1:23
14:11 16:1
26:13 102:17
**location**   73:20
**log**   60:2 96:22
97:3 98:7
**london**   77:24
78:3
**long**   41:19 43:10
**longer**   10:15,22
11:2,16 12:17
**look**   30:18 39:16
39:17 42:13,18
53:12 65:16
67:25 105:11
124:3
**looked**   30:9
57:14
**looking**   41:23,24
42:1 44:4 72:2

93:3,9,24,25
111:19 113:16
119:11 128:4
**looks** 63:21
65:25 73:7
90:14
**lost** 26:18 45:6
**lot** 60:8 65:2
**lovells** 2:3 34:10
**luck** 111:13,16

**m**

**m** 123:9
**ma'am** 20:5
**mac** 115:23
116:8
**machine** 1:21
**madison** 2:4
**magnitude** 62:4
**mail** 15:13,18
**maintain** 18:8
18:13
**maintained**
17:22
**maki** 123:9
**making** 27:16
**man** 105:9
**manager** 9:13
**manner** 35:19
50:17 97:9
**march** 95:24
**mark** 47:14
63:20 77:12
80:5,5 96:21
123:24
**marked** 39:11
48:11 64:5,12
97:3

**martin** 2:10 4:11
35:25 36:15
**martino** 29:20
29:24 30:5
**materials** 63:13
**matter** 50:8
125:6
**max** 24:16 69:10
69:10 70:16
81:4 83:20,21,22
83:24 118:24
119:7
**mcknight** 118:2
118:4,9,14
**mean** 9:13 11:23
14:16,17 17:19
27:5 30:6 32:14
36:13 50:23
58:7 61:21 71:4
76:25 79:5 80:5
84:19 85:14
93:19 94:9
102:13 110:20
112:24 114:25
115:17
**meaning** 22:25
31:20,22,23 71:7
**means** 17:4
81:10 113:12
118:23
**meant** 27:15
42:17 106:13
**medical** 110:23
**medically**
110:18
**medium** 121:20
**meet** 40:8 41:11
41:17 106:5

107:18 108:9
**meeting** 9:20
39:6 40:12,17
41:8,16,19 42:3
43:11,14,19
62:24 88:4,6,7
88:11,11,12
104:6 106:24
107:1,2,11,23
108:4
**meetings** 88:9
**memorializing**
62:16
**mentioned** 38:14
119:16,17
**message** 98:13
98:14,15
**messages** 3:19
3:21 64:13
65:24 80:19
97:4 98:16
**met** 38:23,24,25
52:14 63:4 89:3
98:1 104:22
108:7,7,11
**metro** 3:15
47:10,13 48:9,19
48:19 49:3,11
52:11,12,14 54:5
59:3,19 90:6
**michael** 2:2 4:7
10:1 14:8 29:20
121:14
**michael.hefter**
2:5
**mid** 84:16
**middle** 10:6

**midlothian**
15:15
**mike** 13:5,23
34:20 52:21
87:9 123:18
**million** 51:13,15
51:18 52:4,5,7
52:10 61:23
74:9 77:22 78:1
83:2 93:5,14
**mills** 34:22,24
35:3 58:22,25
128:19
**mind** 89:14
**mine** 47:16
116:17
**minutes** 48:2,3
78:25 101:20
102:5
**mobile** 100:16
**mobilize** 69:3
**mohammed** 1:4
4:8 130:4 133:4
**moment** 26:25
**monetize** 69:12
**monetizing**
69:15
**money** 11:1
13:21,23,23
52:22 53:1,18
54:13 57:8,12
58:10 59:6,7,13
61:19 62:4,9
74:7 128:13,16
129:16
**moore** 14:9 18:5
**moore's** 49:21
49:22 50:2

**morning** 22:5
107:6 109:9,11
109:13 111:23
**mortar** 14:13
15:24
**mortgage** 115:25
**move** 44:4,22
56:17 65:17
67:8 68:8 69:24
81:22 98:20
112:15 115:14
**moved** 12:8 44:6
121:11
**mshappy** 20:1
21:20
**mtn** 121:9,19
**multiple** 19:5,5
33:8,11,15,21,22
108:23

**n**

**n** 2:1
**name** 18:25 19:3
24:3,16,23,25
25:2,3 26:1,8,9
26:17 27:22
28:14,17,21,25
29:20,21 30:16
30:24 31:1,2
32:24 33:6 34:1
34:5,7,15,22
35:8,12 36:11
37:9,13,19 49:19
79:23 89:6 90:5
90:9 96:17
100:12 104:14
104:15,24 106:9
108:6,17,19

109:25 118:1
119:18 120:1
128:2,2 132:15
**names** 36:20
38:5 45:1 55:3,3
96:18
**nature** 23:9
105:21
**necessarily** 41:5
**need** 5:21,23
71:12 73:6 79:1
94:24 99:18
109:8 112:20
113:14
**needed** 14:23
33:12 42:23,24
55:12 57:24
58:9 68:17 93:1
95:9,10 96:3,10
110:25 119:19
**needing** 110:18
110:18 123:1
**needs** 65:19
**neither** 35:5
133:22
**nephew** 101:13
**nephew's** 101:14
**never** 7:24 9:19
9:19 11:11,14
12:10,11 13:5,6
18:2 19:4 32:9,9
37:25 44:11
52:12,12,13
54:12 55:5 57:2
59:6,7 69:23
73:17 87:6 92:9
108:7,7,8 113:22
113:22,22

115:10,10,11,14
115:14 117:1,2,8
**new** 1:2 2:4,9
42:1 67:19
88:12 97:19
102:9,17,21
103:2 104:7
106:11 111:25
112:3 116:12
119:10 120:11
133:2
**news** 23:12 84:5
**ngia** 24:24
**nice** 64:25
**nick** 122:12,13
122:22,23
**nicks** 122:20
**night** 106:25
107:2
**nine** 75:16
**nonresponsive**
44:23
**nope** 108:11,11
113:21
**notary** 132:24
**note** 130:10
**noted** 125:15
132:5
**notes** 121:20
**notice** 97:12
**noting** 118:21
**november** 67:5
67:16 68:5 69:1
71:9 72:10
73:13,19 74:18
97:22 112:18
114:10 115:22
116:21

**number** 17:18
45:16 47:4
51:16 59:22
65:9 74:20 98:2
100:16 108:22
121:13
**numbered** 1:18
**numbers** 61:7
**numerous** 32:8
125:7
**ny** 2:4,9 130:15
**nyc** 111:23

**o**

**o** 25:5,5
**oath** 4:15 132:13
133:14
**objection** 5:18
49:16
**objectionable**
5:17,19
**obligations**
86:25
**obligor** 86:18
**occur** 94:13
**occurred** 43:11
**october** 110:12
111:12,15,23,24
**offered** 67:20
**office** 9:13,13
15:4,5,10,14,24
132:21
**offices** 14:10,12
14:17 15:22
**oh** 8:7 21:18
25:6 45:11 46:4
63:14 81:21
82:5 85:23

88:22 127:23
128:19
**ok** 79:1 101:24
102:3,19 114:2
119:20
**okay** 8:7 11:20
11:25 14:10
18:12 21:5 22:6
23:16 25:8,12
26:12,20,23 27:1
27:2,20 29:2
33:25 36:19
38:22 39:5,21,24
40:14 45:6,11,11
45:15 46:11
47:16,18 48:17
48:24 49:23
50:7 53:12
55:18 56:4,24
57:14 61:4
63:14 64:8,24
66:3,5,7 67:11
67:14 68:1,4,6
71:20 74:23
75:21 76:9,17
77:3,7 80:17
81:24 82:17
85:9,16 89:4,12
90:3 92:9 93:3,8
94:2,12 95:25
96:21 99:13,15
100:2,5,10
101:17 102:10
102:16 106:3
107:20 108:14
113:8 114:13,15
115:14 118:8,25
119:6,8 122:16

124:15 126:4,6
126:22 127:2,25
128:1 129:2,15
129:17
**old** 64:21
**older** 106:1
**olivas** 106:3,4,8
**once** 54:18
127:21
**one's** 127:25
**ones** 13:7,8 32:7
32:8,9 129:6,7
**open** 52:17
119:18
**operate** 13:15
35:18
**operated** 35:19
**operation** 16:4
**operations** 14:14
16:6
**opportunity**
39:16,25
**oral** 1:9,15 33:21
35:5,7,11 62:20
105:2
**orally** 33:16
43:25 62:23
**order** 62:3
**ordered** 21:9
61:22,23 62:1
**original** 51:12
**ought** 65:1
**outcome** 133:25
**outline** 115:4
**outside** 113:23
**overview** 76:13
**owe** 93:14

**owed** 24:13
115:25
**owned** 52:15
59:23 119:17
**owner** 7:21
**owners** 73:21
114:25
**owns** 72:18

**p**

**p** 2:1,1 25:25
**p.m.** 1:19 69:1
70:7 72:9,10
73:12 78:25
84:14 88:1 91:7
91:7 99:17
101:6,21,22
102:5 110:12
111:12,16,24
112:19 114:10
123:22,22
129:22
**pacific** 114:18
114:21,24
**page** 3:2,11
39:18 131:3
133:19
**paid** 50:20 51:10
51:14 55:1
56:13,14 57:3,7
57:19 58:1,6,15
60:18 61:10,18
61:21,25 126:12
128:6,9,11,13,15
128:18
**pak** 25:25 26:4
**paper** 58:8

**paperwork**
115:15
**pardon** 8:5
118:6
**part** 19:10 37:23
39:13,14 50:13
53:4 80:9,14
122:19 128:2
**particular** 43:15
50:16 51:10
65:10 71:23
73:8 74:4 87:17
88:4 91:12 95:3
115:9 117:5
**parties** 20:16,22
94:18 96:13
133:23
**partner** 104:19
105:14
**partners** 115:24
**party** 103:23
133:18,21
**paste** 116:16
**pasting** 76:4
77:5 90:14
**pat** 14:9
**pay** 50:15,25
51:3 91:17,22,25
**paying** 60:18
91:13
**payment** 52:23
56:9 62:17
**payrolling**
122:24,25 123:1
**penny** 49:20
**people** 14:5,7
19:5 36:20
70:19 71:3,16

74:15 81:12
95:9,15 96:3,18
96:18 119:12
128:17
**people's** 83:6
**percent** 51:19,22
52:7,9,24 57:7
57:10,20 62:18
**percentage**
50:16,19 89:24
**performance**
125:2
**period** 10:5
19:24 44:8 55:6
56:21 70:18
75:16 94:18
97:17,23 101:12
103:14 105:2
107:8
**person** 9:18
38:25 50:15
63:3 66:15,25
69:8 70:5 86:20
87:11 88:17
103:20 104:24
110:20 132:15
**person's** 109:24
**personal** 3:21
19:17,20,23 23:4
58:13 66:12
90:9 94:11,13
96:24 97:4 98:1
98:7,9
**personally** 23:7
29:15 56:24
61:1 78:12
132:12

**persons** 68:18
**pet** 49:20,20,21
49:22
**peter** 2:3 4:8
39:22 47:9,16
53:4 63:8 65:18
77:10 98:20
118:16
**peter.bautz** 2:5
**philipp** 2:7,10
4:10
**phone** 3:19,21
4:11 15:2 21:6
45:10 47:23
63:3,5 64:23
66:11,12,14
67:25 74:20
89:5 92:12,13
96:24 97:4,10,18
97:19,21,24 98:1
98:7,8,9 102:25
108:22
**phones** 64:18
98:4
**photo** 3:17
**photograph** 64:5
**pick** 94:5 113:1
113:9,19,24
114:17
**picked** 113:17
**picking** 114:3
**pickup** 112:20
112:25 113:6,13
114:6,14
**picture** 63:21
68:2
**piece** 12:15,22

**pieces** 111:21
**pipeline** 116:12
**place** 15:17 38:7
40:13 88:8
133:13
**placed** 133:14
**places** 113:16
**plaintiff** 1:16 2:6
**plane** 67:7,15
109:8 119:10
**play** 9:10
**playing** 44:21
**please** 5:14,24
39:19 66:1,2
67:6 71:2 73:4
73:13 75:9
78:19,19 79:2,10
80:4 81:10,10
85:22,22,24
94:25 95:12
99:18 103:5
107:5,6,11
112:14 115:3
**pleasure** 40:7
**plus** 9:18 22:11
**po** 15:15 90:9
**pocket** 106:22
**point** 4:25 5:8,21
7:16 10:15,21
11:15 16:9 42:7
45:9 46:2 57:10
70:14 71:16
73:16 74:6 75:9
80:6,6 91:12
93:10,23 96:19
100:9 102:8,11
103:1 105:18
110:24

**points** 42:25
**policies** 52:3
56:14
**policy** 50:24
54:25
**politely** 110:5
**portion** 12:21
57:19 95:13
**possible** 92:17
93:20
**post** 15:10,14
77:23
**potential** 29:13
32:16,22 43:19
70:20 72:23
77:22 78:1
93:10
**pp** 96:2
**ppp** 96:2
**practices** 13:16
**pray** 22:5
**prepaid** 55:20
57:1
**preparation**
22:14 63:13
**prepare** 22:4,16
**prepared** 65:8
97:8
**pretty** 23:13
**prevent** 126:13
**previous** 107:2
**pricing** 83:2
**primary** 7:3,15
**principal** 28:7,8
**principals** 36:21
**printed** 18:5
55:13

**[prior - really]**

**prior** 7:14 22:14
23:17 41:8
61:18,21,23,24
91:14 109:4,4
**private** 8:12
**privy** 54:24
**pro** 5:9
**probably** 21:7
36:13 58:2,15
97:18 98:21
101:13 103:9
**problem** 126:21
**procedure** 1:24
**proceed** 5:8
**proceeded** 96:12
**proceeding**
38:11 133:24
**proceeds** 56:2
129:11
**process** 13:1
55:16 70:9,19
77:11 114:7
115:5
**produce** 21:10
**produced** 1:15
20:12 63:7 64:1
69:23
**product** 20:15
88:19
**profiling** 76:14
**profit** 89:24
**program** 64:21
65:8 116:1,2
**promise** 92:10
**properties** 7:22
8:2,9
**property** 7:20,25
115:25

**propose** 72:3
114:5
**proposed** 51:22
**proposing** 68:12
83:24
**protecting**
125:25
**prove** 59:22
**proved** 132:13
**provide** 12:25
16:21,24 17:6,16
23:23 24:5
25:15 29:5 32:4
32:16,22 33:12
**provided** 26:2
27:6,11 29:10
38:10,14 50:9
57:15 63:15
64:2 66:9 90:9
115:11,20 127:5
**provider** 43:3,6
43:12
**provides** 100:16
108:15,17
**providing** 4:18
32:10 33:4,9,16
42:4,9 50:10
51:15 54:20
55:21 56:10
60:15 96:9
100:12 120:1
126:13
**provisions** 1:25
**public** 132:24
**pull** 39:3 60:2
**pulled** 30:7 93:6
**purpose** 59:18
118:11

**purposes** 5:20
55:21 120:2
127:15 132:18
**pursuant** 1:23
38:11 133:16
**put** 18:14 19:7
20:8 24:16
53:20,24 59:7
68:16,19 95:17
96:12 102:14
114:15,21
121:25
**putting** 9:22
54:23 76:18
93:8 94:2 95:18
108:3 122:12

**q**

**qnb** 83:14,17
**question** 5:14,16
6:5 13:25 29:23
32:13,20 40:22
46:6 49:19 50:5
59:14 60:24
65:13,20 70:11
76:10 77:12
80:4,5 87:4,5
88:14 91:11
93:12,15 99:8
102:8 106:24
115:12 118:12
124:24 126:8,10
**questions** 4:12
5:12,19 48:11
67:8 79:11
93:16 100:7
129:18,21

**quick** 41:15
47:20 109:8
**quote** 83:1
111:13

**r**

**r** 2:1 25:5,5
28:15,15
**r2** 45:21
**raised** 125:1
**ran** 12:4,18
**ray** 74:22,24
75:2
**reach** 105:22
**reaching** 75:11
**read** 22:5 39:20
69:12 72:4 81:9
83:14 89:9,20
95:11,13 98:20
98:23 118:17
124:17 130:9
132:2
**reading** 124:13
125:18
**ready** 39:22 67:7
67:8,14 68:8
72:8 84:15
85:12,18 115:5
124:9
**real** 7:12,15,18
7:23 8:1 47:20
54:1 56:23 62:5
77:22 78:1
92:16,20,24 93:4
93:10,24 94:4
111:21
**really** 43:1 60:16
82:17 84:5

128:15
**reason** 5:22
  10:22 11:2
  63:16 72:19
  86:7 106:16
  130:11 131:3
**reasons** 133:20
**recall** 9:4 16:13
  20:20 23:22
  26:1,5,17 27:8
  28:22 29:15,18
  29:21,23 30:1,16
  30:25 31:4,6,17
  32:21,24,25 33:7
  38:24 40:3
  43:13 47:5
  51:25 58:5 60:9
  62:19,25 63:2
  64:3 67:11,15
  68:18 71:17,19
  71:24 72:9
  75:11,17 76:20
  76:21 77:12,25
  78:16,20 79:13
  79:18 84:25
  88:3 101:14
  102:20,23,25
  103:22 104:5
  106:16,25 107:7
  107:9 108:4
  109:5,13 110:2,3
  112:12 114:4
  118:1 119:23,25
  120:3,12 125:17
  127:14
**receipt** 119:5
  130:18 133:19

**receive** 15:11
  51:21,22 56:24
  57:8,18 60:13
  83:15
**received** 15:18
  18:1,2 50:17
  52:1,7 54:8,13
  54:20 55:7,10,11
  55:25 57:2,9,22
  58:10,18,21 61:1
  61:9,14 62:9
  65:11 66:8 76:5
  79:18 86:24
  90:15 98:13,14
  128:23 129:10
  129:16
**receiving** 40:3
  69:15
**recess** 48:6 91:7
  123:22
**recognize** 28:21
  28:25
**recollect** 61:3
  63:24 74:21
  77:2,8 79:24
  94:19 99:6
  104:14
**recollection**
  36:20 39:4,19
  40:12,24 46:7
  64:4 73:15 74:5
  74:11,23 75:1
  80:21 82:4 83:8
  83:17 84:21
  86:2 87:16
  89:17 90:24
  99:4 100:22
  101:11 103:12

103:16 104:15
  109:19 110:15
  111:7 113:12
  116:6 117:22
  120:7,24 122:5
  122:13,22 123:2
**record** 1:25 5:18
  6:7 26:25 27:3
  31:23 48:5
  62:14 65:5,9
  133:14
**reed** 117:23,25
**refer** 81:2 90:1
  92:19 94:20
  99:25 106:1
**reference** 82:15
  82:18 86:2
  104:12 105:12
  109:16,17
  111:17 112:10
  118:22 119:1
  120:16 121:20
  123:8
**referenced** 130:6
**referencing**
  111:2,6
**referred** 81:13
  122:8
**referring** 18:18
  24:21 25:10
  68:9 71:15 79:3
  99:21 103:7
  119:13,14 121:1
  122:4
**refers** 83:3,4
**reflects** 64:13
**refresh** 39:4,19
  40:11,23 46:6

72:15 73:14
  79:23 80:20
  87:16 90:24
  99:3 100:22
  101:11 103:12
  103:16 122:4,21
**refreshes** 74:4
**regarding** 31:25
  33:9 56:8 125:9
**regards** 9:22
  47:1,1 82:24
  125:8
**registered** 15:7
**regular** 58:7
**reit** 116:1,2,4
**related** 67:12
  96:1 133:23
**relating** 30:3
  61:10 76:22
  77:14
**relationship**
  23:6 51:9
  114:20
**relationships**
  12:12
**remain** 13:1
**remember** 18:15
  26:9,11 31:2
  32:1 37:13,19
  38:5 39:1 41:13
  41:14 67:17
  68:21 71:11
  77:1 83:21 84:7
  94:10 96:17
  108:5 110:7
**remote** 1:9
**remotely** 1:22

removed   12:15
   12:23
repaid   24:12
repeat   5:2 17:12
   111:14
rephrase   5:15
replace   16:15
replies   91:2
reply   85:22,24
reported   1:21
   133:13
reporter   1:20
   6:7 20:6 28:16
   133:11
reporter's   3:5
   25:1 133:7
representatives
   44:10
represented   5:3
request   21:9
   22:12 30:3,11,15
   57:16 59:25
requested   30:12
   31:10 95:13
   106:4 133:17,20
requests   20:6
requires   33:22
research   11:13
researching
   129:8
residential   8:3
resigned   56:12
resigning   61:25
resolution   125:6
respect   26:6
   32:20 35:15
   52:9 56:5 59:3
   59:25 61:5

66:15,21,25 95:3
respond   79:2
   102:19 106:11
   112:7 125:20
responding
   119:20
responds   78:24
   102:5 105:15
   106:25 111:22
   114:2
response   30:10
   30:14 31:8
   57:16 101:22
   102:23
responsive   21:21
   21:24 22:12
rest   5:23 12:22
result   25:18
   52:23 54:9 61:1
   61:11 89:24
   128:13,23
resulted   123:15
return   130:13,17
returned   69:4
   133:18,19
revealing   126:8
review   22:6,8
   39:25 71:10,21
   127:21 130:7
reviewing
   124:10
revised   90:20
rick   120:21,22
   120:25
right   22:10
   24:19 26:9
   34:16 59:23
   66:6 69:19

73:10 77:20,21
   80:12 81:8
   82:12,18 83:22
   85:25 87:15
   98:12 106:15
   111:11 113:6
   114:11 115:18
   116:21 119:9
   122:2 123:10
   126:1
ring   73:21
   121:22
ringing   64:7
rita   99:8,9
rj   104:12,13
rogers   34:22,24
   35:3 46:12,18
   58:22,25 128:20
role   8:16 9:10
   28:2 95:6 96:5
   110:22 117:10
rolling   73:7
romeo   35:9
room   5:23
roommate's
   49:22
roth   27:22,24,25
   28:6,10
roy   35:13
rule   133:16
rules   1:24 38:12
run   104:24
rush   47:18

**s**

s   2:1
sad   37:12

safe   23:15 69:4
   102:19
safekeeping
   119:5
salary   60:13,16
sales   7:10
savvy   21:4
saying   55:2 80:2
   84:21 86:4
   88:25 90:18
   93:19 125:11
says   40:6 42:12
   46:3 47:1 53:13
   53:21 67:6,14,17
   68:7,25 69:12
   71:20 72:2 73:5
   73:13,20 74:9,19
   75:8,23 77:10,18
   77:21 79:1,17,17
   79:21 81:10
   85:11 88:1
   89:21 91:23
   98:13 101:8,24
   105:23 106:3
   109:7,23 110:6
   115:22 120:5,21
   122:2,11,20
sblc   72:14,24
   73:1 77:24 78:2
   78:5,7,13 83:15
   87:20 90:19
schedule   90:21
school   6:15,18
   6:20 7:1,7
   101:19
schwan's   7:10
screen   3:15
   26:18 45:9

47:17 49:9
127:4
**screenshot** 47:13
48:15 52:19
54:3 59:9
**screenshots**
47:10 48:9 53:4
**screwed** 118:14
**scroll** 39:15,23
65:23 66:3
124:9
**se** 5:9
**seal** 132:20
**search** 21:11,12
21:18,20,23 30:2
30:4,13 31:7
66:8,14 105:5,6
**searched** 21:14
21:16 31:10
**second** 20:5 22:2
47:21 61:22
101:5
**see** 40:9 42:15
44:25 45:2,8,10
45:12,21 47:2
49:8 53:8,16,21
60:6 65:24,25
67:9 69:5 71:12
72:6 74:20 75:6
75:22 76:15
77:19 81:13,22
82:10 85:13,19
89:15 90:21
92:14,15 93:1,2
93:12 94:20
95:1 97:13 99:3
100:13,19 101:9
102:1 106:5

107:13 109:9
112:8 114:8
115:6 118:13
121:10 122:17
123:8
**seeing** 39:14
64:5 114:8,9
**seeking** 86:19
**seen** 24:25 63:22
64:14 85:17
**sell** 7:25 69:7
**send** 12:20,21
18:6 21:16
63:10 71:9,20
76:13 115:3
125:10
**sending** 76:5
77:6 87:23
90:15 103:7
**sense** 7:5 84:18
84:19 100:8
119:24
**sent** 18:3 27:14
55:13 65:11,13
98:13,15 106:13
130:14
**separately** 19:16
**september**
107:10,16
108:10 109:7,12
109:14 110:5,8
130:3 134:1
**served** 21:9
**servers** 18:13,14
**service** 122:25
123:1
**services** 42:5,10
50:9 94:8

**set** 19:6 20:7
50:19,21 99:1
102:24,24
**sg** 16:15
**sgifunding** 20:9
**sgit** 7:5,8,15 8:11
8:12,17,21 10:4
10:9,16,23 11:1
11:7,18 12:1,4
12:10,11 13:15
13:21 14:3,6,11
14:14 15:3 16:4
16:8,12,15,21
17:6,15 18:13,21
19:15,25 20:19
23:23 24:5,9,23
25:15,19 26:2
27:6,11 28:3,11
28:22 29:5,25
32:4,12,22 33:9
33:16 34:16,19
35:19 36:6 37:5
42:4,6,9 43:6,11
44:6 45:24 46:7
46:11 48:18
49:6,11 50:8
51:14,21 52:1,6
54:8,12,15,19
55:6,9,10,10,21
55:25 57:7
58:11,18 59:4
60:13,19 61:2,10
61:25 62:1,10,17
78:7 86:22
90:10 95:4
127:5,15 128:7
129:2

**sgit's** 14:20 17:9
19:10,13 20:23
32:15 54:5 95:6
**sgitllc.com** 18:25
19:11 21:13
**sharing** 47:17
**sharlotte** 24:23
**sharp** 37:2
**sheet** 130:11
**sheikh** 82:18
88:1
**sheikh's** 82:21
**shek** 82:10,17
**sherry** 1:10,15
3:7 4:1 73:5
79:21 115:23
120:5 130:1,5
131:2 132:2,7,12
133:8,13
**short** 80:7
**shorthand** 1:22
133:11
**shots** 3:15
**show** 18:8 27:10
65:18 121:5
**showing** 47:16
47:19 54:1
**shown** 47:12
48:8 65:6
**shows** 53:5
59:10 65:10
77:4
**shutting** 61:24
**sic** 80:5
**sick** 110:18,19
110:20
**sicknesses**
103:10

side   53:13 69:23
   84:20 86:15
   89:22 98:12
   122:15 128:3
sides   44:21
sidney   34:22
sign   130:12
signature   3:4
   131:1 132:1,4
   133:16,19 134:3
signed   18:6
   91:23 125:12
   130:20
silver   69:2,13
sims   1:10,15 3:7
   4:1,6,14 6:12
   39:10,11 45:1,3
   47:12,14 48:8,11
   53:4,10 63:20,23
   64:5,12,14,15
   65:6,12 75:6
   91:8 96:21,24
   97:3,3 98:20
   123:25 124:2,3,6
   124:12,24 130:1
   130:5 131:2
   132:2,7,12 133:8
   133:13
sing   67:21
sir   10:2
sitting   4:19
   36:11,19 55:24
   74:8 82:3 98:24
   111:7 113:11
   116:18 118:25
   127:13 129:9
situation   77:22
   78:2 85:15

125:14
six   36:10,12 71:3
   71:6,7
size   93:9
skr   69:13 118:21
   118:23 119:5
skype   47:5,6,8
slater   9:8 44:16
   93:18 104:2
   107:18 120:15
sliding   110:14
   110:21
smaller   37:15
smart   52:18
smaylovsky   2:7
   4:10 129:20
software   88:18
sold   94:15
solicitation
   12:10
solutions   130:23
   134:6
somebody   19:16
   65:7 72:11,16
   77:23 81:4 94:6
   96:10 99:11
   105:19 108:4
   114:16 115:13
   116:3 122:25
   123:6
somebody's
   70:10
soon   88:2
sooner   110:14
   110:22
sorry   12:16 27:4
   31:22 62:12
   100:3 103:5,25

106:12,15
   108:13 114:10
sort   88:17
   111:19
sounds   30:24
   33:6
source   56:22
   58:17,25 126:17
sourced   36:4,7
southern   1:2
   133:2
speak   22:18
   66:21 79:7
   114:2
speaking   108:1
   110:7
specific   8:19
   14:19 43:18
   87:7
specifically   30:9
specifics   83:1
spell   25:2
spent   42:13
spoke   22:21
   23:11 33:2
   66:19 100:19
   105:14 120:21
   122:3,12 125:7
spurgeon   1:20
   133:10 134:4
squeezing   37:14
sr   21:18
srm   26:16 27:7
   33:5 108:18,25
   125:1,6 126:13
   126:13
srs   19:22 21:19

srsholdings
   130:2
stalled   92:17
standard   114:6
standby   78:6
   122:20
start   6:12 14:6
   43:9 84:16
   95:23 122:21
started   7:7 10:11
   47:17 92:11
   96:2
state   1:21 5:18
   7:24 15:7,8
   47:11,13 132:9
   132:25 133:11
stated   1:25
   126:19
statement   59:25
   111:6
statements   57:15
states   1:1 3:15
   48:9,19 49:4,12
   52:11,12,14 54:6
   59:3,19 90:6
   115:18 122:17
   133:1
stating   55:12,15
status   106:10
   117:19 127:22
stay   77:10
stayed   12:14
   116:13
stems   91:3
stenographically
   133:13
stephens   2:10
   4:11 5:7 23:19

36:15 56:5
61:17,20 66:16
66:22 67:1
128:24 129:12
**stephens's** 23:1
36:1
**steps** 16:15 43:2
**stolen** 11:1
**stop** 124:20,21
**stopped** 17:14
**strange** 122:18
**street** 2:8 134:6
**strike** 44:23
101:21 104:3
**strive** 6:9
**stuff** 54:24 58:7
68:23 80:10
112:21,23 122:7
**styled** 1:17
**subgallagher**
8:22 9:3 12:22
18:21 52:17
53:2 56:14
61:24 126:15,18
126:24 127:1
**submit** 33:12
**submitted** 32:8
36:8,16
**subscribed**
132:16
**subsequent**
12:24
**sue** 109:1
**sued** 37:6
**suite** 134:7
**suited** 102:1
**support** 67:22

**supposed** 13:8
92:6
**sure** 8:20 15:9
23:14 29:9
32:14 57:13
67:18 68:15
81:23,23 84:10
85:8 91:2
105:19 120:18
121:5
**sureties** 57:3
**surety** 8:13 9:19
9:20,22,23 12:7
13:5,6,6 16:21
17:1,10,15 23:23
24:5 25:15 26:2
27:6,10 28:5,5
29:5,13 32:4,10
32:16,22 33:5,9
33:17 35:22
37:6 38:9 42:1
42:24 43:3,6,9
43:12 50:10,14
50:20 54:15,20
55:21 56:10
60:14,21 86:8,23
87:1,6 95:4
127:6,15 129:3
**swedish** 118:22
119:2,2
**switching** 127:3
**sworn** 1:17 4:2

**t**

**t** 74:21,24 75:2
**table** 63:9,22
64:13,17 66:10
71:4 88:18 97:9

**take** 12:21 13:9
18:5 38:20
39:19 45:15
47:21 48:2
50:13 57:11
61:8 77:11
86:13 91:6
123:21 124:15
127:4
**taken** 1:17 16:14
133:24
**talk** 20:17 42:3
43:19 68:17
73:5 78:21 81:3
99:18 112:20
113:14 117:11
**talked** 9:22 37:4
97:20 105:9,21
108:23
**talking** 6:8 70:19
71:22 72:22
73:16,22 82:5
84:17 89:18
98:15,16 109:22
110:15 116:1
121:23 123:6
125:21 128:19
**tammy** 34:1,3
40:9,19,24 41:1
41:2,7 88:15,17
88:20 89:1,3
**technical** 62:14
**technologically**
21:4
**telecom** 7:12
**telephone** 28:19
47:4 75:12
100:16 108:20

**tell** 40:7 41:24
65:2,4 68:3
81:16 95:20
**telling** 65:3 92:5
**templates** 45:17
**ten** 17:20 24:1
36:8 48:3
**term** 17:3
121:20
**terminated** 11:9
**termination**
11:11
**terms** 38:19
**testified** 4:2
10:14 35:20
38:17
**testifying** 55:19
**testimony** 4:19
4:25 10:25 15:3
19:8 22:9 30:8
33:20 38:11,13
38:13,14 49:10
54:12 55:19
66:20,24 130:9
130:18 133:14
**texas** 1:21,23
7:24 15:7,16
38:25 108:12,12
132:25 133:11
134:4,7
**text** 3:19,21 64:9
64:13 65:10,11
65:16,24 66:25
67:5,11 68:7,24
72:3 73:8 74:4
75:15 76:3,5
77:5,10 80:19
81:25 84:20

90:14 94:2 97:4
97:12,15,21 98:7
101:2,6,23
110:11 112:1
114:11 118:18
120:20 123:9
**texts** 20:12,14
65:1,2 66:10,15
88:15,25 89:9
91:9 92:14
96:22 97:22
99:1 101:7
102:24 110:4
**thani** 1:4,4 4:8
33:10,18 36:14
43:20 44:2,9,19
54:10,14,19 56:2
66:16,22 67:1
99:21 106:11
128:13,24
129:11,14 130:4
130:4 133:4,4
**thani's** 23:1
46:17 99:5
128:10
**thank** 23:16 25:8
25:8 27:20
51:20 53:7 68:6
81:24 102:6,7
119:6 124:11
127:2
**thanks** 90:19
99:19 109:12
**theft** 10:24
**therefor** 133:20
**thief** 118:5,7
**thing** 18:3 20:8
21:6 40:21

63:16 71:6
81:11 85:6,12
116:25 125:10
128:10
**things** 16:21
26:10 58:2
68:14,15 73:6,7
74:15,16 77:1
105:24 117:1
**think** 6:8 17:20
29:22 37:3,17
38:3,3 39:13
40:22 47:22
61:9 64:25
69:22 83:4
85:20 96:4
97:20 110:17
123:16 124:22
**thinking** 115:4
**third** 20:15,22
94:17 103:23
**thought** 42:6
110:14,22
**threatened**
109:1 125:16
126:14
**threats** 109:4
**three** 6:25 36:14
67:22 76:14
127:20
**throckmorton**
134:6
**thursday** 107:12
**thx** 90:21
**time** 5:1,8,21 7:6
7:16 10:5,15,21
11:15 13:17
14:3,3 15:1 16:9

17:14 22:21
23:10 39:19
42:7,13 43:22,24
44:8 46:22 55:6
56:21 58:1
60:21 63:4
65:10 68:3
70:14,18 74:13
77:12 80:7,18
84:24 91:12
93:23 94:18
96:8 97:17,23
99:22 100:9
101:12 102:7,8
102:11 103:1,14
105:1,18 107:8
107:16 110:8
116:4 120:6
124:15 129:19
130:19 133:13
**timeframe** 130:8
**times** 38:2
108:24 111:19
125:8
**timing** 38:19
54:23
**tip** 26:10
**today** 4:15 5:4
19:21 22:4,7,14
22:19 35:20
36:11,19 37:5
55:24 82:4 84:5
98:24 111:8
113:11 116:18
118:25 127:13
129:9
**told** 9:14,15
10:12 13:3

37:25 56:16
70:4 87:11 88:5
120:24
**tom** 104:16,18
104:19,22 105:3
105:15,17 106:1
**tomorrow**
101:25 102:4
**tongue** 26:10
**tonight** 102:4
116:13
**top** 36:9 37:22
39:10,13,14 40:6
44:25 46:2
65:22 69:2,13
70:8 72:14
**topics** 127:3
**total** 51:25
**touch** 114:22
**trade** 112:6
**trading** 45:22,25
121:10
**transaction**
24:15 25:16,18
26:3,7 27:7 28:7
28:11 29:6,13
32:5,11,23 33:1
33:5,7,17 36:1,3
37:7 43:20 44:1
46:17 52:13
54:9,13,16,21
55:15 56:1,2,5
68:11,22 70:2
71:18,23,24
72:11,23 73:2,15
76:22 77:14
79:13,14 81:7
83:17 87:2,17

89:25 90:25
91:4 96:6 98:25
99:4,5,21 112:11
112:14,16,23
114:17,18 117:6
120:2 125:3
127:6,16 128:7
128:18,24,25
129:4,11,12
**transactions**
16:25 17:7,15,23
18:9 28:4 34:17
36:6,12,21 43:7
45:25 46:8,11
49:1 52:2 55:7
55:22 56:9,25
57:3 61:11
66:17,22 67:1
70:21 74:12
78:8,13 80:25
82:8 86:22
91:22 92:24
93:24 94:4,17
96:3
**transcript** 130:6
130:20 133:14
133:19
**transfer** 82:22
**transferred**
129:14
**transferring**
59:18
**transpire** 108:2
**transpired** 55:5
113:21 115:11
**travel** 102:19
**traveled** 41:10
67:19 85:4

**traveling** 67:15
84:25 102:9,15
106:18 111:25
120:7
**tray** 74:19
**trial** 38:17
**tried** 117:13,15
**true** 33:3,15
116:19 132:4
133:14
**trust** 8:22,24 9:3
9:6,9,11 17:22
18:7 35:16
44:17 56:12,19
57:9
**trustee** 14:9 16:9
16:15 56:12,15
56:16,19 57:23
61:24 106:21
**trusts** 60:20
**try** 5:14,19 8:20
121:25
**trying** 26:19
37:19 68:16,19
69:9 80:1
102:24
**turn** 63:6 64:8
104:3 117:18
**turned** 22:10
**two** 22:7,19
35:24 36:16
37:5 40:19 52:3
56:13 57:10,10
61:17 70:3
95:17 96:13
98:4 102:14,14
127:20

**type** 14:13 70:5
**typed** 119:4
**typical** 81:11
**typo** 119:15

**u**

**u** 109:25
**uh** 25:7 72:7
75:7 76:1
100:17 101:10
102:2
**understand** 4:14
4:17,21,23 5:13
6:1,10 17:3
32:13 36:25
43:4 46:20
**understanding**
6:14 41:7 45:18
46:21 48:17
55:18 66:9 80:2
128:12
**understood** 12:9
55:17
**unexpected**
41:15
**united** 1:1 133:1
**update** 84:4,9
**urgency** 78:21
**url** 87:14
**use** 5:23 19:10
19:14,21 20:14
20:17,18 21:19
21:20 69:2 84:5
98:8 115:23

**v**

**v** 130:4
**various** 21:1
68:14,23 74:14

74:16 80:23
88:9 113:16
117:1 125:8
**vegas** 25:23
26:14 37:21
85:5 86:6 100:4
**vehicle** 78:13
**verbal** 33:24
92:5
**verbatim** 111:15
**verify** 130:9
**veritext** 130:14
130:23 134:6
**veritext.com.**
130:15
**vet** 13:8 52:17
**victim** 11:24
**video** 4:9 84:15
**vietnam** 94:21
95:7,16,18,25
96:18
**vincent** 9:8
44:16 56:17
93:18 104:2
107:19 120:15
120:17
**virginia** 10:13
37:11
**visiting** 40:8
**vs** 1:5 133:5

**w**

**wait** 81:17
**walk** 85:18
**wall** 68:23
**want** 4:25 5:2,22
48:10 65:22
79:7 80:9 91:8

124:23 125:24
125:25 126:2
**wanted**   50:24,25
51:6,13 59:22
93:1 100:7
118:13
**wanting**   36:9
69:6,7 87:7
112:15 117:7,8
**ward**   104:16,18
104:19,22 105:3
105:7,15,17
**watched**   23:12
**water**   5:23 23:13
58:15
**way**   24:19 33:14
52:16 55:25
56:16 62:2
93:21 123:8
127:14
**we've**   47:25
97:20
**website**   87:14
**week**   22:23
84:16 100:4
107:12,23
**weeks**   22:7,19
**welcome**   48:7
**went**   13:23
37:12 41:3 51:1
52:20 67:21
107:2 123:17
125:12 127:9
**west**   10:13 37:11
85:1,2,5,14 86:5
86:5
**whatsapp**   20:17
20:18 21:23

**whatsoever**
79:25
**whereabouts**
82:21
**whichever**   69:22
**william**   9:8
44:16 82:16,23
83:4 84:10
93:18 104:1
107:18 120:15
121:25
**willy**   79:15,22
79:23
**wire**   82:10,21
114:19
**wired**   128:16
**wise**   80:1 110:18
**withdraw**   43:23
91:15 126:10
**withdrawal**
59:15
**withdrawals**
59:5,7
**witness**   1:16,22
53:6 65:19 66:1
129:18 130:8,10
130:12,19 132:1
133:13,15
**woman**   34:1
35:8,12
**word**   9:20
**work**   6:24 7:6
21:6 105:25
**worked**   7:9,10
7:10,11 14:24
15:23
**working**   6:22
7:19 42:21

55:22 71:16
76:22 77:1
79:13 90:25
93:2 99:8
105:13,17 117:5
**world**   77:15
100:8
**worth**   51:15
93:14 134:7
**wow**   81:21 82:5
**wright**   9:16,17
9:21 10:3,9,14
10:22,25 11:7,9
11:16 12:6 14:3
14:8
**wright's**   12:4,24
**write**   25:4 56:18
62:1 81:19
**written**   33:16,21
33:24 35:5,7,11
43:25 103:18
105:2
**wrong**   84:20
90:13 113:4
**wrote**   9:8 44:16
54:15
**www.bancopr...**
87:14
**wyoming**   8:25
115:24

|       x       |
| x   25:5 50:25 |
| 133:17         |

|       y       |
| **yeah**   9:7 13:18 |
| 27:15,18 34:13  |
| 39:15 48:24     |

53:23 58:14
61:6 65:18 68:1
70:6,12 74:7,21
81:23 85:3,24
98:10 108:20
114:11 118:19
121:16
**year**   6:17 17:20
**year's**   119:10
**years**   9:19 14:19
36:22 89:5
104:23 105:9
**yep**   88:16 97:7
**yesterday**   90:19
**yo**   125:14,14
**york**   1:2 2:4,9
67:19 88:12
102:9,17,21
103:2 104:7
111:25 112:3
120:11 133:2

|       z       |
| **zoom**   20:3 123:3 |
| 123:9          |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.